SMITH, GAMBRELL & RUSSELL, LLP
ANNE K. EDWARDS (SBN 110424)
    aedwards@sgrlaw.com
444 South Flower Street, Suite 1700
Los Angeles, California 90071
Telephone: 213-358-7200
Facsimile: 213-358-7310

MATTHEW J. O'HARA (*pro hac vice* forthcoming)
MEGHAN E. TEPAS (*pro hac vice* forthcoming)
311 South Wacker, Suite 3000
Chicago, Illinois 60606
Telephone: 312-360-6000

Attorneys for Defendants
SPINS LLC and DAAP LLC

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CROWNALYTICS, LLC,<br><br>Plaintiff,<br><br>v.<br><br>SPINS LLC, DAAP LLC, and CIRCANA, LLC, f/k/a/ Information Resources, Inc.,<br><br>Defendants,<br><br>v.<br><br>BEDROCK ANALYTICS LLC,<br><br>Respondent. | Civil Case No.: _:-__-cv-___<br><br>**NOTICE OF MOTION AND MOTION TO COMPEL COMPLIANCE OF SUBPOENA ISSUED TO BEDROCK ANALYTICS LLC; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>**SUPPORTING DECLARATIONS OF MEGHAN E. TAPAS AND JOHN PAVLENKOV**<br><br>**July 19, 2024**<br><br>**(Pending in the United States District Court for the District of Colorado, Civil Action No. 1:22-cv-01275)**<br><br>DATE:    TBD<br>TIME:    TBD<br>PLACE:    TBD |

Smith, Gambrell & Russell, LLP
444 South Flower Street, Suite 1700
Los Angeles, California 90071

TABLE OF CONTENTS

MEMORANDUM OF POINTS AND AUTHORITIES ................................................................3

BACKGROUND .................................................................................................................3

ARGUMENT ......................................................................................................................5

    I.  The Information SPINS Seeks is Relevant and Should Be Produced. ...........................6

    II.  Bedrock's Objections to Producing Confidential Information Should Be
        Overruled. ..........................................................................................................9

CONCLUSION..................................................................................................................11

**Smith, Gambrell & Russell, LLP**
444 South Flower Street, Suite 1700
Los Angeles, California 90071

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Smith, Gambrell & Russell, LLP**
444 South Flower Street, Suite 1700
Los Angeles, California 90071

<u>TABLE OF AUTHORITIES</u>

**Cases**

*3M v. Pribyl*, 259 F.3d 587, 603 (7th Cir. 2001) ........................................................ 10

*HP Turners, LLC v. Sykes-Bonnett*, Case No. 3:17-cv-05760-BHS, 2018 WL 10398217, at *3 (W.D. Wash. Dec. 6, 2018).......................................................................................... 13

*Huynh v. Wal-Mart Associates, Inc.*, Case No. 18-cv-01631-VC (SK), 2019 WL 13221170, at *1 (N.D. Cal. Aug. 1, 2019) (quoting *Moon v. SCP Pool Corp.*, 232 F.R.D. 633, 637 (C.D. Cal. 2005)) (cleaned up) ..................................................................................................... 9

*In re Reddit, Inc.*, Case No. 24-mc-8005-TSH, 2024 WL 477519, at *1 (N.D. Cal. Feb. 7, 2024) (quoting Fed. R. Civ. P. 26(b)(1))............................................................................. 8

*Moore v. James H. Matthews & Co.*, 550 F.2d 1207, 1218 (9th Cir. 1977)................................ 10

*PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002)............................................ 10

*Scalia v. Int'l Longshore & Warehouse Union*, 336 F.R.D. 603, 609 (N.D. Cal. 2020) (quoting *Oakes v. Halvorsen Marine Ltd.*, 179 F.R.D. 281, 283 (C.D. Cal. 1998) ................................ 9

*United States ex rel. Blaum v. Triad Isotopes, Inc.*, 104 F. Supp. 3d 901, 923 (N.D. Ill. 2015).. 11

*United States v. Empire Gas Corp.*, 537 F.2d 296, 303 (8th Cir. 1976)...................................... 10


**Statutes**

Federal Rules of Civil Procedure 37(a)(1) and 45(d)(2)(B)(i)................................................. 4, 6

Smith, Gambrell & Russell, LLP
444 South Flower Street, Suite 1700
Los Angeles, California 90071

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

<u>**NOTICE OF MOTION AND MOTION**</u>

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on July __, 2024 at X:00 a./p.m., or as soon thereafter as the matter may be heard, in the courtroom of Honorable _____, United States District Judge, Northern District of California, located at_____, the undersigned Petitioners will, and hereby do, move the Court for an order compelling Bedrock Analytics LLC ("Bedrock"), to produce documents pursuant to Petitioners' subpoena that was properly issued from the District of Colorado.

Defendants-Petitioners SPINS LLC and DAAP LLC ("Petitioners"), respectfully move this Court pursuant to Federal Rules of Civil Procedure 37(a)(1) and 45(d)(2)(B)(i) to compel Bedrock to produce documents pursuant to SPINS and DAAP's subpoena *duces tecum*, (the "Document Subpoena"). The Document Subpoena was properly issued out of the District of Colorado and served in litigation captioned *Crownalytics, LLC v. SPINS, LLC, et al.*, Case No. 1:22-cv-01275 (the "Litigation"). The motion is based on this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, the Declaration of Meghan E. Tepas ("Tepas Declaration" or "Tepas Decl."), the Declaration of John Pavlenkov ("Pavlenkov Declaration" or "Pavlenkov Decl."), the supporting exhibits, oral argument of counsel, and such other materials and argument as may be presented in connection with the hearing of the motion.

<u>**STATEMENT OF RELIEF SOUGHT**</u>

Petitioners seek an order compelling Bedrock to produce documents pursuant to Petitioners' lawful subpoena issued in the Colorado Litigation.

<u>**STATEMENT OF ISSUES TO BE DECIDED**</u>

1. Whether Bedrock should be compelled to produce documents that are relevant to the underlying litigation.

2. Whether Bedrock's objections to producing confidential information should be overruled.

<u>**LOCAL RULES 37-1 AND 37-2 COMPLIANCE**</u>

**Meet-and-Confer:** Petitioners conferred with Bedrock on the issues contained within this motion to compel, both in e-mail and telephonically, and could not reach an agreement. (Tepas Decl. ¶¶ 6-13.)

**Discovery Sought:** Request 4 of the Document Subpoena: "Documents sufficient to identify customers that purchased or otherwise obtained CPG Data Analytics from Bedrock, including the particular type of Data Analytics obtained, the brand or brands for which such Data Analytics were obtained, the price paid or payments received for such Data Analytics, and the duration of any contract governing such customer's purchase of such Data Analytics." (*See* Tepas Decl., Ex 2, at 8).

**Discovery Objection:** Response to Request for Production No. 4: "Bedrock objects to this Request on the ground that it is overly broad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and not proportional to the needs of the case. This action concerns IRI's and SPINS's alleged, anticompetitive 'arrangement expressly coordinating and combining their sale of data to NOCPG manufacturers,' and it is unclear how the identities of Bedrock's customers or the particulars of the services they purchased from Bedrock are relevant to the claims and defenses at issue in this action. Bedrock further objects to this Request on the ground that it calls for proprietary and competitively sensitive information that could be used by Defendants to the detriment of Bedrock." (*See* Tepas Decl., Bedrock's Response to Document Subpoena, attached as Ex. 4, at 4-5).

**Amended Request:** After SPINS received Bedrock's objections, the parties engaged in several meet-and-confer conferences (described further below) during which SPINS explained that Request 4 could be satisfied simply with the production of the contracts between Bedrock and its customers. (Tepas Decl., ¶ 7.) Those contracts contain all of the categories of information contained within Request 4: the identity of Bedrock's customers, the pricing terms, the duration of the contract, and the services offered by Bedrock to the customer. Bedrock continued to object to the request. (Tepas Decl., ¶ 8.)

Smith, Gambrell & Russell, LLP
444 South Flower Street, Suite 1700
Los Angeles, California 90071

## MEMORANDUM OF POINTS AND AUTHORITIES

Petitioners respectfully move this Court pursuant to Federal Rules of Civil Procedure 37(a)(1) and 45(d)(2)(B)(i) to compel Bedrock to produce documents pursuant to Petitioners' Document Subpoena. A copy of the Document Subpoena is attached as Exhibit 2 to the Tepas Declaration.[1]

## BACKGROUND

### *Summary of Underlying Action*

Defendants SPINS and Circana are in the business of collecting and curating point-of-sale (POS) data from grocery retailers and licensing that data to manufacturers of consumer packaged goods (CPGs) throughout the country. Plaintiff Crownalytics is a provider of data analytics services to CPGs who license POS data from a variety of sources.

In its Complaint against Defendants, Crownalytics has alleged that SPINS and Circana are two of three competitors in the "NOCPG"[2] market for the provision of retail tracking data. (See Tepas Decl., Ex. 1, ¶¶ 8, 26). Crownalytics' antitrust claims in the Litigation arise from Crownalytics' claims that SPINS and Circana have unreasonably used their combined market power in an alleged "NOCPG Data Market" to foreclose competition within an alleged "NOCPG Data Analytics Market" and that they conspired with each other to do so. (*Id.* ¶ 11.) Defendants dispute the existence of an "NOCPG" data market or "NOCPG" data analytics market.

Crownalytics alleges that SPINS and Circana worked in concert with respect to the alleged data market to force CPG customers for POS data to utilize SPINS for their data analytics needs with the alleged goal that SPINS would thereby capture a monopoly in the data analytics market. (Tepas Decl., at Ex. 1 ¶¶ 90, 96.) Crownalytics alleges competitive harm in the

---

[1] SPINS has also requested Bedrock's counsel that he accept service of the attached subpoena to Bedrock for a Rule 30(b)(6) deposition to take place in San Francisco on September 4, 2024. (*See* Tepas Decl., ¶ 16, Ex. 11.)

[2] The acronym is used by Crownalytics in its Complaint, which it says stands for Natural and Organic Consumer Packaged Goods.

analytics market as a result, including limitation on consumer choice, reduced quality of output, and increased prices. (*Id.* ¶ 97.)

Crownalytics further alleges that Nielsen, a large company that is a major source of POS data for CPGs is an "inferior third-place choice" after SPINS and Circana, thereby giving market power to SPINS and Circana to foreclose CPG customer choice regarding data analytics. (*Id.* ¶¶ 26, 35.)

*The Bedrock Subpoena*

Given the allegations and the claims brought by Crownalytics, on November 16, 2023, SPINS issued a subpoena duces tecum to Bedrock seeking information pertinent to the pending claims and defenses. (Tepas Decl., Exs. 2 (Subpoena), 3 (Proof of Service)). Bedrock is a third-party data analytics company, headquartered in Oakland, California, and is one of the companies selling in the data analytics market alleged in the Litigation. Crownalytics alleges that Bedrock is one of four principal competitors within the "NOCPG Data Analytics Market" and that it and Bedrock "served most customers" in the alleged market. (Tepas Decl., Ex. 1 ¶¶ 41-42.) Critically, Crownalytics alleges that Bedrock has been "cut off from its customers by SPINS an IRI" and that "no third party is providing analytics services to customers independently from the concerted effort of SPINS and [Circana]." (*Id.* ¶ 92.)

The Document Subpoena sought different categories of information related to Crownalytics's claims. As relevant here, Request 4 sought: 1) the identity of Bedrock's customers; 2) the types of data that Bedrock analyzed for its customers; 3) pricing information for the types of services that Bedrock offered its customers; and 4) the duration of the service contracts that Bedrock offered to its customers. These categories of information relate to the confines one of the alleged relevant markets (the data analytics market that Bedrock and Crownalytics compete in), as well as the competitive effects and harm Crownalytics alleges occurred in the market. SPINS later informed Bedrock after meeting and conferring that Request 4 could be satisfied if Bedrock produced the contracts between Bedrock and its customers, which would show all of the categories of information contained within Request 4.

Smith, Gambrell & Russell, LLP
444 South Flower Street, Suite 1700
Los Angeles, California 90071

*Meet-and-Confer Process*

On December 14, 2023, Bedrock served its written responses and objections to the Subpoena but did not produce any documents. (Tepas Decl., Ex. 4). Counsel for the parties participated in a meet-and-confer conference and, shortly thereafter, Bedrock produced approximately twenty documents.

Counsel for Bedrock and Petitioners then engaged in numerous additional meet-and-confer conferences (both by email and telephone), specifically to address the documents sought in Request 4, but were unable to reach consensus, thus necessitating this motion. (*See* Tepas Decl., Ex. 5; Ex. 8, Apr. 3.) During one such conference, Bedrock provided an additional description of its objection to producing customer contracts. (*See* Tepas Decl., Ex. 5.) First, Bedrock argued that its customer contracts are irrelevant to the claims and defenses at issue in the Litigation. Second, Bedrock asserted an unsubstantiated concern that disclosing the contracts will cause SPINS to threaten Bedrock's customers with "litigation[.]" (Tepas Decl., Ex. 5.)

Counsel for Bedrock and SPINS, as well as respective client representatives, participated in an additional meet-and-confer teleconference on June 26, 2024, after which Bedrock said it would consider its position further. After hearing nothing further for two weeks, counsel for SPINS followed up with counsel for Bedrock and in response, Bedrock indicated that there was no change to their position, and that Bedrock was unwilling to produce documents pursuant to Request 4. (Tepas Decl. ¶ 15.) Petitioners are only moving to compel production of documents with respect to Request 4; all other requests have been complied with.

## ARGUMENT

The Court should order Bedrock to produce documents requested under Amended Request No. 4. Rule 26 allows discovery "regarding any non-privileged matter that is relevant to any party's claim or defense and proportional to the needs of the case[.]" *In re Reddit, Inc.*, Case No. 24-mc-8005-TSH, 2024 WL 477519, at *1 (N.D. Cal. Feb. 7, 2024) (quoting Fed. R. Civ. P. 26(b)(1)). "The scope of allowable discovery under Rule 45 is the same as the scope of discovery

Smith, Gambrell & Russell, LLP
444 South Flower Street, Suite 1700
Los Angeles, California 90071

permitted under Rule 26(b)." *Id.* Under Rule 45(d), a subpoena recipient should produce documents unless the production would cause a non-party to be subject to an undue burden. "[A]n evaluation of undue burden requires the court to weight the burden to the subpoenaed party against the value of the information to the serving party and requires the court's consideration of such factors as relevance, the need of the party for the documents, the breadth of the document request, the time period covered by it, the particularity with which the documents are described and the burden imposed." *Huynh v. Wal-Mart Associates, Inc.*, Case No. 18-cv-01631-VC (SK), 2019 WL 13221170, at *1 (N.D. Cal. Aug. 1, 2019) (quoting *Moon v. SCP Pool Corp.*, 232 F.R.D. 633, 637 (C.D. Cal. 2005)) (cleaned up). "The party resisting discovery 'has the burden to show that discovery should not be allowed, and has the burden of clarifying, explaining, and supporting its objections.'" *Scalia v. Int'l Longshore & Warehouse Union*, 336 F.R.D. 603, 609 (N.D. Cal. 2020) (quoting *Oakes v. Halvorsen Marine Ltd.*, 179 F.R.D. 281, 283 (C.D. Cal. 1998)).

The Court should grant SPINS's motion to compel the information sought in the Document Subpoena and now at issue because it is relevant to claims in the underlying litigation, the burdens on Bedrock are proportional to the needs of the case, and a protective order in that litigation more than adequately addresses Bedrock's confidentiality concerns.

### I. The Information SPINS Seeks is Relevant and Should Be Produced.

Petitioners seek documents whose relevance to the case is beyond dispute. Specifically, SPINS has requested that Bedrock produce the data analytics service contracts between Bedrock and its customers as a means to satisfy Request 4. These customer contracts would show the following information: 1) the identity of customers, 2) the types (*e.g.,* POS data or other types of data relevant to CPGs) and sources of data (*e.g.,* SPINS, Circana, Nielsen, retailer portals, and CPG brokers) analyzed, 3) pricing information, and 4) the duration of the contract. This information is critical to understanding market behavior and analyzing and testing the allegations in the Litigation regarding market definition and competitive harm to the alleged market.

Crownalytics has alleged that SPINS's activities in the alleged data analytics market has effectively foreclosed the data analytics market. Bedrock's customer contracts, and the information contained within those documents, relate directly to Crownalytics's allegations of foreclosure and conspiracy to monopolize the market in favor of SPINS, because the extent of Bedrock's ongoing and active participation within the market would necessarily defeat Crownalytics's claims. Moreover, Bedrock's participation in the market is relevant to both the market definition and whether Bedrock, *or any other* "third party," is experiencing anticompetitive effects.

Plaintiff alleges that SPINS's conduct has led to increased prices, reduced output, lessened quality, and overall competitive harm in the alleged NOCPG Data Analytics Market. Moreover, Plaintiff alleges that Petitioners' conduct has led to third-party data analytics companies to be driven from the market. Plaintiff has specifically named Bedrock as a competitor that has "been cut off from [its] customers" and that "no third party is providing analytics services to customers independently from the concerted effort of SPINS and [Circana]." (Tepas Decl., Ex. 1 ¶ 92.) The extent of Bedrock's continued operation in the market, the prices that Bedrock charges to its customers, the sources of data Bedrock analyzes for CPGs, and the identity of its customers are all relevant data points to determine whether Bedrock in fact no longer can compete in the alleged market and to analyze economic behavior in the alleged market. *See Moore v. James H. Matthews & Co.*, 550 F.2d 1207, 1218 (9th Cir. 1977) (noting that the relevant market is determined by products of similar price, use, quality, and characteristics); *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (noting that the relevant market is determined by products of similar price and quality); *3M v. Pribyl*, 259 F.3d 587, 603 (7th Cir. 2001) (price and quality are relevant factors when evaluating whether products are reasonably interchangeable); *United States v. Empire Gas Corp.*, 537 F.2d 296, 303 (8th Cir. 1976) (price and quality must be considered when analyzing the availability of substitute products).

As explained above, Bedrock is a provider of data analytics services and currently an active market participant, and the facts and circumstances surrounding Bedrock's relationships, which is contained entirely within the contracts Bedrock enters into with its customers, serve to disprove, among other things, Plaintiff's allegations that there are now no firms in the market who perform data analytics services other than SPINS, that SPINS provides an inferior service , that customers pay inflated prices for data analytics services, and that SPINS and Circana have the market power to raise prices or restrict output of data analytics services. *See United States ex rel. Blaum v. Triad Isotopes, Inc.*, 104 F. Supp. 3d 901, 923 (N.D. Ill. 2015) ("a plaintiff must show that the defendants' conduct had an anticompetitive effect in a relevant market, and that the defendants have market power in that market"). Moreover, the identity of Bedrock's customers is crucial to testing Crownalytics's claims that CPGs are forced to deal with SPINS and Circana because Nielsen is an undesirable "third-place choice" and that CPG customers who can no longer utilize Crownalytics to analyze data from SPINS or Circana have been forced to turn to SPINS for data analytics rather than to other reasonably close substitutes such as the services of Bedrock. Customer identities assist in analyzing economic behavior in the marketplace, such as evidence that a particular CPG decided not to purchase SPINS's analytics products, turned to Bedrock as a substitute for Crownalytics, or relied upon Nielsen POS data. Therefore, the information contained in Bedrock's contracts with its customers (pricing information, sources of data analyzed, and identity of customer) is critical to Petitioners' defense.

The request is also particularly tailored to receive this result. Because all the information sought by Request 4 is contained in the contracts Bedrock has with its customers, the Request 4 is narrowly tailored to seek only the information necessary to test Crownalytics's allegations concerning market definition, SPINS's and Circana's market power, harm to competition and monopolization.

## II. Bedrock's Objections to Producing Confidential Information Should Be Overruled.

Bedrock has objected to producing pricing information because such information is either confidential or proprietary. Specifically, Bedrock argues that it "is concerned that, if SPINS receives Bedrock's customers' identities, SPINS will subpoena them as well, and use the threat of compelling discovery from them to induce them to cease doing business with Bedrock." (*See* Tepas Decl., Ex. 5). This objection is both factually unfounded and legally insufficient and should be rejected.

In an attempt to support Bedrock's objection, Bedrock's counsel referred to a letter sent by SPINS in *2019* to Bedrock in which SPINS advised Bedrock that it was not permitted to access SPINS' data that is licensed by SPINS' and Bedrock's mutual client via the customers log-in credentials. Rather, as SPINS' contracts with CPGs explicitly require, a third party such as a CPG customer's consultant (like Bedrock), must obtain a "Third-Party Agreement" (TPA) in order to access SPINS' data. (Tepas Decl., Ex. 6.) That letter was sent over five years ago and accurately explains SPINS' contract requirements. Nor did Bedrock dispute SPINS' assertion of contract rights. In fact, after SPINS sent this 2019 letter to Bedrock, Bedrock and SPINS entered into six separate TPAs in 2020 and 2021 allowing Bedrock to access SPINS-licensed information for six CPG customers. (Pavlenkov Decl. ¶2.) The letter does not provide any excuse for Bedrock's refusal to now comply with a validly issued subpoena.

Moreover, there is a robust Protective Order in place that provides sufficient protection for Bedrock and alleviates any concerns Bedrock may have about how documents that are produced in this case may be used. That Protective Order was entered in the Litigation on June 21, 2023 (*See* Tepas Decl., Ex. 7 at B:11-B:19.) As Bedrock is aware, the Protective Order permits any producing party—including third parties—to designate appropriate documents as Confidential or Attorneys' Eyes Only. As to both categories of documents, *no document produced in discovery in the Litigation may be used outside of the Litigation*. (Tepas Decl., Ex. 7 at B-12 ¶¶ 5-7.) Attorneys'-Eyes-Only documents may not be seen by anyone other than outside

**Smith, Gambrell & Russell, LLP**
444 South Flower Street, Suite 1700
Los Angeles, California 90071

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

counsel for the parties, expert witnesses, and the general counsels of SPINS and Circana. (*Id.* ¶ 7). The Protective Order is also clear that any third-party subpoena recipient may request that its "Attorneys' Eyes Only" designated documents be restricted even from the parties' in-house counsel. (*Id.* ¶ 7(b).)

As Bedrock's counsel admits, "it is true that Bedrock can produce this information on an attorneys' eyes only basis under the protective order in place in this litigation[.]" (Tepas Decl., Ex. 5.) There is no reason to believe that SPINS' counsel will disclose the identity of Bedrock's customers to SPINS. The Protective Order's protections are mandated and enforced by a court order and directly address Bedrock's stated concerns regarding producing sensitive information. Accordingly, Bedrock has no valid basis upon which to refuse to comply with the subpoena. *See HP Turners, LLC v. Sykes-Bonnett*, Case No. 3:17-cv-05760-BHS, 2018 WL 10398217, at *3 (W.D. Wash. Dec. 6, 2018) (denying a motion to quash where the subpoena recipient's concerns regarding the confidentiality of requested information was belied by the protective order because "the parties must proceed as the protective order and addendum to the protective order instruct"). In addition, Petitioners' outside counsel are bound by professional obligations, as well as their duties as officers of the Court. Bedrock has no legitimate basis to continue to refuse to produce responsive documents on the unsupported purported concern that SPINS (or SPINS' lawyers) may flaunt the protective order.

Finally, Bedrock's objection that SPINS will use Bedrock's information to subpoena Bedrock's customers in the litigation and then strong-arm them to cease doing business with Bedrock is unsupported and far-fetched. SPINS has no such intention. SPINS' notification to Bedrock in 2019 informing Bedrock of SPINS' contract rights was entirely appropriate and not tortious in any respect. Bedrock and SPINS already have TPAs with specific CPGs allowing Bedrock to access SPINS information licensed to those CPGs. Moreover, with the exception of customers of Bedrock that are also SPINS customers and have already been identified in the litigation, SPINS has no intention of subpoenaing any of Bedrock's customers and has no

intention of using the Subpoena as a springboard to issue new subpoenas as a way to compete with Bedrock.

## **CONCLUSION**

For the foregoing reasons, Petitioners SPINS and DAAP respectfully request that this Court (i) grant their motion to compel; (ii) order Bedrock to supplement its production in response to Request 4 of the Subpoena; (iii) award Petitioners their reasonable expenses, including attorneys' fees, associated with litigating this motion; and (iv) grant any other such relief that the Court deems fair and just.

DATED: July 22, 2024                    SMITH, GAMBRELL & RUSSELL, LLP


By:   _____*/s/ Anne K. Edwards*_____
         Anne K. Edwards
         Attorneys for Defendant/Petitioner
         SPINS LLC and DAAP LLC

**Smith, Gambrell & Russell, LLP**
444 South Flower Street, Suite 1700
Los Angeles, California 90071

## DECLARATION OF MEGHAN E. TEPAS

I, Meghan E. Tepas, declare as follows pursuant to 28 U.S.C. § 1746:

1.      I am a partner at the law firm of Smith, Gambrell & Russell, LLP in its Chicago office. I am one of the attorneys representing Defendants-Petitioners SPINS LLC and DAAP LLC in litigation pending in the United States District Court for the District of Colorado, styled *Crownalytics, LLC v. SPINS LLC, et al.*, 22:cv-01275-NYW-JPO (the "Litigation"). I submit this Declaration in support of the motion of Defendants-Petitioners ("Petitioners") to compel compliance with a document subpoena. I am fully familiar with the facts and circumstances set forth below.

2.      The current complaint in the Litigation is a six-count complaint alleging Sherman Act antitrust claims against the Defendants for group boycott, tying, and conspiracy to monopolize. A copy of the First Amended Complaint in the Litigation is attached hereto as **Exhibit 1**.

3.      SPINS issued a subpoena duces tecum to Bedrock Analytics LLC ("Bedrock"), seeking information pertinent to the pending claims and its defenses (the "Subpoena"). The Subpoena was served on Bedrock on November 16, 2023. True and accurate copies of the Subpoena and proof of service are attached hereto as **Exhibits 2 and 3** respectively.

4.      Bedrock is a third-party data analytics company, headquartered in Oakland, California, and is one of the companies selling in the allegedly now foreclosed data analytics market alleged in the Litigation.

5.      On December 14, 2023, Bedrock served SPINS its responses and objections to the Subpoena. A true and correct copy of Bedrock's responses and objections are attached hereto as **Exhibit 4.** Bedrock did not produce any documents at that time.

6.      Shortly thereafter, I participated in a meet-and-confer conference with Bedrock's counsel. Bedrock then produced approximately twenty documents. However, Bedrock did not produce documents pursuant to Request 4.

SMITH, GAMBRELL & RUSSELL, LLP
444 SOUTH FLOWER STREET, SUITE 1700
LOS ANGELES, CALIFORNIA 90071, UNITED STATES OF AMERICA
TELEPHONE: 213-358-7200

7.      Thereafter, I engaged in multiple additional meet-and-confer conferences with counsel for Bedrock (both by email and telephone), but we were unable to reach consensus on Request 4. During those conferences, I explained in more detail the types of documents SPINS is seeking under Request 4 and why. In particular, I indicated that production of customer contracts would satisfy Request 4.

8.      After our conversation, counsel for Bedrock, Christopher Edgar, sent me an email stating that Bedrock was objecting to production of the customer contracts. A true and correct copy of this e-mail chain is attached hereto as **Exhibit 5**.

9.      As purported support of Bedrock's refusal to produce its customer contracts, Mr. Edgar sent me a letter that SPINS sent to Bedrock on July 12, 2019. A true and correct copy of the July 12, 2019, letter to Bedrock is attached hereto as **Exhibit 6**.

10.     I then participated in another meet-and-confer with Bedrock's counsel to further discuss Bedrock's concerns.

11.     During the conference, I explained that Bedrock's objection to producing documents on the basis that they are confidential was without merit and did not constitute a legitimate basis to withhold responsive documents because the parties to the Litigation have a robust protective order in place, which even allows for an "Attorneys' Eyes Only" designation.  The protective order in the District of Colorado also allows a third party to designate documents such that they would not even be accessible to in-house counsel. (Ex. 2, B-13, ¶ 6(b).) A copy of the protective order was provided to Bedrock at the time the Subpoena was served.  (*See* Ex. 2 at B-10).[1]

---

[1] The original protective order was amended on January 31, 2024, to address the departure of one of the parties' in-house counsels who was previously named specifically in the original protective order. A true and correct copy of the Amended Protective Order is attached hereto as **Exhibit 7.** The modification has no material effect on the issue presented in this motion.

SMITH, GAMBRELL & RUSSELL, LLP
444 SOUTH FLOWER STREET, SUITE 1700
LOS ANGELES, CALIFORNIA 90071, UNITED STATES OF AMERICA
TELEPHONE: 213-358-7200

**DECLARATION OF MEGHAN E. TEPAS RE MOTION TO COMPEL**

12.    Mr. Edgar again responded indicating that Bedrock did not change its position and that it would continue to object on the ground that Bedrock did not believe that customer contracts would contain relevant information and that Bedrock was concerned that SPINS would threaten Bedrock's customers with litigation. (*See* Ex. 5.)

13.    Mr. Edgar and I continued to exchange e-mails concerning the objections Bedrock raised. A true and correct copy of an April 3, 2024, e-mail chain, is attached hereto as **Exhibit 8.** A true and correct copy of a June 17, 2024, e-mail chain, is attached hereto as **Exhibit 9**. A true and correct copy of a July 9, 2024, e-mail chain is attached hereto as **Exhibit 10**.

14.    Additionally, on June 26, 2024, I participated in an additional meet-and-confer teleconference with counsel for Bedrock. Representatives from both clients also participated. After this conference, Bedrock said it would consider its position further.

15.    Two weeks later, I followed up, but counsel for Bedrock indicated that there was no change to their position, and that Bedrock was unwilling to produce documents pursuant to Request 4 of the Subpoena.

16.    I have requested that Mr. Edgar accept service of a deposition subpoena to Bedrock for a Rule 30(b)(6) deposition to take place in San Francisco on September 4, 2024. Mr. Edgar responded indicating that he will accept service on behalf of Bedrock. A true and correct copy of the deposition subpoena served on Bedrock is attached hereto as **Exhibit 11.**

I declare under penalty that the foregoing is true and correct.

Executed on this 22nd day of July, 2024.

_____
    /s/ Meghan E. Tepas
    Meghan E. Tepas

SMITH, GAMBRELL & RUSSELL, LLP
444 SOUTH FLOWER STREET, SUITE 1700
LOS ANGELES, CALIFORNIA 90071, UNITED STATES OF AMERICA
TELEPHONE: 213-358-7200

# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:22-cv-01275-NYW-SKC

CROWNALYTICS, LLC, a Colorado Limited Liability Company

Plaintiff,

v.

SPINS LLC, a Delaware Limited Liability Company; DAAP, LLC a
Delaware Limited Liability Company; and INFORMATION
RESOURCES, INC., a Delaware Corporation

Defendants.

---

## FIRST AMENDED COMPLAINT AND JURY DEMAND

---

This is an action for damages and injunctive relief under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and other federal and state laws, including the Colorado Antitrust Act, Colo. Rev. Stat. § 6-4-101 *et seq.,* arising out of the unlawful and anticompetitive practices of Defendants SPINS, LLC ("SPINS"); DAAP, LLC ("DAAP"); and Information Resources, Inc. ("IRI") (collectively, "Defendants"). Crownalytics alleges as follows upon actual knowledge with respect to itself and its own acts and upon information and belief as to all others:

## I.   <u>**JURISDICTION AND VENUE**</u>

1.      This Court has subject matter jurisdiction over Crownalytics's claims relating to violations of Sections 1 and 2 of the Sherman Act, under 28 U.S.C. §§ 1331 and 1337, and 15 U.S.C. § 15. The Court has supplemental jurisdiction over Crownalytics's state law claims pursuant to 28 U.S.C. § 1367(a). Crownalytics's federal and state law claims arise from the same events and transactions, involve substantially identical issues of fact and law, and are so related to each other that they form part of the same case or controversy under Article III of the United States Constitution. These actions have affected interstate commerce.

2.      This Court has personal jurisdiction over Defendants because they each transact business in the District of Colorado, are registered with the Colorado Secretary of State, and maintain registered agents for service of process in Colorado. Crownalytics, a Colorado company, is a competitor in the data analytics market and is being injured by Defendants' anticompetitive conduct. A substantial part of Defendants' wrongful acts occurred in and were directed to the District of Colorado. Both IRI and SPINS serve Colorado-based customers and over two dozen of Crownalytics's and SPINS's mutual customers reside in Colorado.

3.      Venue is proper in this judicial district under 15 U.S.C. § 22 and 28 U.S.C. § 1391. A substantial part of Defendants' wrongful acts occurred in and were directed to the District of Colorado.

## II.  **THE PARTIES**

4.      Plaintiff Crownalytics is a Colorado Limited Liability Company with its principal place of business at 9455 Crystal Lane, Longmont, CO 80503. Crownalytics is a data-agnostic analytics and insights consulting company that provides data analytics services to customers that manufacture and sell natural and organic consumer packaged goods ("NOCPG"). NOCPG is an industry-recognized segment in the broader consumer packaged goods marketplace. Crownalytics turns hard-to-use retail sales tracking data purchased by its customers into meaningful and actionable information and insights that help them optimize their sales and marketing strategies. Crownalytics has competed and thrived in this market for years by offering premium services at the lowest prices in the industry.

5.      Defendant SPINS is a Delaware Limited Liability Company with its principal place of business at 222 W. Hubbard Street, Suite 300, Chicago, IL 60654. SPINS provides retail tracking data (also called purchase or point-of-sale data) relevant to the NOCPG industry. These are data collected from retail sales channels which customers of SPINS can then buy a license to access and use. Since 2017, SPINS also has provided data analytics services in competition with independent providers. SPINS provides these services both directly and through its subsidiary, DAAP. Since 2021, SPINS also has marketed a data analytics tool called PowerTabs.

6.      Defendant DAAP is a Delaware Limited Liability Company with its principal place of business at the same location as SPINS, 222 W. Hubbard Street, Suite 300, Chicago, IL 60654. Upon information and belief, SPINS owns, at a minimum, a controlling interest in DAAP, and DAAP may be a wholly owned subsidiary of SPINS. DAAP also provides data analytics services. Upon information and belief, DAAP participated, or was an instrumentality of SPINS, in the planning and execution of the wrongful conduct and conspiracy alleged in this complaint. (References to "SPINS's data analytics services" refer to analytics services offered by SPINS

and/or DAAP.)

7.      Defendant IRI is a Delaware Corporation with its principal place of business at 203 N. LaSalle Street, Suite 1500, Chicago, IL 60601. IRI also provides retail tracking data relevant to NOCPG manufacturers. IRI provides retail tracking data in other market segments as well. As with SPINS, IRI's customers buy a license to access and use these data. IRI also offers data analytics services in this market directly and through its partnership with its data analytics competitor, SPINS.

## III.    NATURE OF THE ACTION

8.      Defendants IRI and SPINS are two of the three competitors in the market for the sale of retail tracking data relevant to NOCPG manufacturers ("NOCPG Data Market" or "Data Market"). Defendants collect these point-of-sale data from retailers and sell licenses to use that retail data to NOCPG manufacturers. These manufacturer customers buy the data from IRI and SPINS, and then employ data analytics firms like Crownalytics to analyze the data for them.

9.      Crownalytics provides data analytics services to NOCPG manufacturers. The market for data analytics services provided to manufacturers of NOCPG ("NOCPG Data Analytics Market" or "Data Analytics Market") was competitive until Defendants began working together to foreclose competition in that market.

10.     Because the NOCPG Data Market is upstream from the Data Analytics Market, the state of competition—or lack thereof—in the NOCPG Data Market has consequences for the Data Analytics Market.

11.     SPINS and IRI by themselves have sufficient market power in the NOCPG Data Market to foreclose competition in the downstream Data Analytics Market. But, as explained further below, SPINS and IRI working in concert are even better positioned to do so. At issue here is IRI's and SPINS's use of their market power individually and jointly in the NOCPG Data

Market—in which they are horizontal competitors—to drive out competition from the Data Analytics Market—in which they also are horizontal competitors of each other and Crownalytics.

12.     In the three-supplier NOCPG Data Market, direct competitors IRI and SPINS decided to forgo competition and instead entered an agreement to combine and coordinate the sale and provision of their competing data sets.  Under this current and ongoing anticompetitive and illegal agreement not to compete, SPINS serves as the primary sales and distribution channel for IRI's NOCPG data as well as the sole sales channel for its own data. As a result of its arrangement with IRI, SPINS—and only SPINS—also offers a bundle of IRI and SPINS retail tracking data (hereafter, the "SPINS/IRI Bundle"). Neither the IRI or SPINS data, nor the SPINS/IRI Bundle, can be replicated, so the barriers to entry for this market are high and new entry is impractical and improbable. This ongoing horizontal agreement between SPINS and IRI constitutes a *per se* antitrust violation because it involves two separate economic entities that should compete, but instead have agreed to allocate markets and fix prices.

13.     While it is possible for at least some large customers to procure IRI data separately from IRI (and not as part of the SPINS/IRI Bundle), to ensure that SPINS is the primary if not sole channel through which the vast majority of NOCPG manufacturers procure IRI data (i.e., to perfect Defendants' market-allocation and price-fixing agreements), IRI prices its standalone data at two to three times the price at which it can be purchased as part of the SPINS/IRI Bundle.

14.     The intended result is to make buying IRI data directly from IRI economically irrational for most customers who instead buy the SPINS/IRI Bundle. For example, over eighty percent of Crownalytics's customers for analytics services buy the SPINS/IRI Bundle. Another ten percent purchase SPINS data alone.

15.     At first, the focus of Defendants' SPINS/IRI Bundle seemed to be the elimination of competition between themselves in the NOCPG Data Market, as well as raising barriers to other

data rivals (Nielsen) thereby harming competition and customers in this NOCPG Data Market.

16.    But in 2019, Defendants began using their market power in the Data Market to ultimately take over the Data Analytics Market as well. To that end, in March 2019, SPINS and IRI announced an expansion of their conspiracy, including the offering of what they labeled "advanced analytics solutions."

17.    Although they called their analytics "advanced," the reality is that the 2019 offering of analytic capability from SPINS for use with IRI data was underwhelming. Customers— since they still had the choice—continued to use Crownalytics and other third-party analytics providers based on the combinations of pricing and quality.

18.    Rather than compete on the merits, in 2021, SPINS and IRI agreed to take things a step further, using their Data Market power in a new way: to foreclose Crownalytics and others from competing with them in the Data Analytics Market, and coerce their data customers to use Defendants' analytic solutions.  In doing so, of course, Defendants also would (and did) increase prices and lower quality to customers in the Data Analytics Market.

19.    To accomplish their anticompetitive scheme, Defendants coordinated to simultaneously alter their prior business practices of many years to: (a) prohibit all of their NOCPG manufacturing customers who buy Defendants' data from doing business with Crownalytics (and other third-party analytics providers) in the Data Analytics Market; (b) prohibit these same customers from purchasing stand-alone software from Crownalytics to self-analyze Defendants' data; and (c) condition the sale of Defendants' NOCPG data—both the SPINS/IRI Bundle and each of their data sets separately—on the manufacturers' agreement either not to use other firms that compete with Defendants in the Data Analytics Market or to buy Defendants' data analytics services in that market.

20.    Remarkedly SPINS admitted it was not acting alone in its efforts to exclude

5

independent analytics providers.  To the contrary, SPINS ultimately admitted in a 2022 letter to Crownalytics that IRI "directed SPINS not to provide IRI data to Kris [Crown] or Crownalytics." This reflects the reality that, as the main distributor of IRI's data, SPINS would have needed IRI's approval before it could impose conditions on the purchase of IRI data via the SPINS/IRI Bundle.

21.     This conduct violates Sections 1 and 2 of the Sherman Act as: (a) a group boycott of Crownalytics—a *per se* violation of Section 1 of the Sherman Act; (b) illegal tying in violation of Sections 1 and 2 of the Sherman Act; and (c) a conspiracy to monopolize in violation of Section 2 of the Sherman Act. This conduct also violates the Colorado Antitrust Act.

22.     To advance Defendants' anticompetitive scheme, SPINS has promoted and sold SPINS PowerTabs tools and services, in breach of a contract with Crownalytics by which it specifically agreed that SPINS may not use Crownalytics's confidential information and reports as a basis to develop or have a third party develop an Excel-based report substantially similar to Crownalytics data analytics reports. Instead, SPINS used Crownalytics's confidential information and reports to create SPINS's substantially similar Excel-based PowerTabs tools and services.

## IV.     THE RELEVANT PRODUCT AND GEOGRAPHIC MARKETS

23.     To analyze the conduct alleged, there are two relevant product markets: the NOCPG Data Market and the NOCPG Data Analytics Market. The geographic scope of both these markets is national.

### A.     The Relevant Product Markets

#### 1.     The NOCPG Data Market

24.     In the NOCPG Data Market, three providers collect and sell retail tracking data from various retail channels that are relevant to NOCPG manufacturers. These data are stored in databases that the providers maintain. Access to and use of these data are then sold to NOCPG manufacturers. Defendants IRI and SPIN have developed massive databases that are highly

6

relevant to NOCPG customers. SPINS and IRI are competitors in the NOCPG Data Market.

25.     IRI's data include point-of-sale transactions from large grocery chains and retail outlets. SPINS's data is an exclusive collection of point-of-sale transactions from more specialized, often regional, natural and organic retailers.

26.     A third data collection company is The Nielsen Company, LLC (Nielsen). Like IRI, Nielsen also collects data from retail channels. Customers in the NOCPG Data Market appear to consider Nielsen's data set a third-place choice when compared to either SPINS's or IRI's data. It is unclear whether this is because of the relevance of the retailers from whom Nielsen collects data, or because of the effectiveness of IRI and SPINS's anticompetitive conduct.

27.     Customers in the NOCPG Data Market are manufacturers of NOCPG. To identify and obtain the best advertising, sales channels, and other opportunities necessary to launch and sell NOCPG, these customers look to historical data relating to sales of both their own and other NOCPG. As noted, these data are collected at the point-of-sale from sales channels ranging from large grocery chains (such as Kroger and Walmart) to more specialized and often regional natural and organic retailers and sales channels.

28.     Both SPINS and IRI offer their data as a standalone product. But rather than competing, they coordinate the sale of their data via the SPINS/IRI Bundle. The price for the IRI data as part of the SPINS/IRI Bundle is significantly (two to three times) lower than the price IRI charges for the identical data on a standalone basis, rendering it economically irrational for nearly all data customers to buy the IRI data separately from IRI. Indeed, the pricing is strategic, as it serves to support Defendants' conspiracy and not any efficiencies delivered to the market. Importantly, SPINS does not identify which data are SPINS's data and which data come from IRI in the SPINS/IRI Bundle—although on its website and elsewhere SPINS promotes the fact that the SPINS/IRI Bundle includes IRI data.

29.     Replication of either the SPINS or IRI database, let alone the SPINS/IRI Bundle, is impossible due to, among other factors, exclusive contracts and relationships that SPINS and IRI have taken years to establish and cement with retail channels. As SPINS explains on its website, the SPINS/IRI Bundle is "the industry's only source of cross-channel visibility across the full market landscape." SPINS then explains why: "through exclusive retail partnerships, SPINS is the only place to access point of sale data from hundreds of leading natural, regional, and specialty retailers where emerging trends are often seen first."[1]

30.     Along with exclusive agreements, the time and cost of replicating these data sets is prohibitive. In a complaint that IRI filed against Nielsen in 1997 alleging monopolization of the retail tracking data market, IRI described the barriers to entering that market, which still exist:

> 34. The cost of entering a retail tracking services market, whether using audit-based or scanner-based technology is high. In order to offer its InfoScan service in the United States, for example, IRI had to first create an enormous database of sales and "causel" data measuring consumer purchases at thousands of retail outlets throughout the country. IRI also had to employ hundreds of computer technicians, software engineers, field personnel and client service staff, construct a computer processing facility, and develop complicated computer software systems. IRI then had to develop the expertise to organize, process, and manipulate the vast amounts of scanner data involved in providing a national retail tracking service.

> 35. Moreover, before IRI could begin offering a competitive retail tracking service, it had to accumulate at least 12 to 18 months of data for comparative purposes so that clients could measure trends and changes affecting sales of their products. Stated differently, a supplier typically has to collect and process data for a year-and-a-half before it is in a position to be able to generate revenues and compete effectively in a market for retail tracking services.[2]

31.     Indeed, IRI's complaint explains in detail "the high barriers to entry that characterize these markets" (referring to the broader consumer packaged goods marketplace).[3]

---

1.      *See* https://www.spins.com/insights-and-tools-for-brands/ (last visited on May 30, 2023).
2.      *See Information Resources, Inc. v. The Dun & Bradstreet Corp., et al.*, First Amended Complaint ¶¶ 34-35, Dkt. 1-1.
3.      *Id.* ¶ 95.

These include a long history of industry concentration; high costs to enter the market and also to compete in the market after entry, including those related to developing and maintaining proprietary software systems and "unique expertise"; the long period—twelve to eighteen months—that data must cover before they can be used to identify trends or changes in marketplace behavior; the costs to collect large amounts of data often enough to be useful to customers as well as the costs to store these data and deliver them to customers.[4] According to IRI, "[b]ecause of the high costs associated with providing a retail tracking service, upon information and belief, at a minimum, an efficient supplier must have a share of between 35% and 40% of the United States Market just to break even or achieve a minimum viable scale."[5]

32.    NOCPG manufacturers determine individually which databases include the data most relevant to their business plans. Nearly all customers in the NOCPG Data Market (over eighty percent) buy the SPINS/IRI Bundle.

33.    Accordingly, both SPINS and IRI, individually, have market power in the NOCPG Data Market. Additionally, when acting in concert, the two together possess even more significant market power in the NOCPG Data Market.

## 2.    The Data Analytics Market

34.    After purchasing data in the NOCPG Data Market, NOCPG manufacturers must then analyze those data to identify various market attributes that will help them optimize their sales and marketing strategies. The value of the data lies not in the data themselves, but, rather, in the conclusions to be drawn from them by using data analytics services. Likewise, there is no value to data analytics services without a data set on which to perform them. Crownalytics is one provider of these data analytics services and, until these recent anticompetitive actions by Defendants drove

---

4.    *Id.* ¶¶ 123-127.
5.    *Id.* ¶ 128.

them from the market, the most aggressive among the competitors in terms of the price and value of its services.

35.     The Data Analytics Market is the market in which NOCPG manufacturers obtain data analytics services. The suppliers include experienced third-party data analytics services firms with specific expertise in analyzing point-of-sale data—provided by IRI and SPINS and, to a lesser extent, Nielsen. The data from Nielsen are not interchangeable with the data from IRI and SPINS. That is, many customers or potential customers require data from SPINS and/or IRI and analytics services for that respective data. The customers are manufacturers of NOCPG who retain providers of data analytics services to help them optimize their sales and marketing strategies.

36.     Before the exclusionary conduct that is the basis for this complaint, most customers in the NOCPG marketplace relied entirely on third-party data analytics services providers (like Crownalytics) to analyze the NOCPG data.

37.     Because of the significant associated costs, self-provisioning is not a viable alternative to third-party provisioning of data analytics for most NOCPG data analytics customers. For most of these customers, it would not make business sense to attempt to analyze NOCPG data on their own or to invest in developing the capability to do so. (To place this in perspective, the average charge from Crownalytics for analytics services for a year was only $20,000.) Third-party data analytics providers like Crownalytics permitted these customers to avoid the costs associated with hiring and retaining in-house data analytics experts and the investment necessary to stay current with analytics tools and expertise. Certain large, sophisticated NOCPG manufacturer customers may perform *some* data analysis themselves, using "in-house" professionals, but even most of these customers still purchase data analytics services from third parties to supplement their internal data analytics.

38.     These NOCPG manufacturers that purchase analytics services in the Data

Analytics Market are all customers in the NOCPG Data Market.

39.      Third-party data analytics providers are largely database agnostic, analyzing whatever data their customers provide to them, regardless of the source. Indeed, one reason a customer purchases third-party data analytics services is to harmonize data obtained from multiple sources.

40.      While both IRI and SPINS also offer data analytics services to NOCPG manufacturers (and in part because of that), they have always understood that their customers retain third-party data analytics firms to analyze the data that IRI and SPINS sell to them. IRI and SPINS are also aware of the identities of these data analytics services providers and, until the events giving rise to the complaint, facilitated their access to the data purchased from SPINS and IRI by NOCPG manufacturers. In fact, on various occasions, SPINS has sent emails thanking Crownalytics for promoting SPINS's database to new and existing mutual customers—of SPINS in the NOCPG Data Market and of Crownalytics in the Data Analytics Market. IRI likewise facilitated Crownalytics access to IRI data for customers who bought IRI data.

41.      Crownalytics entered the Data Analytics Market in 2016. By 2020, there existed at least four independent competitors—along with SPINS and IRI—in the Data Analytics Market. These included Crownalytics, TABS Analytics, Red Fox Analytics, LLC ("Red Fox"), and Bedrock Analytics ("Bedrock").

42.      While IRI provides some data analytics services directly, it appears to have allocated at least some portion of that business to its competitor and co-conspirator SPINS. Before IRI and SPINS undertook their anticompetitive scheme, Bedrock and Crownalytics served most customers in the previously competitive Data Analytics Market.

43.      Although other entities provide data analytics services to other types of manufacturing customers, those suppliers are outside the Data Analytics Market because they lack

the requisite reputation and experience in the NOCPG space within the consumer-packaged goods

industry to compete effectively with data analytics services providers like Crownalytics, who have

mainly catered to customers in this space for years. But even were these potential entrants inclined

to enter this market, Defendants' conduct has erected barriers to competition by **any** unaffiliated

data analytics firm, whether a prior incumbent or new entrant. Defendants' conduct forecloses

current and potential competitors equally.

44.     Since the filing of the original complaint, Crownalytics has received notice after

notice from customers expressing with regret that Defendants' conduct requires them to terminate

their relationships with Crownalytics and move to the more expensive analytic services offered by

SPINS. Plaintiff's primary independent competitors are having similar experiences. Through this

conduct, SPINS has amassed substantial power in the Data Analytics Market. Upon information

and belief, SPINS's market share in the Data Analytics Market now exceeds sixty percent and that

share continues to grow as the full effects of Defendants' exclusionary conduct takes hold.

**B.**     **The Relevant Geographic Markets**

45.     The relevant geographic scope of both the NOCPG Data Market and the Data

Analytics Market is national.

46.     Because of differences between countries in consumer demand, language,

currency, customer, brand names, bar codes, and advertising, among others, the NOCPG Data

Market is national in coverage.

47.     Because data analytics services are designed to factor in and assess these same

country-specific variables, the Data Analytics Market also is national.

48.     While a supplier of either service could be located anywhere in the world,

expanding the relevant geographic market to global does not affect this case. An international data

provider would still need access to relevant US retail tracking data and would encounter the same

barriers discussed herein as a company based in the United States. Similarly, an international provider of analytics services would be just as foreclosed from entering the data analytics market by Defendants' anticompetitive conduct as a US-based provider.

## V.    GENERAL ALLEGATIONS

### A.    Crownalytics's Relationship with SPINS and IRI

49.     When Crownalytics began providing data analytics services in 2016, its customers provided it with access to the data they had purchased from SPINS, IRI, and Nielsen for Crownalytics to analyze.

50.     SPINS knew that Crownalytics was providing these data analytics services to their mutual customers. Indeed, SPINS facilitated this arrangement by providing Crownalytics with access credentials for its databases so that Crownalytics could directly access the data that their mutual customers had purchased.

51.     IRI likewise facilitated Crownalytics's provision of data analytics services to their mutual customers. In fact, IRI regularly provided Crownalytics access credentials to its data so that Crownalytics could serve a particular customer. For example, as late as January 2021, IRI sent Crownalytics credentials and IRI's secure URL so that Crownalytics could access IRI data and conduct analytics services for their mutual customer, Johnsonville Sausage. Specifically, IRI wrote: "Kris, Enclosed, please find your ID & PW for IRI Unify. We recommend using Chrome as your browser, and saving your PW in its settings." IRI personnel also contacted Crownalytics to set up training for its Unify System.

52.     Before 2021, it did not appear that Defendants' anticompetitive activities were outwardly focused at Crownalytics or the Data Analytics Market. In fact, during that time, Crownalytics had an extremely collaborative relationship and worked well with both IRI and SPINS. For example, in an email to Crownalytics dated September 2, 2020, SPINS representative

Anubhav Goel said, "Hope this note finds you and yours doing well. I heard you're building a strong partnership with Brent Grube, one of our newest Sales leaders also based in the Denver area. He's quickly becoming a big fan of yours." Similarly, Crownalytics and IRI worked well together to serve their mutual customers.

      **B.**    **Then, Things Change**

53.     In mid-2021, both IRI and SPINS suddenly and simultaneously moved to restrict third-party data analytics services providers'—including Crownalytics's—access to their databases (the data purchased by their customers)—contrary to the prior practices of both companies.

54.     In April 2021, SPINS's Mr. Pavlenkov introduced Mr. Crown to Edricco Reina, who he explained would be responsible for managing SPINS's relationship with independent analytics companies going forward. When Mr. Crown met with Mr. Reina, Mr. Reina informed Mr. Crown that SPINS was working on yet another new "partnership model" for independent data analytics services providers. But he provided no other details at that time.

55.     Three weeks later, while Mr. Crown was waiting for SPINS's Mr. Reina to provide those details, Crownalytics heard from IRI.

56.     On May 5, 2021, Crownalytics received a cease-and-desist letter from IRI (hereafter, the "Cease & Desist") demanding that Crownalytics immediately discontinue all use of IRI's data—which their mutual customers had purchased—and destroy all copies of those data, including any work product developed through their use. This letter arrived without any warning or preceding discussion and took Crownalytics (and its customers) entirely by surprise.

57.     Crownalytics responded to the Cease & Desist, informing IRI that it had not engaged in any of the wrongdoing alleged in that letter (indeed, had not engaged in any wrongdoing at all). Crownalytics nevertheless agreed to take the steps requested by IRI to

discontinue use of the data which their mutual customers had bought from IRI. Crownalytics complied with IRI's demands, despite the significant cost to Crownalytics of doing so, hoping to preserve the possibility of resolving this sudden, inexplicable, and fabricated, conflict.

58. Crownalytics was advised by other data analytics providers that they had received similar demands from SPINS or IRI, including both Bedrock and Red Fox.

59. A month later, in June 2021, while Crownalytics and IRI continued their discussion of the Cease & Desist, Mr. Crown received an email from SPINS's Mr. Reina, indicating that he now was prepared to discuss the "new partnership model" to which he had referred in April. Perhaps recognizing that IRI and SPINS's coordinated and simultaneous cessation of business relationships and practices relating to independent data analytics providers— that had been in place for years—might be a bit obvious, SPINS took a different tack than IRI: SPINS labeled its cease-and-desist demand a "new partnership model."

60. The new model that Mr. Reina revealed was anything but a partnership. To the contrary, SPINS was taking the same action as IRI. Like IRI, going forward, SPINS would reverse its prior practices and now prohibit third-party data analytics services providers from accessing SPINS's database in conjunction with those providers' analysis of data that their customers had procured from SPINS. Not surprisingly, SPINS later admitted to Crownalytics that its decision to cut off independent analytic providers was driven by its agreements and relationship with IRI. SPINS conceded that IRI "directed SPINS not to provide IRI data to Kris [Crown] or Crownalytics." SPINS also acknowledged that "SPINS understands that IRI has sent a cease and desist letter" to Crownalytics regarding its "use of [IRI] data," and noted that SPINS was acting to preserve the "trust" that IRI "ha[s] placed in us."

61. During a subsequent call on July 1, 2021, Mr. Reina explained to Mr. Crown that, going forward, customers purchasing data from SPINS for analysis by independent data analytics

services providers would only be permitted to buy static "extracts" of those data to share with their
chosen data analytics provider. Not only would these new extracts include inferior data, they would
add significant costs to the use of third-party analytics firms, making it too expensive for a
manufacturer customer for analytics services to use a competing analytics company.

62.     Under SPINS's new "partnership" plan, NOCPG manufacturers would now only
be permitted to provide their retained independent data analytics services providers incomplete,
static extracts of data purchased from SPINS, rather than providing the complete access on which
the Data Analytics Market was premised. These extracts' inferiority to the data previously
available renders the output of the analyses of the extracts correspondingly inferior and
unacceptable to data analytics firms' manufacturer customers.

63.     Indeed, the extracts available to non-SPINS data analytics providers are useless
for purposes of the services that Crownalytics (and other data analytics services providers)
performs. The extracts' limited utility precludes data analytics services providers from generating
the type of reporting their customers need and completely defeats the purpose for which customers
hire a third-party data analytics services provider like Crownalytics—which was exactly the effect
Defendants intended.

64.     Further, NOCPG customers would now have to pay $5,000 for each extract, on
top of the costs they already incurred to buy the data from SPINS. Given that a NOCPG
manufacturer could require from four to twenty extracts under SPINS's new "partnership" plan
annually, the manufacturer customers are now looking at what can fairly be characterized as a
$20,000 to $100,000 tax on substantially inferior data and thus substantially inferior data analytics
outputs. To place the degree of this tax in perspective, Crownalytics's average annual charges for
its data analytics services were $20,000, demonstrating the sham nature of this nonviable

alternative offering.[6] In other words, with SPINS new "partnership" program, its data customers could no longer practically use independent data analytics companies.

65.    Now, only customers who agree to use SPINS's data analytics services—and not use those of a third party—could avoid this degradation in data access and increase in data analysis cost.

66.    Although SPINS and IRI had offered data analytics services before Defendants' new anticompetitive plan, in that previously competitive market environment, neither had gained a significant share of the Data Analytics Market. That is because SPINS and IRI have not offered services that are attractive enough to customers in price and quality to effectively compete against third-party analytics providers on the merits. The only way they could build market share—and ultimately market power—in the Data Analytics Market was through their anticompetitive conduct. And that is what they did.

67.    As if the effect and intent of this effort to foreclose the Data Analytics Market were not obvious enough, Mr. Reina explained it to Crownalytics: third-party data analytics services providers would not survive. And even more specifically, Mr. Reina stated that he "did not know how they would exist in the future."

68.    This statement would have been nonsensical unless Mr. Reina knew that the plan was a concerted effort between IRI and SPINS. Absent SPINS's and IRI's agreement to the plan, it was in both SPINS's and IRI's independent economic interest to cater to customers' desire to use third-party analytics services. And absent their conspiracy, that is what IRI would have done upon learning of SPINS's plan (and vice versa)—because it would mean customers would flock

---

6.    Additionally, SPINS now precludes data analytics providers from harmonizing SPINS's data with data Crownalytics's customers may have purchased from Nielsen. While this restriction appears targeted at Nielsen, it also further undermines the value of independent analytics providers. Previously, NOCPG data customers have benefited from data harmonization because the analyses used all the data available to the customer.

to IRI (or, vice versa, customers would flock to SPINS). Except neither SPINS nor IRI would act in their independent economic self-interest when they could instead obtain the fruits of their concerted effort. Mr. Reina betrayed his knowledge of all this when he predicted the future with such confidence. And his prediction was, of course, accurate.

**C.**    **The Anticompetitive Consequences for Crownalytics and Others in the Data Analytics Market**

69.    While SPINS's anticompetitive "partnership" plan was not yet fully in effect, SPINS immediately began using it as the anticompetitive weapon it was. SPINS began actively sharing the new plan with customers as well as advising them of the impact this new plan would have on the continuing viability of Crownalytics (and other independent analytics providers) as well as the manufacturer customers' use of third-party analytics services. Among the actions taken by SPINS:

- In November 2021, Crownalytics's remaining customers began reporting that SPINS was telling them that Crownalytics is not authorized to access any SPINS data, even though SPINS's new anticompetitive partnership plan would not be fully effective until May 31, 2022.

- Customers also reported that SPINS was falsely disparaging Crownalytics and recommending an alternative data analytics provider, Red Fox, in the event they did not wish to use SPINS. (Red Fox, previously one of the smaller independent data analytics services providers, appears to have reached an undisclosed agreement with SPINS and IRI. Even assuming that Red Fox did not simply join IRI and SPINS's conspiracy, Red Fox's agreement with SPINS neutralizes

Red Fox's ability and incentive to act as a bona fide independent competitor—disciplining either pricing or quality—of IRI or SPINS in the Data Analytics Market. Red Fox will not be stepping into the low-cost, high-quality maverick role from which Crownalytics was being driven out.)

70.     As expected, Crownalytics's customers began to complain about SPINS's new pricing and data restrictions almost immediately. Crownalytics was repeatedly advised by customers that they had no choice but to drop Crownalytics and move their analytics business to the higher-priced services offered by SPINS. Potential new customers opted not to retain or even inquire with Crownalytics at all.

71.     In a desperate attempt to mitigate its damages in the face of this bald abuse of market power, Crownalytics began to offer customers self-service software tools that did not require Crownalytics to access any data. Rather, the customers would buy the software, enter their data, and analyze the data without Crownalytics's involvement.

72.     Offering this software which permitted customers to replicate at least some of the aspects of Crownalytics's services seemed to address the concerns of some customers, at least temporarily, but many others simply stopped working with Crownalytics.

73.     Yet in a coup de grace, and again without even a colorable excuse, SPINS began advising its customers in the NOCPG Data Market that they are prohibited from using Crownalytics's self-service software to analyze the data they had purchased from SPINS.

74.     This confirms that the claim that SPINS and IRI were protecting intellectual property was pretextual, because as soon as Crownalytics offered customers an alternative third-party data analytics solution that did *not* involve customers providing access to data they bought from SPINS and/or IRI to third-party providers, SPINS moved to prevent them from using that

19

solution, as well.

75.     The use of pretext as a business rationale in communications with other actors in the marketplace is, like other efforts designed to conceal a conspiracy, a common indicia of conspiracy.

76.     On April 5, 2022, Crownalytics received an official Notice of Termination from SPINS, formalizing and completing SPINS's exclusion of Crownalytics from the marketplace in a manner identical to what IRI had done. This notice terminated any still-existing third-party agreements between SPINS and its customers that permitted Crownalytics to access SPINS's data to provide data analytics services to those customers—effective May 31, 2022.

77.     Right after sending the Notice of Termination, SPINS informed Crownalytics's current, past, and potential customers that, "as of June 1, 2022, Crownalytics will no longer have access to any data from SPINS . . . . If you use Crownalytics with SPINS data, you will need to obtain a new analytics solution."

78.     After receiving the notice from SPINS, Crownalytics's remaining customers told Crownalytics that they had no choice but to terminate their agreements with Crownalytics because Crownalytics was no longer able to provide the valuable data analytics services that customers sought. Customers expressed their disappointment at losing Crownalytics's services, as well as their frustration with the fact that they had no choice but to use SPINS's analytics services.

**DEFENDANTS' UNLAWFUL AGREEMENTS**

79.     Defendants have agreed to combine their product offerings and efforts to stifle competition in both the NOCPG Data and Data Analytics Markets.

80.     For years, SPINS and IRI were two of the three firms competing in the NOCPG Data Market. But that changed when they agreed to stop competing with one another and have one of them—SPINS—serve as the distributor for both companies' NOCPG data products. SPINS did

this by bundling the two products into the SPINS/IRI Bundle. The SPINS/IRI Bundle quickly became the dominant data source in the NOCPG Data Market, with most customers in the market buying it, and with all, or nearly all, analytics providers using that data to perform analytics services. This is an illegal price-fixing and market-allocation agreement between competitors.

81.     But Defendants were not satisfied with simply dominating the Data Market. Instead, in 2019, they decided to expand their illegal agreement and arrangement into the Data Analytics Market.

82.     Thus, in March 2019, SPINS and IRI announced an agreement to move beyond simply bundling their data offerings to expand their price-fixing and market-allocation arrangement into the Data Analytics Market as well. Defendants explained that they would now offer a joint solution that would include "advanced analytics solutions."

83.     Defendants' agreement to extend their power into the Data Analytics Market was particularly welcome news for SPINS, which stood to be the primary beneficiary on that front. Indeed, SPINS noted that it was "pleased to expand our partnership with IRI," presumably because, under the agreement, SPINS was being positioned to emerge as the dominant provider of data analytics services in the market. It appears that an aspect of Defendants' agreement was that they would jointly force customers to SPINS—and not IRI—for data analytics services.

84.     Yet this joint effort did not go as they had hoped, as most customers continued to hire third-party analytics providers, such as Crownalytics, for data analytics services, rather than moving to SPINS. This should not have been surprising, given that customers viewed SPINS's analytics services as lower quality and higher priced. So in 2021, Defendants agreed to and began using their market power in the Data Market to coerce customers away from their preferred analytics providers.

85.     In 2021, SPINS and IRI agreed to directly wield their significant and growing

power against their competitors in the Data Analytics Market and as part of that agreement, as discussed, both began moving to exclude third-party analytics providers, including Crownalytics.

86.     Between April and June 2021, SPINS, the main distributor of both SPINS and IRI data, informed Crownalytics of the new requirements to be imposed on third-party data analytics providers. So onerous were these requirements that it made it impossible for Crownalytics to acquiesce. And, indeed, that was Defendants' intent, with SPINS's Mr. Reina remarking how third-party analytics providers such as Crownalytics could not "exist in the future."

87.     Simultaneously, in May 2021, IRI also moved to bar Crownalytics, demanding that Crownalytics discontinue its use of IRI's data—including that purchased from SPINS through the SPINS/IRI Bundle, as well as IRI's standalone data.

88.     Defendants' joint efforts culminated on April 5, 2022, when SPINS's general counsel sent a letter to Crownalytics providing notice of its "termination" of Crownalytics and decision to bar Crownalytics from accessing either SPINS or IRI data. This letter confirmed that SPINS's conduct was not simply and coincidentally parallel with IRI's but was, instead, part of their joint efforts to exclude competition.

89.     Indeed, in its April 2022 letter, SPINS remarkably admitted it was "not alone" in acting to exclude Crownalytics from the market. To the contrary, Defendants had agreed to jointly take those steps. SPINS conceded that IRI "directed SPINS not to provide IRI data to Kris [Crown] or Crownalytics." SPINS also openly acknowledged that it was communicating with IRI about their efforts to exclude Crownalytics, referencing IRI's cease and desist letter and referenced the bond of "trust" between the two competitors. SPINS's letter confirms that IRI and SPINS were not merely consistently communicating with one another, but they were communicating specifically about implementing their scheme and providing one another assurances of common action. Even putting aside this evidence that SPINS and IRI were communicating about the boycott

of Crownalytics, the fact that SPINS delivered the termination letter on behalf of the products of both competitors is direct evidence of their conspiracy to lead a group boycott against Crownalytics, which also extended to other third-party analytics companies. That is, these two independent economic entities that compete in the same markets expressly undertook the penultimate anticompetitive act together. They were holding hands as they kicked horizontal competitors out of the market.

90.     SPINS's letter continued: "We are working with our clients to transition any services that Crownalytics previously provided and to that end the [third-party agreements] will terminate at the end of May." And SPINS made clear that the goal was to compel customers to move their data analytics needs away from Crownalytics and other third-party analytics providers.

91.     SPINS ultimately severed Crownalytics from its customers and the marketplace through a "termination" that occurred on June 1, 2022, and, both Defendants have since prohibited customers from using Crownalytics to conduct analytics services, often over the protests of customers who would have preferred to continue working with Crownalytics.

92.     Crownalytics was not the only analytics provider to be cut off from its customers by SPINS and IRI during this period. Crownalytics understands that at least Bedrock and TABS have been cut off from their customers, and that no third party is providing analytics services to customers independently from the concerted effort of SPINS and IRI.

## VI.   HARM TO COMPETITION

93.     Since Defendants' coordinated conduct began, Crownalytics has received many notices from its customers indicating that they had no choice but to surrender their data analytics services needs to SPINS.

94.     Aside from being coerced to use a data analytics services provider not of their choosing, customers also expressed dissatisfaction to Crownalytics that the prices that SPINS had

begun to charge for data analytics services are much higher than Crownalytics's prices were. Additionally, the quality of their analytics services, as well as their relationship management and customer support, are inadequate.

95.     Defendants have wielded their market power in the NOCPG Data Market to limit customers' choices in the Data Analytics Market to only one: SPINS. In other words, Defendants can, and do, now force NOCPG manufacturers to buy their captive data analytics services as a condition of purchasing access to their essential databases.

96.     Without Defendants' coercive conduct in the NOCPG Data Market, customers would otherwise have contracted with other data analytics services providers in the Data Analytics Market, such as Crownalytics. This is true for many reasons, including that these other data analytics services providers have historically offered superior services at better prices than Defendants now offer. As noted, before the new SPINS "partnership" plan, SPINS's analytics offerings never managed to capture a significant share of the Data Analytics Market in the five years of its existence.

97.     Defendants' actions, collectively and individually, have lessened competition in the Data Analytics Market by limiting consumer choice, increasing prices of the affected services and offerings, and reducing the quality of those outputs. Before the complained-of conduct, there were four independent Data Analytics providers, along with SPINS and IRI, from whom customers could choose—and benefit from the competition on pricing and service quality. Now, Defendants' actions have led to exit from, and consolidation within, the Data Analytics Market leaving customers with only Defendants as their choices for data analytics services.

98.     Defendants' actions, collectively and individually, have lessened competition in the Data Analytics Market by reducing quality of output by eliminating even the possibility of competitive pressure from competing providers of data analytics services (if any non-captive data

analytics services firms choose to remain in the market). Because those would-be competitors' customers are forced to use inferior data to obtain their services, the utility and quality of any data analytics output would be significantly degraded. Accordingly, the overall quality of the data analytics services provided in the Data Analytics Market is diminished and, in essence, destroyed because the analysis depends on access to robust data.

99.     Defendants' actions, collectively and individually, have also lessened competition in the Data Analytics Market by removing any price constraints that previously resulted from the existence of independent competition with a meaningful market share. Crownalytics acquired its position in this market by offering high-quality service at low prices. To the extent that any competition can remain in the face of SPINS and IRI's anticompetitive actions, these competitors will be offering a substantively inferior, higher-priced data analytics services solution. They will be unable to prevent Defendants from imposing supracompetitive pricing because Defendants know that their customers cannot switch to a substitute.

100.    Moreover, Defendants' actions have erected an effective barrier to new entry into the Data Analytics Market because no potential entrant would have the necessary access to Defendants' data sets or be able to independently replicate them (which would require entry into the NOCPG Data Market, which Defendants have also impeded), and access to these data sets is essential to entering and competing in the Data Analytics Market.

## VII.    CROWNALYTICS'S ANTITRUST INJURY AND STANDING

101.    As explained above, Defendants' anticompetitive and unlawful conduct has reduced competition in the Data Analytics Market by eliminating consumer choice, so that the market is limited only to Defendants' own captive data analytics offerings.

102.    Defendants' anticompetitive and unlawful conduct has harmed competition in the Data Analytics Market by reducing quality (and stifling innovation) insofar as Crownalytics, which

offers a superior, differentiated product, is no longer able to offer its product to customers in the

Data Analytics Market. Moreover, Defendants' conduct reduces the incentive to innovate in the

Data Analytics Market due to Defendants' absolute foreclosure of competition in this market.

103.    Since Defendants have effectively excluded all competitors in the Data Analytics

Market, there is no remaining supplier who can restrain SPINS from further increasing its prices.[7]

By vanquishing competition in the Data Analytics Market Defendants are able and do sell inferior

services in that market for higher prices than would exist if Defendants had not engaged in the

anticompetitive conduct described in this complaint to foreclose competition in that market.

Indeed, Defendants specifically intended this market foreclosure as shown by SPINS's Mr. Reina

statements to Crownalytics that as a result of Defendants' actions, third-party analytics companies

like Crownalytics would not exist in that market in the future.

104.    There is no procompetitive justification for the behavior alleged above, all of

which unreasonably restrained trade and decreased competition in the Data Analytics Market.

Even if any procompetitive business objectives exist, any such objectives could have been

achieved by less restrictive means than eliminating all competition.

105.    The same anticompetitive and unlawful conduct described above that has caused

this harm to competition in the Data Analytics Market, has harmed Crownalytics's business. As a

direct result of Defendants' unlawful acts, Crownalytics has lost customers, will lose its remaining

customers, and is effectively precluded from capturing new customers. When the final restraints

on Crownalytics's access to data became effective, on June 1, 2022, Crownalytics was completely

excluded from the marketplace. This harm confers antitrust standing upon Crownalytics to rectify

the antitrust injury that Defendants have caused.

---

7.    Because of its relationship with SPINS, Red Fox no longer provides a competitive restraint.
Presumably, Defendants' conduct will stifle all other remaining competitors shortly, to the extent
it has not already done so.

**FIRST CLAIM FOR RELIEF**

**(Group Boycott – *Per Se* Violation of Sherman Act, 15 U.S.C. § 1 – Against All
Defendants)**

106.   Crownalytics realleges and incorporates by reference all preceding paragraphs as if
fully set forth herein.

107.   Defendants IRI and SPINS are horizontal competitors in the NOCPG Data Market.
Individually, and together, they also are competing suppliers in the Data Analytics Market where
they also compete with Crownalytics, among others.

108.   No other entity collects the NOCPG purchase data that SPINS obtains from smaller
or regional retailers. Nor could another company replicate that database or create a viable substitute
due to a combination of entry barriers including cost, timing, and existing exclusive arrangements.
Because of this unique product offering, SPINS has market power in the NOCPG Data Market.

109.   Because IRI and SPINS have combined their competitive offerings into the
SPINS/IRI Bundle, IRI benefits from SPINS's market power, and SPINS benefits from the
incremental increase in market power driven by the SPINS/IRI Bundle.

110.   Both SPINS and IRI compete against Crownalytics (and other independent data
analytics services providers) in the Data Analytics Market—both individually and as part of their
anticompetitive arrangement.

111.   To provide data analytics services and thereby compete in the Data Analytics
Market, providers such as Crownalytics must have access to the data their customers purchase in
the NOCPG Data Market. Having previously made their data sets available to all providers in the
Data Analytics Market, IRI and SPINS now supply their data sets only along with their own data
analytics offerings.

112.   IRI and SPINS began withholding Crownalytics's (and other competitors') access
to their data, in a departure from past practices that had been mutually beneficial to IRI and SPINS

and data analytics providers, including to Crownalytics, suddenly and contemporaneously. They did so under an agreement to use their shared market power in the NOCPG Data Market to eliminate competition in the Data Analytics Market.

113.   IRI and SPINS make no effort to conceal their anticompetitive conspiracy—in fact they advertise it. IRI and SPINS advertise that they have bundled their previously competing data products and are coordinating their previously competing data analytics offerings. Regardless of the legality of those arrangements, they can hardly now plausibly claim that a major decision impacting the value of that very data bundle as well as their analytics offerings businesses was anything but an agreement to destroy competition from competing independent analytics companies.

114.   Consistent with these admissions, both companies—within weeks of each other— terminated business practices involving complex interdependent relationships with Crownalytics (and others) that had been in place for years and on which the entire Data Analytics Market depends. Deciding to cut off its customers' access to independent analytics providers that served most Data Analytics Market customers is not something that can be done on a whim, given the symbiotic relationship between providers in the NOCPG Data Market and the Data Analytics Market—the services of either one being worth less without the other's.

115.   Because access to SPINS and IRI's data is necessary to provide data analytics services, Defendants' denying Crownalytics access to their data sets prevents Crownalytics from competing in the Data Analytics Market. Moreover, this prevents customers in the Data Analytics Market from benefiting from the competition that previously existed in that market, which provided them with more, better choices and lower prices.

116.   Defendants' anticompetitive conduct affects interstate commerce in the Data Analytics Market because Defendants, directly and indirectly, use the means and instrumentalities

of interstate commerce, including by offering their products and services to customers throughout the United States and in furtherance of the acts and communications alleged herein.

117.    Crownalytics has suffered injury as a direct result of Defendants' competition-reducing conduct, and the harm to competition flows from that injury: its exclusion from the market results in loss of customers and revenue for Crownalytics and reduced choice and increased prices and lower quality for consumers—in particular, the elimination of customers' ability to choose a low-cost provider of higher-quality services in the Data Analytics Market.

118.    Crownalytics's business reputation and customer relationships have also been damaged by Defendants' actions as described throughout this complaint.

119.    There is no reason that is not pretextual why either IRI or SPINS would seek to exclude Crownalytics and other competitors from the Data Analytics Market other than the desire to serve that market unrestrained by competition.

120.    Indeed, barring Crownalytics from competing in the Data Analytics Market is the only reason IRI or SPINS would preclude Crownalytics's access to their data. And IRI and SPINS agreed to do so exclusively for this purpose.

121.    Even if there were another purpose, one that was legitimate and procompetitive, animating IRI and SPINS's agreement, that purpose could have been achieved through less restrictive means.

122.    Because Defendants IRI and SPINS are horizontal competitors in the NOCPG Data Market who share market power in that market (and also horizontal competitors of each other and Crownalytics in the Data Analytics Market), their conspiracy is *per se* illegal under the Sherman Act.

123.    Alternatively, Defendants' conduct is unlawful under an inherently suspect, quick-look, or rule-of-reason analysis because the anticompetitive effects substantially outweigh any

legitimate procompetitive benefits of their agreement.

124.    Defendants have thus violated Section 1 of the Sherman Act.

125.    As a result of the foregoing, Crownalytics has been damaged in an amount to be determined at trial.

### SECOND CLAIM FOR RELIEF
**(Tying – Violation of Sherman Act, 15 U.S.C. §§ 1, 2 – Against All Defendants)**

126.    Crownalytics realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

127.    Defendants IRI and SPINS collect retail tracking data, which they sell to customers—manufacturers of branded NOCPG—in the NOCPG Data Market.

128.    Crownalytics, Defendants SPINS and IRI, and others (at least before Defendants' anticompetitive conduct) provide data analytics services to those same customers in the Data Analytics Market.

129.    The NOCPG Data Market and the Data Analytics Market are separate markets involving separate products and services. NOCPG manufacturers want—and historically had—the freedom to buy those separate products and services from different suppliers.

130.    SPINS and IRI agreed with each other only to sell their data in the NOCPG Data Market to customers who also retained SPINS to provide data analytics services in the Data Analytics Market.

131.    Defendants coerced customers into contracts that contain *de facto* provisions which operate as negative tying arrangements by conditioning the purchase and use of data on an agreement not to buy or use the services of Crownalytics (and other competitors in the Data Analytics Market). Defendants have sent cease and desist letters telling customers that they cannot provide access to any third parties such as Crownalytics, except in the limited, pretextual manner described above. If NOCPG manufacturers desire data analytics services, they now must turn to

SPINS.

132.    Because of their necessary and irreplicable data sets, as well as their large market shares, IRI and SPINS have market power in the NOCPG Data Market.

133.    The NOCPG Data Market has high barriers to entry. Not only would entry require a major capital investment, it also would require real-time and ongoing access to retail data for which Defendants have exclusive contracts. There are no realistic alternatives to which NOCPG manufacturers can turn.

134.    Defendants are able to impose these tying arrangements on customers because they have market power in the NOCPG Data Market and are assured that they will not face new entry, nor will any other circumstance reduce their market power in the foreseeable future.

135.    The negative tie affects a substantial volume of interstate commerce in the Data Analytics Market by restricting Crownalytics and other rivals from competing in the market. Defendants' anticompetitive conduct affects interstate commerce because Defendants, directly and indirectly, use the means and instrumentalities of interstate commerce, including by offering their products and services to customers throughout the United States and in furtherance of the acts and communications alleged herein.

136.    Crownalytics has suffered injury as a direct result of Defendants' competition-reducing conduct, and the harm to competition flows from that injury: its exclusion from the market results in loss of customers and revenue for Crownalytics and reduced choice and increased prices and lower quality for consumers—in particular, the elimination of customers' ability to choose a low-cost provider in the Data Analytics Market.

137.    Crownalytics's business reputation and customer relationships have also been damaged by Defendants' actions as described throughout this complaint.

138.    There are no legitimate or procompetitive business reasons for these acts other than

to eliminate competitors in the Data Analytics Market.

139.    Defendants have thus violated Sections 1 and 2 of the Sherman Act.

140.    As a result of the foregoing, Crownalytics has been damaged in an amount to be determined at trial.

### THIRD CLAIM FOR RELIEF
### (Conspiracy to Monopolize – Violation of Sherman Act, 15 U.S.C. § 2 – Against All Defendants)

141.    Crownalytics realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

142.    Defendants IRI and SPINS are horizontal competitors in both relevant markets: the NOCPG Data Market and the Data Analytics Market. Through their partnership in the NOCPG Data Market, Defendants derived the opportunity to conspire to monopolize the Data Analytics Market.

143.    Because IRI and SPINS have combined their competitive offerings in the NOCPG Data Market into the SPINS/IRI Bundle, IRI benefits from SPINS's market power, and SPINS benefits from the incremental increase in market power driven by the SPINS/IRI Bundle. But those benefits were not enough for Defendants. SPINS and IRI saw the opportunity to eliminate all competition in the Data Analytics Market.

144.    Defendants agreed to bar Crownalytics and other rivals from accessing their data solely to monopolize the Data Analytics Market.

145.    As discussed above, Defendants terminated business practices and complex interdependent relationships with Crownalytics (and others) that had been in place for years and on which the entire Data Analytics Market depends.

146.    Because access to SPINS and IRI's data is necessary to the provision of data analytics services, Defendants' denying Crownalytics access to their data sets prevents

Crownalytics from being able to compete in the Data Analytics Market. Moreover, this prevents customers in the Data Analytics Market from benefiting from the competition that previously existed in that market, which provided them with more, better choices and lower prices.

147.    Defendants' anticompetitive conduct affects interstate commerce in the Data Analytics Market because Defendants, directly and indirectly, use the means and instrumentalities of interstate commerce, including by offering their products and services to customers throughout the United States and in furtherance of the acts and communications alleged herein.

148.    Crownalytics has suffered injury as a direct result of Defendants' competition-reducing conduct, and the harm to competition flows from that injury: its exclusion from the market results in loss of customers and revenue for Crownalytics and reduced choice and increased prices and lower quality for consumers—in particular, the elimination of customers' ability to choose a low-cost provider in the Data Analytics Market.

149.    There are no legitimate or procompetitive business reasons for these acts other than to eliminate competitors in the Data Analytics Market.

150.    Defendants have thus violated Section 2 of the Sherman Act.

151.    As a result of the foregoing, Crownalytics has been damaged in an amount to be determined at trial.

### FOURTH CLAIM FOR RELIEF
**(Group Boycott and Concerted Refusal to Deal – Colorado Antitrust Act, Colo. Rev. Stat. § 6-4-104 – Against All Defendants)**

152.    Crownalytics realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

153.    As alleged herein, Defendants' group boycott and concerted refusal to deal constitute illegal restraints of trade in violation of Colo. Rev. Stat. § 6-4-104.

154.    As a result of the foregoing, Crownalytics has been damaged in an amount to be

determined at trial.

## FIFTH CLAIM FOR RELIEF

### (Tying – Colorado Antitrust Act, Colo. Rev. Stat. § 6-4-104 – Against All Defendants)

155.    Crownalytics realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

156.    Defendants' tying arrangements, as alleged herein, constitute illegal restraints of trade in violation of Colo. Rev. Stat. § 6-4-104.

157.    As a result of the foregoing, Crownalytics has been damaged in an amount to be determined at trial.

## SIXTH CLAIM FOR RELIEF
### (Breach of Contract – Against SPINS)

158.    Crownalytics realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

159.    SPINS and Crownalytics entered into a consulting agreement effective June 29, 2017, by which Crownalytics would provide Consultant Reports and Services to certain clients that SPINS designates ("Agreement"). Paragraph 8 of the Agreement sets forth SPINS's agreement to protect Crownalytics's intellectual property:

> 8. Intellectual Property. SPINS will not offer or provide the Consultant Reports to any other SPINS client other than Designated Clients. SPINS acknowledges that the Consultant Reports and other deliverables that Consultant develops in connection with this Agreement (collectively, the "Work Product") are and will be the Consultant's sole property. SPINS may make suggestions to Consultant with respect to the Consultant Reports and will not assert any proprietary rights to such suggestions against Consultant. SPINS obtains no rights by license or otherwise in the Work Product, except that Consultant hereby grants SPINS a non-exclusive, non-sublicensable limited license solely for the purpose of making the Consultant Reports available to Designated Clients. ***SPINS may not use Consultant's Confidential Information that is a part of the Consultant Reports as a basis on which to develop or have a third party develop an Excel report that is substantially similar to the Consultant Reports. SPINS' breach of***

34

*this agreement may cause irreparable harm to the Consultant and monetary damages may not be a sufficient remedy for an unauthorized disclosure, usage, sharing or selling of the Consultant Reports. If SPINS discloses the Consultant Reports in violation of this Agreement, Consultant may, without waiving any other rights or remedies and without posting a bond or other security, seek an injunction, specific performance, or other equitable remedy to prevent further disclosure, and may pursue other legal remedies.*

160.    The Agreement has not been formally terminated, but in any event, under paragraph 15g of the Agreement, paragraph 8 survives its termination.

161.    Crownalytics performed under the Agreement by providing to SPINS and the Designated Clients its Confidential Information and Consultant Reports, including its Sales Planning Tools and its Strategic and Sales Planning Services.

162.    Crownalytics's principal place of business is Colorado. It entered the Agreement with SPINS in Colorado, and it performed its obligations under the Agreement in Colorado.

163.    SPINS understood that Crownalytics was located in Colorado. When SPINS communicated with Crownalytics, it directed those communications to Colorado. And when SPINS wrongfully terminated the Agreement, it sent its termination notice to Crownalytics's address in Colorado, and Crownalytics felt the harm of SPINS's wrongful termination in Colorado.

164.    In or about February 2021, SPINS launched a new Excel-based tool called PowerTabs.

165.    SPINS used Crownalytics's Confidential Information, Consultant Reports, Sales Planning Tools, and Strategic and Sales Planning Services Reports as a basis to develop or have a third party develop PowerTabs in breach of its contractual obligations.

166.    SPINS's PowerTabs is substantially similar to, indeed in certain material respects identical to, Crownalytics's Excel-based data analytics tools.

167.    SPINS advertises PowerTabs on its website and markets PowerTabs as a competitive alternative to Crownalytics's Data Analytics Services.

35

168.     As a result of the foregoing, SPINS has breached paragraph 8 of the Agreement.

169.     Upon information and belief, SPINS has provided Data Analytics Services using PowerTabs in partnership with DAAP and/or IRI.

170.     As a result of the foregoing, Crownalytics has been damaged and irreparably harmed.

171.     As a result of the foregoing, Crownalytics is entitled to injunctive relief.

172.     As a result of the foregoing, Crownalytics is entitled to damages in an amount to be determined at trial.

## VIII.   **RELIEF REQUESTED**

WHEREFORE, Crownalytics demands judgment in its favor, and against Defendants, plus the following additional relief:

A.     An injunction as to all Claims and as requested herein;

B.     Damages in an amount to be proven at trial;

C.     Treble damages on Crownalytics's antitrust claims;

D.     Reasonable attorneys' fees and costs;

E.     Pre- and post-judgment interest at the highest allowable legal rates; and

F.     Such other and further relief as the Court deems just and proper.

## IX.   **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury.

Dated:  May 30, 2023              BONA LAW PC

                                 *s/Luke Hasskamp*
                                 Luke Hasskamp
                                 Kristen Harris
                                 4275 Executive Square, Suite 200
                                 La Jolla, CA 92037
                                 luke.hasskamp@bonalawpc.com
                                 kristen.harris@bonalawpc.com

858 964-4589

Pat Pascarella
100 Crescent Court, #700-3425
Dallas, TX 75201
pat.pascarella@bonalawpc.com
469 296-7716

Aaron Gott
331 Second Ave S., Suite 420
Minneapolis, MN 55401
aaron.gott@bonalawpc.com
612 284-5001

LAW OFFICE OF RICK
 D. BAILEY, ESQ
Rick D. Bailey, Esq.
1801 Broadway, Ste. 528
Denver, CO 80202
rick@rickbaileylaw.com
Tel. 720 676-6023

COUNSEL FOR PLAINTIFF

Plaintiff's Address: 9455 Crystal Lane, Longmont, CO 80503.

**CERTIFICATE OF SERVICE**

The undersigned certifies that he served all counsel of record electronically with a copy of

**FIRST AMENDED COMPLAINT AND JURY DEMAND** using the Court's CM/ECF

electronic filing system.

_s/Luke Hasskamp_
Luke Hasskamp

# EXHIBIT 2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 22-cv-1275-RM-SKC

CROWNALYTICS, LLC, a Colorado Limited Liability Company,

     *Plaintiff*,

v.

SPINS LLC, a Delaware Limited Liability Company; DAAP LLC, a Delaware Limited Liability Company, and INFORMATION RESOURCES, INC., a Delaware Corporation,

     *Defendants*.

---

**NOTICE OF SUBPOENA FOR PRODUCTION OF DOCUMENTS**

---

To: See Attached Certificate of Service

     PLEASE TAKE NOTICE THAT Defendants SPINS LLC and DAAP LLC, through the undersigned counsel, have issued and will serve the attached Subpoena and Attachment for production of documents as set forth therein, to the law offices of Smith, Gambrell & Russell, LLP, 311 S. Wacker Dr., Ste. 3000, Chicago, Illinois 60606 on Bedrock Analytics LLC, Attn: Bedrock Analytics Corporation, c/o William Salcido, 350 Frank Ogawa Plaza, Suite 500, Oakland, CA 94612, via personal service.

Dated:  November 16, 2023

                                    /s/ Meghan E. Tepas

                                    Matthew J. O'Hara
                                    Dylan Smith
                                    Meghan E. Tepas
                                    Alexander A. Pabon
                                    Smith, Gambrell & Russell, LLP
                                    311 South Wacker Drive
                                    Suite 3000
                                    Chicago, Illinois 60606
                                    (312) 360-6000
                                    mohara@sgrlaw.com
                                    dylansmith@sgrlaw.com
                                    mtepas@sgrlaw.com
                                    apabon@sgrlaw.com

                                    Raymond W. Martin
                                    Wheeler Trigg O'Donnell LLP
                                    370 17th Street, Suite 4500

Denver, Colorado 80502
(303) 244-1863
martin@wtotrial.com

*Counsel for SPINS LLC and DAAP LLC*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned attorney hereby certifies that on the date shown below, she caused a copy of the foregoing Notice of Subpoena for Production of Documents to be served on counsel of record for defendant via the email addresses indicated below:

Aaron Robert Gott              aaron.gott@bonalawpc.com

Alexandra H. Shear            alex.shear@bonalawpc.com

James Peter Denvir, III        jdenvir@bsfllp.com

Kenneth F. Rossman , IV      krossman@lrrc.com

Kristen Amber Harris          kristen.harris@bonalawpc.com

Luke Hasskamp                luke.hasskamp@bonalawpc.com

Michael Scott Mitchell         mmitchell@bsfllp.com

Patrick Joseph Pascarella      pat.pascarella@bonalawpc.com

Rick D. Bailey                rick@rickbaileylaw.com


Dated:  November 16, 2023                          /s/ Meghan E. Tepas

*311 South Wacker Drive*
*Suite 3000*
*Chicago, IL 60606*
*Tel: 312-360-6000*
*www.sgrlaw.com*



*Meghan E. Tepas*
*Direct Tel:  312-360-6454*
*Direct Fax:  312-360-6520*
*mtepas@sgrlaw.com*

November 15, 2023

Bedrock Analytics Corp.
c/o William Salcido
350 Frank Ogawa Plaza, Suite 500
Oakland, CA 94612

Re:    *Crownalytics, LLC v. SPINS, LLC, et al.*
        Case No. 22-cv-1275-NYW-SKC, U.S.D.C. District of Colorado

Dear Mr. Salcido:

        Enclosed please find a Subpoena requesting that you produce documents in connection with the above-referenced case. Enclosed please also find copies of the Court's June 21, 2023 Protective Order and the Court's Joint ESI Protocols.

                                                Sincerely,



                                                Meghan E. Tepas
                                                Partner

MET/ap
Enclosures

AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

### for the

### District of Colorado

CROWNALYTICS, LLC

_____
*Plaintiff*
v.
SPINS, LCC; DAAP, LLC; and INFORMATION
RESOURCES, INC.
_____
*Defendant*

)
)
)
)
)
)

Civil Action No.  22-cv-1275-RM-SKC

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:  Bedrock Analytics Corporation, c/o William Salcido
     350 Frank Ogawa Plaza, Suite 500
     Oakland, CA 94612
_____
*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:

     See attached Rider

| Place: Smith, Gambrell & Russell, LLP, 311 S. Wacker Dr., Suite 3000, Chicago, IL 60606 | Date and Time: December 15, 2023 by 5:00 p.m. |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:  11/15/2023

*CLERK OF COURT*

OR

_____
*Signature of Clerk or Deputy Clerk*

/s/ Meghan E. Tepas
_____
*Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*  SPINS, LLC and DAAP, LLC
_____ , who issues or requests this subpoena, are:

Meghan E Tepas, Smith, Gambrell & Russell, LLP, 311 S. Wacker Dr., Suite 3000, Chicago, IL 60606, mtepas@sgrlaw.com, 312-360-6000

### Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No. 22-cv-1275-RM-SKC

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❏ I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

❏ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ ____0.00____ .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

  **(1) For a Trial, Hearing, or Deposition.** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
    **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
    **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
      **(i)** is a party or a party's officer; or
      **(ii)** is commanded to attend a trial and would not incur substantial expense.

  **(2) For Other Discovery.** A subpoena may command:
    **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
    **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

  **(1) Avoiding Undue Burden or Expense; Sanctions.** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

  **(2) Command to Produce Materials or Permit Inspection.**
    **(A)** Appearance Not Required. A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
    **(B)** Objections. A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
      **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
      **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

  **(3) Quashing or Modifying a Subpoena.**
    **(A)** When Required. On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
      **(i)** fails to allow a reasonable time to comply;
      **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
      **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
      **(iv)** subjects a person to undue burden.
    **(B)** When Permitted. To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
      **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

      **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
    **(C)** Specifying Conditions as an Alternative. In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
      **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
      **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

  **(1) Producing Documents or Electronically Stored Information.** These procedures apply to producing documents or electronically stored information:
    **(A)** Documents. A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
    **(B)** Form for Producing Electronically Stored Information Not Specified. If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
    **(C)** Electronically Stored Information Produced in Only One Form. The person responding need not produce the same electronically stored information in more than one form.
    **(D)** Inaccessible Electronically Stored Information. The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

  **(2) Claiming Privilege or Protection.**
    **(A)** Information Withheld. A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
      **(i)** expressly make the claim; and
      **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
    **(B)** Information Produced. If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

## Definitions and Instructions

The term "documents" should be broadly construed to encompass anything considered a "document" under the Federal Rules of Civil Procedure, including electronically stored information.

"Bedrock" means Bedrock Analytics Corporation and its agents, employees, subsidiaries, affiliates, and any entity or name through which it does business.

"NielsenIQ" means Nielsen Consumer LLC, and its agents, employees, subsidiaries, affiliates, and any entity or name through which it does business.

"Data" means any data concerning the sale, purchase or marketing of consumer packaged goods in the United States, including point-of-sale data, retail measurement data, or consumer panel data.

"Data Analytics" means any data management, analytics or visualization platform or service.

Unless otherwise indicated, this subpoena calls for documents created from January 1, 2018, through the present.

## Documents Requested

1. All documents concerning Crownalytics, LLC ("Crownalytics"), including without limitation, all documents concerning Crownalytics, Kristopher Crown, or any attorney or other person acting on Crownalytics's or Crown's behalf.

2. All documents concerning Bedrock's participation or potential participation in the NielsenIQ Partner Network.

3. All documents concerning any third-party agreement or other contract, agreement, or understanding authorizing Bedrock to access Data from NielsenIQ, SPINS LLC ("SPINS"), Information Resources, Inc. ("IRI"), Circana, Inc. ("Circana"), The NPD Group ("NPD"), or any other Data source.

4. Documents sufficient to identify customers that purchased or otherwise obtained CPG Data Analytics from Bedrock, including the particular type of Data Analytics obtained, the brand or brands for which such Data Analytics were obtained, the price paid or payments received for such Data Analytics, and the duration of any contract governing such customer's purchase of such Data Analytics.

5. All documents concerning Bedrock's or any competitor's share of the Data Analytics market or any segment of the Data Analytics market.

6. All documents concerning Data Analytics that compete with Data Analytics offered by Bedrock, including Data Analytics offered by SPINS, DAAP, IRI, Circana, NielsenIQ (including Byzzer and Data Impact), Crownalytics, Red Fox Analytics, TABS Analytics, Big Chalk, or Crisp.

7. All marketing presentations and other marketing materials concerning any Data Analytics offered by Bedrock.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 22-cv-1275-RM

CROWNALYTICS, LLC, a Colorado Limited Liability Company,

     *Plaintiff*,

v.

SPINS, LLC, a Delaware Limited Liability Company; DAAP, LLC, a Delaware Limited Liability Company; and INFORMATION RESOURCES, INC., a Delaware Corporation,

     *Defendants*.

---

## PROTECTIVE ORDER

---

Upon a showing of good cause in support of the entry of a protective order to protect the discovery and dissemination of confidential information, IT IS ORDERED:

1.    This Protective Order shall apply to all documents, materials, and information, including without limitation, documents produced, answers to interrogatories, responses to requests for admission, deposition testimony, and other information disclosed by the parties or by non-parties responding to subpoenas pursuant to the disclosure or discovery duties created by the Federal Rules of Civil Procedure.

2.    As used in this Protective Order, "document" is defined as provided in Fed.R.Civ.P. 34(a). A draft or non-identical copy is a separate document within the meaning of this term.

3.    Information designated "CONFIDENTIAL" shall be information that is confidential to Crownalytics, LLC; SPINS, LLC; DAAP, LLC; and/or Information Resources, LLC, producing non-parties or any of them and which may properly be protected pursuant to Fed

R. Civ. P. 26(c)(1). CONFIDENTIAL information shall not be disclosed or used for any purpose except prosecuting, defending, or attempting to settle this case subject to the terms of this Order.

4.      Information designated "ATTORNEYS' EYES ONLY" shall be information that the designating party in good faith believes to contain, constitute, reveal, or reflect trade secrets, , competitively sensitive or similar information of a high degree of commercial sensitivity, such as (i) business/strategic plans; (ii) sales, cost and price information, including sales/financial projections; (iii) non-public marketing information; (iv) detailed sales and financial data, and/or information that—if disclosed—would create a substantial risk of serious harm that could not be avoided by less restrictive means. ATTORNEYS' EYES ONLY information shall constitute a subset of CONFIDENTIAL information, and all provisions in this Order pertaining to CONFIDENTIAL information apply equally to materials designated as ATTORNEYS' EYES ONLY unless stated otherwise herein.

5.      CONFIDENTIAL documents, materials, and/or information (collectively "CONFIDENTIAL information") shall not, without the consent of the party producing it or further Order of the Court, be disclosed except that such information may be disclosed to:

(a)      outside counsel and a single inside counsel actively working on this case for each defendant, identified as follows:  Evan Makela for SPINS/DAAP and Susan Bennett for IRI;

(b)      persons regularly employed or associated with the outside attorneys actively working on the case whose assistance is required by said attorneys in the preparation for trial, at trial, or at other proceedings in this case;

(c)      employees for the parties to whom counsel reasonably believes disclosure is necessary for purposes of the litigation;

(d)     outside expert witnesses and outside consultants retained in connection with this proceeding, to the extent such disclosure is necessary for preparation, trial or other proceedings in this case;

(e)     the Court and its employees ("Court Personnel");

(f)     stenographic reporters and videographers who are engaged in proceedings necessarily incident to the conduct of this action;

(g)     deponents, witnesses, or potential witnesses not otherwise listed in this paragraph (5), to whom outside counsel reasonably believes disclosure is necessary for purposes of the litigation and: (i) if reasonably believed to be an author, recipient, or sender of such information or involved in the drafting of said material; or (ii) who is referenced in the information or whose conduct is purported to be identified in the information, provided that counsel for the party intending to disclose such information has a good-faith basis for believing such CONFIDENTIAL information is relevant to events, transactions, discussions, communications or data about which the person is expected to testify or has knowledge; disclosure to such person is limited to the portion of the document in which the person or person's conduct is identified or referenced; and such person has completed the acknowledgment referenced in paragraph 7 of this Order.

(h) any designated arbitrator or mediator who is assigned to hear this matter or who has been selected by the parties, and his or her staff;

and

(i)     other persons by written agreement of the parties.

6.     ATTORNEYS' EYES ONLY Designations.

(a)     Subject to paragraph 6(b) below, the receiving parties shall not disclose or permit the disclosure of any information designated as ATTORNEYS' EYES ONLY to any third person or entity except those identified in subparagraphs (5)(a)-(b) or (d)-(i) above, provided that with respect to subparagraph (g) ATTORNEYS' EYES ONLY information may be disclosed only to a person at or in preparation for a deposition or hearing, the person is reasonably believed to be an author, recipient or sender of such information, and such person has completed the acknowledgment referenced in paragraph 7 of this Order.

(b)     Notwithstanding paragraph 6(a), if any third party objects to the disclosure of its ATTORNEYS' EYES ONLY information to the inside counsel of a party under 5(a) above, the third party shall state such objection in its discovery response and the parties shall not disclose the confidential information to the party's inside counsel.

7.     Prior to disclosing any CONFIDENTIAL or ATTORNEYS' EYES ONLY information to any person listed above (other than outside counsel and the specified inside counsel, persons employed by counsel, Court Personnel, stenographic reporters, or any persons under subparagraph (5)(g) above who are current employees of the parties), counsel shall provide such person with a copy of this Protective Order and obtain from such person a written acknowledgment stating that he or she has read this Protective Order and agrees to be bound by its provisions. All such acknowledgments shall be retained by counsel and shall be subject to in camera review by the Court if good cause for review is demonstrated by opposing counsel.

8.      Documents are designated as CONFIDENTIAL or ATTORNEYS' EYES ONLY by placing or affixing on them (in a manner that will not interfere with their legibility) the following or other appropriate notice: "CONFIDENTIAL" or "ATTORNEY'S EYES ONLY."

9.      Whenever a deposition involves the disclosure of CONFIDENTIAL or ATTORNEYS' EYES ONLY information, the deposition or portions thereof shall be designated as CONFIDENTIAL or ATTORNEYS' EYES ONLY and shall be subject to the provisions of this Protective Order.  Such designation shall be made on the record during the deposition whenever possible, but a party may designate portions of depositions as CONFIDENTIAL or ATTORNEYS' EYES ONLY after transcription, provided written notice of the designation is promptly given to all counsel of record within thirty (30) days of receipt from the court reporter of the final transcript.

10.      An inadvertent failure to designate a document as CONFIDENTIAL or ATTORNEYS' EYES ONLY does not, standing alone, waive the right to so designate the document; provided, however, that a failure to serve a timely Notice of Designation of deposition testimony as required by this Order, even if inadvertent, waives any protection for deposition testimony.  If a party or a non-party subpoena respondent designates a document as CONFIDENTIAL or ATTORNEYS' EYES ONLY after it was initially produced, the receiving party, on notification of the designation, must make a reasonable effort to assure that the document is treated in accordance with the provisions of this Order.  No party shall be found to have violated this Order for failing to maintain the confidentiality of material during a time when that material has not been designated CONFIDENTIAL or ATTORNEYS' EYES ONLY, even where the failure to so designate was inadvertent and where the material is subsequently designated CONFIDENTIAL or ATTORNEYS' EYES ONLY.

11.    A party may object to the designation of particular CONFIDENTIAL or ATTORNEYS' EYES ONLY information by giving written notice to the party designating the disputed information. The written notice shall identify the information to which the objection is made.  If the parties cannot  resolve the objection it shall be the obligation of the party challenging the designation as CONFIDENTIAL or ATTORNEYS' EYES ONLY to file an appropriate motion requesting that the Court determine whether the disputed information should be subject to the terms of this Protective Order.  If such a motion is filed, the disputed information shall be treated as CONFIDENTIAL or ATTORNEYS' EYES ONLY under the terms of this Protective Order until the Court rules on the motion. If the challenging party fails to file such a motion, the disputed information shall keep its designation as CONFIDENTIAL or ATTORNEYS' EYES ONLY and shall not thereafter be treated otherwise.  In connection with a motion filed under this provision, the party asserting the designation of information as CONFIDENTIAL or ATTORNEYS' EYES ONLY shall bear the burden of establishing why the disputed information should be treated as CONFIDENTIAL or ATTORNEYS' EYES ONLY.

12.    Any party wishing to file a document designated as CONFIDENTIAL or ATTORNEYS' EYES ONLY in connection with a motion, brief or other submission to the Court must file it as a restricted document in accordance with D.C. Colo. LCivR 7.2.  It shall then be up to the party asserting the designation of information as CONFIDENTIAL or ATTORNEYS' EYES ONLY to file a motion to restrict within the 14-day period set forth in D.C. Colo. LCivR 7.2(e), or the document shall become unrestricted.

13.    Nothing in this Order shall be construed to affect the use of any document, material, or information at any trial or hearing.  A party that intends to present or that anticipates that another party may present CONFIDENTIAL or ATTORNEYS' EYES ONLY information at a hearing or

trial shall bring that issue to the Court's and parties' attention by motion or in a pretrial memorandum without disclosing the CONFIDENTIAL or ATTORNEYS' EYES ONLY information. The Court may thereafter make such orders as are necessary to govern the use of such documents or information at trial.

14. The parties hereto also acknowledge that regardless of the producing party's diligence, an inadvertent production of attorney-client privileged or attorney work product materials may occur. In accordance with Fed. R. Civ. P. 26(b)(5) and Fed R. Evid. 502, they therefore agree that if a party produces or provides discovery that it believes is subject to a claim of attorney-client privilege or attorney work product, the producing party may give written notice to the receiving party that the document or thing is subject to the attorney-client privilege or attorney work produce and request that the document or thing be returned to the producing party and all copies or summaries thereof destroyed. The returning party shall return or destroy such documents or things and all copies thereof, and shall certify completion of the same to the producing party within 7 days after receiving notice. This action shall not constitute an admission or concession that the document or thing is in fact properly subject to a claim of attorney-client privilege or attorney work product, nor shall it foreclose any party from moving the Court pursuant to Fed. R. Civ. P. 26(b)(5) and Fed. R. Evid. 502 for an order that such document or thing has been properly designated or should be produced.

15. At the conclusion of this case, unless other arrangements are agreed upon, each document and all copies thereof which have been designated as CONFIDENTIAL or ATTORNEYS' EYES ONLY shall be returned to the party that designated it CONFIDENTIAL or ATTORNEYS' EYES ONLY, or the parties may elect to destroy CONFIDENTIAL or ATTORNEYS' EYES ONLY documents. Where the parties agree to destroy CONFIDENTIAL

or ATTORNEYS' EYES ONLY documents, the destroying party shall provide all parties with an affidavit confirming the destruction. The parties' attorneys, however, may maintain file copies of emails containing information designated as CONFIDENTIAL or ATTORNEYS' EYES ONLY, or with such information attached, after the litigation has concluded.

16.    This Protective Order may be modified by the Court at any time for good cause shown following notice to all parties and an opportunity for them to be heard.

17.    After the termination of this Action, the Court will continue to have jurisdiction to enforce this Order.

18.    Nothing in this Order shall bar or otherwise restrict outside counsel from rendering advice to his or her client with respect to this Action, and in the course thereof, from relying in a general way upon the examination of materials designated CONFIDENTIAL or ATTORNEYS' EYES' ONLY information, provided, however, that in rendering such advice and in otherwise communicating with his or her client, such counsel shall not disclose the specific contents of any materials designated CONFIDENTIAL or ATTORNEYS' EYES ONLY, except as specifically permitted by this Order or otherwise ordered by the Court.

19.    If any receiving party is subpoenaed in another action or proceeding or served with a document or testimony demand or a court order, and such subpoena or demand or court order seeks CONFIDENTIAL or ATTORNEYS' EYES ONLY material of a producing party, the receiving party shall give prompt written notice to counsel for the producing party and allow the producing party an opportunity to oppose  such subpoena, demand or court order prior to the deadline for complying with the subpoena, demand or court order. No compulsory disclosure to third parties of information or material exchanged under this Order shall be deemed a waiver of

any claim of confidentiality except as expressly found by a court or judicial authority of competent jurisdiction.

*So Ordered*.

Dated: June 21, 2023

Hon. S. Kato Crews
United States Magistrate Judge

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No. 22-cv-1275 NYW-SKC

CROWNALYTICS, LLC, a Colorado Limited Liability Company,

    *Plaintiff*,

v.

SPINS, LLC, a Delaware Limited Liability Company; DAAP, LLC, a Delaware Limited Liability Company; and INFORMATION RESOURCES, INC., a Delaware Corporation,

    *Defendants*.

---

## JOINT ESI PROTOCOLS

---

The attached are the joint ESI protocols agreed to and proposed by all parties.

I.      **Definitions**

    A.      "Electronically Stored Information" or "ESI", as used herein, means and refers to computer generated information or data of any kind, stored in or located on computers, file servers, discs, back-up tapes or other virtualized devices or media.

II.     **Collection, Preservation and Search Terms**

    A.      The parties will reasonably cooperate to disclosure and identify the ESI systems that may contain relevant and/or responsive ESI.

    B.      The parties agree to meet and confer regarding custodians that may have in their possession, custody or control relevant and/or responsive ESI.

    C.      Nothing in this protocol shall be construed to affect the admissibility of discoverable ESI.  All objections to discoverability or admissibility are preserved.

    D.      The parties agree to meet and confer regarding the use of reasonable search terms including searching using file types, email domains and date ranges for relevant custodians.

III.    **Filtering**

    A.      De-Duplication: a party is only required to produce a single copy of responsive information. De-duplication shall be done based upon a commercially accepted method (e.g. MD5 hash values). Duplicate materials will be identified at the family level. Email attachments, however, will only be de-duplicated if the parent email is also a duplicate. Moreover, loose electronic documents will not be de-duplicated against email attachments.

    B.      De-NISTing: Electronic file collections will be De-NISTed, removing commercially available operating system and application file information contained on the current NIST file list

    C.      The parties will meet and confer regarding any additional filtering techniques.

IV.     **Production Format of Paper or Scanned Records**

    A.      The parties will produce paper records scanned or otherwise converted into electronic form or documents otherwise maintained in static image format in the following format if reasonably feasible:

    B.      All documents shall be scanned to 300 DPI Group IV Black & White Tagged Image File Format (.TIFF or .TIF) files. TIFF files shall be produced in single-page format and 81/2 x 11 inch page size (except for documents requiring a different page size). Each image file should have a unique file name which shall be the Bates number of the page.

C.     In scanning paper documents, distinct documents should not be merged into a single record, and single documents should not be split into multiple records (i.e., paper documents should be logically unitized). The parties will make reasonable efforts to have their vendors unitize documents correctly and will commit to reasonably address situations where there are improperly unitized documents.

D.     Color documents (e.g., color photographs or graphical representations in color) shall be scanned as black & white, single-page TIFF images in accordance with the technical specifications set out above, unless agreed with the opposing party or ordered by a court of competent jurisdiction. If color images are required, the files shall be delivered in single page, JPEG format.

## V.    Production of ESI

A.     The parties will produce ESI in 300 DPI Group IV Black & White Tagged Image File Format (.TIFF or .TIF) files. TIFF files shall be produced in single-page format and 81/2 x 11 inch page size (except for documents requiring a different page size) along with corresponding image load files (e.g., .OPT, LEP, DII file). All TIFF files are to be provided with an accompanying searchable text (.TXT) file, and such text files shall contain the full text extraction. Extracted text will not be provided for electronic documents that have been redacted (e.g., for privilege, protected personally information or non-relevant trade secrets) because the extracted text would reveal the redacted information. Instead, these files should be run through an OCR process to capture the visible text only and the results exchanged in lieu of the original extracted text.

B.     Word documents will be produced in the above format with tracked changes and comments showing.

C.     Presentation files, including but not limited to Microsoft PowerPoint files shall be processed in the above format with images displaying comments, hidden slides, speakers' notes and similar data. Presentation files shall be provided in both image and native format.

D.     During the process of converting ESI from the electronic format of that application in which the ESI is normally created, viewed, and/or modified to TIFF, metadata values should be extracted and produced in a load file ("metadata load file").

E.     The metadata values that are to be extracted and produced in the metadata load files – where reasonably available and where permitted under applicable international privacy regimes (.DAT file using concordance standard delimiters) should conform to the fields set out in **Appendix 1**.

F.     All date fields will be formatted MM/DD/YYYY and all time fields will be formatted HH:MM:SS where reasonably feasible.

G.     Any party may add to its production one or more metadata fields in addition to those enumerated above and in Appendix 1, such additions may not be used to obligate any other party to provide additional fields of any type.

H.     To the extent reasonably available, the "Custodian," or "Source" field with respect to ESI gathered from an individual's hard drive will provide metadata sufficient to identify the individual custodian from whose hard drive such ESI has been gathered.

I.      A party may de-duplicate ESI globally or across more than one custodian provided that the producing party identifies all custodians within the production from which each such file or document was collected and deduped from the collection during processing.

## VI.    Production of Excel and Database ESI

A.     Unless such materials contain privileged information, MS-Excel spreadsheets and similar type databases (e.g., MS Access) shall be produced in native format with a TIFF placeholder. The metadata load file shall contain a link to the produced MS-Excel spreadsheets and databases via data values called "Native Link." The Native Link values should contain the full directory path and file name of the MS-Excel spreadsheet or database as contained in the produced media. The Native Link field should be included in the .dat file specified above. The obligation to produce TIFF versions shall not apply where the TIFF version cannot be rendered in a readable or legible manner.

B.     Production of responsive data contained in relational databases other than MS-Access should be achieved via report or export of such data to MS-Excel spreadsheets or .csv files that will be produced, if reasonably feasible. If this is not reasonably feasible, the parties will meet and confer regarding a reasonable format.

C.     To the extent such material contains information subject to a claim of privilege, the information shall be produced in the form of a redacted TIFF image or a party may redact native Excel files by inserting "redacted" where the material is redacted if the producing party maintains a non-redacted version of the Excel.

## VII.   Production of Audio and Video Files

A.     Audio and video files are to be produced in the native audio file format in which they were maintained in the ordinary course of business. Produced native audio and video files should be accompanied by a reference file containing the name of the file and hash value for each produced file, if feasible. The audio and video files, as well as all other native files produced, should indicate their native file application in the "File Type" field referenced above, where that metadata field is reasonable available.

B.     To the extent audio or video files contain Personally Identifiable Information ("PII"), the files will be produced under the terms of a separate stipulation or order to be agreed upon by the parties or ordered by the Court.

## VIII.  Parent Child Relationships

A.     Parent-child relationships (e.g., the associations between emails and their attachments) will be preserved. Email and other ESI attachments will be produced as independent files immediately following the parent email or ESI record. Parent-child relationships will be identified in the data load file as indicated above.

**IX.      Compressed and Encrypted Files**

    A.    Compressed Files: Compressed file types (i.e., .zip, .rar, .7z) shall be extracted prior to production resulting in the production of individual files.

    B.    Encrypted Files: The producing party will take reasonable steps, prior to production, to decrypt any password protected files or provide the passwords and any other access requirements for any encrypted files that are produced.

**X.      Bates Numbering & Document Identifiers**

    A.    Bates numbers and any confidentiality designations should be electronically branded on each produced TIFF image of ESI.

    B.    Production Media Unless otherwise agreed, documents and ESI will be produced on optical media (CD/DVD), external hard drive, secure FTP site or similar electronic format. Deliverable media should be encrypted and labeled with the name of the action, the identity of the Producing Party, and the following information: Volume name, production Bates range(s), and the date of delivery

**XI.      Privilege Log**

    A.    The producing party must also provide a log of any potentially responsive documents withheld on the basis of privilege. Each log entry must contain in separate fields privilege identification number; beginning and ending bates numbers (for redacted documents); author/sender/from; recipients/to; cc; bcc; date of the document; an indication of whether a document is redacted or withheld entirely; the basis for the privilege claim and a description of the privileged content contained within the document and the basis for the privilege assertion sufficiently detailed to enable assessment of the privilege claim.

    B.    Privileged communications between the client and outside counsel relating to the preparation, prosecution, and/or defense of this lawsuit do not need to be logged. Outside counsel's attorney work product does not need to be logged.

## APPENDIX 1 – METADATA FIELDS

| Field Name | Field Description | Hard Copy | Email | Non-e-mail ESI |
|---|---|---|---|---|
| BegBates | Beginning Bates number (including Prefix) | x | x | x |
| EndBates | Ending Bates number (including Prefix) | x | x | x |
| BegAttach | Beginning Bates number of the first document in an attachment range | x | x | x |
| EndAttach | Ending Bates number of the last document in attachment range | x | x | x |
| Custodian/Source | Name of custodian(s) or source of email(s) or file(s) produced | x | x | x |
| File Type | The record type of document | | x | x |
| Subject | Subject line extracted from an email message | | x | |
| From | From field extracted from an email message | | x | |
| To | To or Recipient extracted from an email message | | x | |
| CC | Carbon Copy ("Cc") field extracted from an email message | | x | |
| BCC | Blind Carbon Copy ("Bcc") field extracted from an email message | | x | |
| Sent Date | Sent date and time of e-mail message (Or, if a party has 2 separate fields, date and time can be in separate fields) | | x | |
| Received Date | Received date/time of e-mail message (Or, if a party has 2 separate fields, date and time can be in separate fields) | | x | |
| File Name | Name of file as saved on system | | | x |
| Author | The author of the document | | | x |

| | | | | |
|---|---|---|---|---|
| File Extension | The document extension extracted from document properties | | | x |
| Redactions | Yes/No determination advising if the document contains redactions | x | x | x |
| Confidentiality | Yes/No field or whatever type of Confidentiality is being claimed | x | x | x |
| Last Modified Date | The application recorded date and time on which the document was last modified (Or, if a party has 2 separate fields, date and time can be in separate fields) | | | x |
| Created Date | The application recorded date and time on which the document was created (Or, if a party has 2 separate fields, date and time can be in separate fields) | | | x |
| Hash Value | MD5 or SHA-1 hash value used to dedupe the data | | x | x |
| Page Count | Number of pages in the produced document | x | x | x |
| Native Link (if natives are exchanged) | Relative path to any files produced in native format, such as Excel spreadsheets | | | x |
| Text Path | Relative path to any OCR/extracted text files in the production set | x | x | x |
| Duplicate Custodian | When globally deduping, this field will list for the Producing Party the other custodians that possessed a copy of the document. | | x | x |

Dated: December 2, 2022

**SPINS, LLC and DAAP, LLC**

By: */s/ Matthew J. O'Hara*
       One of Their Attorneys

Matthew J. O'Hara
Dylan Smith
FREEBORN & PETERS LLP
311 South Wacker Drive
Suite 3000
Chicago, IL 60606
(312) 360-6000
mohara@freeborn.com
dsmith@freeborn.com

Raymond W. Martin
WHEELER TRIGG O'DONNELL LLP
370 Seventeenth Street
Suite 4500
Denver, Colorado 80202
martin@wtotrial.com

**Information Resources, Inc.**

By: */s Michael Mitchell/*
       One of Its Attorneys

Michael S. Mitchell
James P. Denvir
BOIES SCHILLER FLEXNER LLP
1401 New York Avenue, NW
Washington, DC 20005
(t) +1 202 274 1125
(m) +1 301 452 5764
mmitchell@bsfllp.com
jdenvir@bsfllp.com

Kenneth F. Rossman
LEWIS ROCA ROTHGERBER CHRISTIE LLP
1601 19th St.
Suite 1000
Denver, CO 80202
krossman@lewisroca.com

**Crownalytics, LLC**

By: */s/Rick D. Bailey*
       One of Its Attorneys

Rick D. Bailey, Esq.
LAW OFFICE OF RICK D. BAILEY, ESQ
1801 Broadway, Ste. 528
Denver, CO 80202
Tel. (720) 676-6023
rick@rickbaileylaw.com

Pat Pascarella
BONA LAW PC
Pat Pascarella
100 Crescent C. #700-3425
Dallas, TX 75201
pat.pascarella@bonalawpc.com

Alexandra Shear
BONA LAW PC
287 Park Avenue South, Suite 422
New York, NY 10010
alex.shear@bonalawpc.com

Aaron R. Gott
BONA LAW PC
331 2nd Avenue S. #420
Minneapolis, MN 55401

Kristen Harris
BONA LAW PC
4275 Executive Square, Suite 200
La Jolla, CA 92037
kristen.harris@bonalawpc.com

# EXHIBIT 3

365801
Law Firm Ref#: 234772.001

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

CROWNALYTICS LLC, a Colorado limited liability company,

      Plaintiff(s)

      vs.

SPINS LLC, a Delaware limited liability company; et al.,

      Defendant(s)

Case No.: 1:22-cv-01275-NYW-SKC

**AFFIDAVIT OF SPECIAL PROCESS SERVER**

I, ____FRANK PRITCHETT_____, being first duly sworn on oath, deposes and states the following:

I am over the age of 18 and not a party of this action. I am an agent of It's Your Serve, Inc, Illinois Department of Financial and Professional Regulation number 117.000885. I attempted service of the within **Cover Letter dated November 15, 2023; Protecitve Order; Joint ESI Protocols; Notice of Subpoena for Production of Documents; Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action to Bedrock Analytics Corporation c/o Registered Agent Solutions Inc., located at 838 Walker Road, Suite 21-2, Dover, DE 19904** resulting in the following:

☐ **PERSONAL SERVICE:** By leaving a copy of the process with Bedrock Analytics Corporation c/o Registered Agent Solutions Inc. personally on the _____ day of _____, 20____ at _____M.

☒ **AUTHORIZED SERVICE:** By leaving a copy of the process with:
Name: _JUSTIN WOODS_____, Title: _MANAGING AGENT_____, an individual of the company willing and able to accept on behalf of the entity/respondent/witness on the 29_ day of _NOVEMBER___, 20_23_ at _2:00 P_ M.

☐ **SUBSTITUTE SERVICE:** By leaving a copy of the process at the above address which is Bedrock Analytics Corporation c/o Registered Agent Solutions Inc.'s usual place of abode with:
Name: _____, Relationship: _____, a person of his/her family, or other person residing there, over the age of 13 years who was informed of the contents of the listed documents on the _____ day of _____, 20____ at _____M.
After substitute service, I mailed a copy of the listed documents via regular mail to the subject on the _____ day of _____, 20____.

☐ **NON-SERVICE:** for the following reasons with the **DATE** and **TIME** of each attempt listed along with a description of the attempt (attach an additional sheet if needed):

_/_/_ @_____:_____

_/_/_ @_____:_____

_/_/_ @_____:_____

A description of person with whom the documents were left is as follows:

Sex: _MALE___   Race:_BLACK____   Approx. Age: ____40___ Height: _5'6__ Weight: _200___   Hair: _BLACK___

    Noticeable features/Notes: _____

The undersigned verifies that the statements set forth in this Affidavit of Service are true and correct.

Signed and sworn before me on
this _29TH_ day of _NOVEMBER_ 20_23_

_____ (Server Signature)

Notary Public

KEVIN DUNN
NOTARY PUBLIC
STATE OF DELAWARE
My Commission Expires on July 26, 2026

**FRANK PRITCHETT**
(Print Name)

SAAFF/365801

# EXHIBIT 4

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:22-cv-01275

CROWNALYTICS, LLC, a Colorado Limited Liability Company,

Plaintiff,

v.

SPINS LLC, a Delaware Limited Liability Company; DAAP, LLC, a
Delaware Limited Liability Company; and INFORMATION
RESOURCES, INC., a Delaware Corporation,

Defendants.

---

**NONPARTY BEDROCK ANALYTICS CORPORATION'S RESPONSES AND
OBJECTIONS TO DEFENDANTS SPINS LLC AND DAAP LLC'S SUBPOENA FOR
PRODUCTION OF DOCUMENTS**

---

Nonparty Bedrock Analytics Corporation ("Bedrock") responds and objects to the

Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in

a Civil Action served by Defendants SPINS LLC and DAAP LLC (collectively, "Defendants")

and dated November 15, 2023 (the "Subpoena") as follows.

## GENERAL STATEMENT AND OBJECTIONS

1.      All of the responses contained herein are based only on the information that is

presently available to and specifically known to Bedrock.  The following responses are given

without prejudice to Bedrock's right to further object upon the discovery of additional facts.

2.      In addition to any specific objections that may be made in the separate responses

set forth below, Bedrock objects generally to each Request for Production of Documents

("Request") to the extent it seeks to elicit information subject to and protected by the attorney-

client privilege and/or the attorney work product doctrine and/or any other applicable privilege.

1

Nothing contained herein is intended to be or should be construed as a waiver of the attorney-client privilege, the attorney work product doctrine, or any other applicable privilege, protection or doctrine.

3.    Bedrock objects generally to each Request to the extent that it purports to impose obligations upon Bedrock exceeding those authorized by the Federal Rules of Civil Procedure and any other applicable statute or rule.

4.    Bedrock objects to the Requests to the extent that they seek confidential, proprietary, trade secret and/or competitively sensitive material, which will not be produced without an appropriate protective order.

5.    Bedrock objects to the "Joint ESI Protocols" propounded upon Bedrock along with the subpoena served by Defendants on the ground that they prescribe procedures for collecting and producing documents that are unduly costly and burdensome, particularly in the context of a third-party production.

6.    This General Statement and Objections shall be deemed to be incorporated in full into each response separately set forth below.

## RESPONSES TO SPECIFIC REQUESTS

## REQUEST FOR PRODUCTION NO. 1:

All documents concerning Crownalytics, LLC ("Crownalytics"), including without limitation, all documents concerning Crownalytics, Kristopher Crown, or any attorney or other person acting on Crownalytics's or Crown's behalf.

## RESPONSE TO REQUEST FOR PRODUCTION NO. 1:

Bedrock objects to this Request on the ground that it is overly broad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and not proportional to

the needs of the case, to the extent it seeks documents concerning Crownalytics, Crown or related persons that are not relevant to any claim or defense at issue in this action. This action concerns IRI's and SPINS' alleged, anticompetitive "arrangement expressly coordinating and combining their sale of data to NOCPG manufacturers," and it is unclear how "[a]ll documents concerning Crownalytics, LLC," regardless of their subject matter, could be relevant to this case. Subject to this objection and the General Statement and Objections, Bedrock will produce nonprivileged documents responsive to this Request.

**REQUEST FOR PRODUCTION NO. 2:**

All documents concerning Bedrock's participation or potential participation in the Nielsen IQ Partner Network.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 2:**

Bedrock objects to this Request on the ground that it is overly broad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and not proportional to the needs of the case. This action concerns IRI's and SPINS' alleged, anticompetitive "arrangement expressly coordinating and combining their sale of data to NOCPG manufacturers," and it is unclear how "[a]ll documents concerning Bedrock's participation or potential participation in the Nielsen IQ Partner Network" could be relevant to the claims and defenses at issue in this matter. Bedrock further objects to this Request on the ground that it calls for proprietary and competitively sensitive information that could be used by Defendants to the detriment of Bedrock.

**REQUEST FOR PRODUCTION NO. 3:**

All documents concerning any third-party agreement or other contract, agreement, or understanding authorizing Bedrock to access Data from NielsenIQ, SPINS LLC ("SPINS"),

Information Resources, Inc. ("IRI"), Circana, Inc. ("Circana"), The NPD Group ("NPD"), or any other Data source.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 3:**

Bedrock objects to this Request on the ground that it is overly broad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and not proportional to the needs of the case, to the extent it seeks documents concerning the listed entities that are not relevant to any claim or defense at issue in this action.  This action concerns IRI's and SPINS' alleged, anticompetitive "arrangement expressly coordinating and combining their sale of data to NOCPG manufacturers," and it is unclear how Bedrock's "contracts, agreements or understandings" with other entities bear on the claims and defenses at issue.  Bedrock further objects to this Request on the ground that it calls for proprietary and competitively sensitive information that could be used by Defendants to the detriment of Bedrock.

**REQUEST FOR PRODUCTION NO. 4:**

Documents sufficient to identify customers that purchased or otherwise obtained CPG Data Analytics from Bedrock, including the particular type of Data Analytics obtained, the brand or brands for which such Data Analytics were obtained, the price paid or payments received for such Data Analytics, and the duration of any contract governing such customer's purchase of such Data Analytics.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 4:**

Bedrock objects to this Request on the ground that it is overly broad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and not proportional to the needs of the case.  This action concerns IRI's and SPINS' alleged, anticompetitive "arrangement expressly coordinating and combining their sale of data to NOCPG

manufacturers," and it is unclear how the identities of Bedrock's customers or the particulars of the services they purchased from Bedrock are relevant to the claims and defenses at issue in this action. Bedrock further objects to this Request on the ground that it calls for proprietary and competitively sensitive information that could be used by Defendants to the detriment of Bedrock.

**REQUEST FOR PRODUCTION NO. 5:**

All documents concerning Bedrock's or any competitor's share of the Data Analytics market or any segment of the Data Analytics market.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 5:**

Bedrock objects to this Request on the ground that it is overly broad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and not proportional to the needs of the case. This action concerns IRI's and SPINS' alleged, anticompetitive "arrangement expressly coordinating and combining their sale of data to NOCPG manufacturers," and it is unclear how "Bedrock's or any competitor's share of the Data Analytics market or any segment of the Data Analytics market" is relevant to the claims and defenses at issue in this action. Subject to this objection and the General Statement and Objections, Bedrock responds that it has no documents responsive to this Request in its possession, custody or control.

**REQUEST FOR PRODUCTION NO. 6:**

All documents concerning Data Analytics that compete with Data Analytics offered by Bedrock, including Data Analytics offered by SPINS, DAAP, IRI, Circana, NielsenIQ (including Byzzer and Data Impact), Crownalytics, Red Fox Analytics, TABS Analytics, Big Chalk, or Crisp.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 6:**

Bedrock objects to this Request on the ground that it is overly broad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and not proportional to the needs of the case.  This action concerns IRI's and SPINS' alleged, anticompetitive "arrangement expressly coordinating and combining their sale of data to NOCPG manufacturers," and it is unclear how "[a]ll documents concerning Data Analytics that compete with Data Analytics offered by Bedrock" are relevant to the claims and defenses at issue in this action.  Bedrock further objects to this Request on the ground that it calls for proprietary and competitively sensitive information that could be used by Defendants to the detriment of Bedrock.

**REQUEST FOR PRODUCTION NO. 7:**

All marketing presentations and other marketing materials concerning any Data Analytics offered by Bedrock.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 7:**

Bedrock objects to this Request on the ground that it is overly broad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and not proportional to the needs of the case.  This action concerns IRI's and SPINS' alleged, anticompetitive "arrangement expressly coordinating and combining their sale of data to NOCPG manufacturers," and it is unclear how "[a]ll marketing presentations and other marketing materials concerning any Data Analytics offered by Bedrock" are relevant to the claims and defenses at issue in this action.  Bedrock further objects to this Request on the ground that it calls for proprietary and competitively sensitive information that could be used by Defendants to the

detriment of Bedrock.  Subject to these objections and the General Statement and Objections,

Bedrock will produce nonprivileged, publicly available documents responsive to this Request.

Respectfully submitted:

By: */s/ William J. Frimel*
William J. Frimel (Bar. No. 160287)
bill@sffwlaw.com
Seubert French Frimel & Warner LLP
1075 Curtis Street
Menlo Park, CA 94025
Tel: (650) 322-3048

**ATTORNEYS FOR NONPARTY**
**BEDROCK ANALYTICS**
**CORPORATION**

## <u>CERTIFICATE OF SERVICE</u>

I, CHRISTOPHER R. EDGAR, am over the age of eighteen and not a party to the above-referenced action.  My business address is 1075 Curtis Street, Menlo Park, California  94025.

On December 13, 2023, I served the following documents via first-class mail and email:

**NONPARTY BEDROCK ANALYTICS CORPORATION'S RESPONSES AND OBJECTIONS TO DEFENDANTS SPINS, LLC AND DAAP, LLC'S SUBPOENA FOR PRODUCTION OF DOCUMENTS**

I served the foregoing documents via first-class mail and email upon the counsel listed below:

Meghan E. Tepas, Esq.
Smith, Gambrell & Russell, LLP
311 S. Wacker Drive, Suite 3000
Chicago, IL  60606
mtepas@sgrlaw.com

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated:  December 13, 2023

Christopher R. Edgar

# EXHIBIT 5

**Flynn, Kirstin**

| | |
|---|---|
| **From:** | Christopher Edgar <chris@sfw-law.com> |
| **Sent:** | Tuesday, February 20, 2024 11:43 AM |
| **To:** | Tepas, Meghan |
| **Cc:** | Bill Frimel; O'Hara, Matthew; Benjamin Solomon-Schwartz; Ehrhart, Katheleen; Pabon, Alexander |
| **Subject:** | Re: Call today |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Some people who received this message don't often get email from chris@sfw-law.com. Learn why this is important

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Meghan,

Thank you for sending the SPINS licensing documents.  Bedrock has concerns regarding the lawfulness of some of those documents' terms, some of which are presently being litigated in Crownalytics' lawsuit.

Further, to be clear, Bedrock's concern regarding SPINS' request for Bedrock's customers' identities and contracts is not solely based on "a letter SPINS sent Bedrock several years ago."  As I have explained, SPINS continues, today, to contact Bedrock's customers and threaten them with litigation if they continue to use Bedrock's software.  While it is true that Bedrock can produce this information on an attorneys' eyes only basis under the protective order in place in this litigation, Bedrock is concerned that, if SPINS receives Bedrock's customers' identities, SPINS will subpoena them as well, and use the threat of compelling discovery from them to induce them to cease doing business with Bedrock.

I also note that, as explained in my January 16 email, it is not clear why Bedrock's customers' identities are relevant to establishing the scope of the relevant market, and I provided authority to you holding that such information is not relevant to the issue of market definition.

For these reasons, and those articulated in Bedrock's objections to SPINS' subpoena, Bedrock continues to object to the production of its customers' identities and contracts to SPINS.

Chris

---

**From:** Tepas, Meghan <mtepas@sgrlaw.com>
**Sent:** Friday, February 16, 2024 8:43 AM
**To:** Christopher Edgar
**Cc:** Bill Frimel; O'Hara, Matthew; Benjamin Solomon-Schwartz; Ehrhart, Katheleen; Pabon, Alexander; Tepas, Meghan
**Subject:** RE: Call today

Chris,

I noticed one of the attachments did not make it over, so I am including it here.

**Meghan E. Tepas**  she/her/hers
*Partner*

---

**p** | 312-360-6454
**f** | 312-360-6520
**e** | mtepas@sgrlaw.com
311 South Wacker Drive | Suite 3000 | Chicago, IL 60606
www.sgrlaw.com | My Bio



---

**From:** Tepas, Meghan <mtepas@sgrlaw.com>
**Sent:** Friday, February 16, 2024 9:49 AM
**To:** Christopher Edgar <chris@sffwlaw.com>
**Cc:** Bill Frimel <Bill@sffwlaw.com>; O'Hara, Matthew <mohara@sgrlaw.com>; Benjamin Solomon-Schwartz <bsolomon-schwartz@bsfllp.com>; Ehrhart, Katheleen <kehrhart@sgrlaw.com>; Pabon, Alexander <apabon@sgrlaw.com>; Tepas, Meghan <mtepas@sgrlaw.com>
**Subject:** RE: Call today

Chris,

To recap, last time we spoke you conveyed your client's concern about a letter SPINS sent Bedrock several years ago wherein SPINS complained about Bedrock's improper use of customer log-in credential. I explained that that letter was not intended to be an indication of animosity between Bedrock and SPINS, but rather SPINS' enforcement of its own customer contracts with prohibit customers from sharing SPINS' data without a TPA in place.

While we believe your client is well-aware of these types of access restrictions in SPINS (and other data providers') agreement, we agreed to pass along those contracts so you could review. They are attached.

If you could please review and provide an update on your client's position with respect to producing the customer agreements (and other responsive documents) requested by the subpoena, we would appreciate it. Again, while we understand there is some sensitivity to producing such documents to competitors, that is the nature of antitrust litigation and the reason we have a robust protective order in place.

I look forward to hearing from you.

Thank you,

Meghan

**Meghan E. Tepas**  she/her/hers
*Partner*

**p** | 312-360-6454
**f** | 312-360-6520
**e** | mtepas@sgrlaw.com
311 South Wacker Drive | Suite 3000 | Chicago, IL 60606
www.sgrlaw.com  |  My Bio



**From:** Christopher Edgar <chris@sffwlaw.com>
**Sent:** Thursday, January 25, 2024 12:04 PM
**To:** Tepas, Meghan <mtepas@sgrlaw.com>
**Cc:** Bill Frimel <Bill@sffwlaw.com>; O'Hara, Matthew <mohara@sgrlaw.com>; Benjamin Solomon-Schwartz <bsolomon-schwartz@bsfllp.com>; Smith, Dylan <dylansmith@sgrlaw.com>
**Subject:** Re: Call today

> CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Hi Meghan,

My understanding from our call was that you were going to pass along a sample agreement between SPINS and one of its customers -- is that doable?

Regards, Chris

---

**From:** Tepas, Meghan <mtepas@sgrlaw.com>
**Sent:** Thursday, January 25, 2024 9:34:23 AM
**To:** Christopher Edgar
**Cc:** Bill Frimel; O'Hara, Matthew; Benjamin Solomon-Schwartz; Smith, Dylan; Tepas, Meghan
**Subject:** RE: Call today

Hi Chris,

Have you had a chance to talk to your client about what we discussed last week? Please let me know when you can.

Thanks,

**Meghan E. Tepas**  she/her/hers
*Partner*

**p** | 312-360-6454
**f** | 312-360-6520
**e** | mtepas@sgrlaw.com
311 South Wacker Drive | Suite 3000 | Chicago, IL 60606
www.sgrlaw.com  |  My Bio



**From:** Christopher Edgar <chris@sffwlaw.com>
**Sent:** Thursday, January 18, 2024 11:49 AM
**To:** Tepas, Meghan <mtepas@sgrlaw.com>
**Cc:** Bill Frimel <Bill@sffwlaw.com>; O'Hara, Matthew <mohara@sgrlaw.com>; Benjamin Solomon-Schwartz <bsolomon-schwartz@bsfllp.com>; Smith, Dylan <dylansmith@sgrlaw.com>
**Subject:** Re: Call today

> CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Okay, let's talk at 10 am CST tomorrow.

---

**From:** Tepas, Meghan <mtepas@sgrlaw.com>
**Sent:** Thursday, January 18, 2024 9:24:14 AM
**To:** Christopher Edgar
**Cc:** Bill Frimel; O'Hara, Matthew; Benjamin Solomon-Schwartz; Smith, Dylan; Tepas, Meghan
**Subject:** RE: Call today

HI Chris,

Thank you for the explanation. Do you have time today for a quick call? I would like to try and clear up the "cease and desist" issue, because there really does still seem to be a disconnect here.

I am generally open until 5pm CST today. I have some time tomorrow between 10-11 CST and between 2-3 CST if that is better for you.

Let me know.

Thanks,


**Meghan E. Tepas**  she/her/hers
*Partner*

---

**p** | 312-360-6454
**f** | 312-360-6520
**e** | mtepas@sgrlaw.com
311 South Wacker Drive | Suite 3000 | Chicago, IL 60606
www.sgrlaw.com  |  My Bio



---

**From:** Christopher Edgar <chris@sffwlaw.com>
**Sent:** Tuesday, January 16, 2024 1:56 PM
**To:** Tepas, Meghan <mtepas@sgrlaw.com>
**Cc:** Bill Frimel <Bill@sffwlaw.com>; O'Hara, Matthew <mohara@sgrlaw.com>; Benjamin Solomon-Schwartz <bsolomon-schwartz@bsfllp.com>; Smith, Dylan <dylansmith@sgrlaw.com>
**Subject:** Re: Call today

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Hi Meghan,

The reason I initially expected to have a response to you by January 12 was that I thought at that time that I would be able to speak to my client on January 12, and I intended to base my response to you on that conversation.  However, I was not able to speak to my client on that date.

In any event, Bedrock continues to object to the production of its contracts with its customers in response to SPINS' subpoena for the reasons set forth below.

First, the customer contracts are irrelevant to the claims and defenses at issue in this case.  In our discussions, you stated that SPINS needs the contracts because they are allegedly relevant to the issue of defining the relevant market for the purposes of Crownalytics' antitrust claims.  However, the identities of Bedrock's customers, and the terms of Bedrock's contracts with them, have no bearing on the scope of the "NOCPG data analytics market," which I understand to be the alleged market at issue.  See, e.g., Lykes Bros. Inc. v. Aaction Mulch, Inc., No. 2:08-cv-399-FtM-99SPC, 2009 WL 10669857, *1 (M.D. Fla. Oct. 1, 2009) (denying motion to compel identification of customers, despite plaintiff's argument that such information was "evidence of the relevant product market for antitrust purposes," because "the identity of [defendant's] customers' names is not necessary to the issue and is protected proprietary information").

Second, my understanding from our conversations is that you do not believe SPINS has sent cease-and-desist communications to Bedrock and Bedrock's customers.  In fact, SPINS has sent communications to Bedrock and its customers claiming that Bedrock is not permitted to display SPINS' data in Bedrock's analytics platform, such as the attached.  As I advised you, Bedrock learned that SPINS contacted two of Bedrock's customers within the last 30 days and made the same claims to those customers.  Under these circumstances, Bedrock has every reason to suspect that, if Bedrock provides its customers' identities to SPINS, SPINS will use that information to threaten Bedrock's customers with litigation and gain a competitive advantage over Bedrock.  See, e.g., Gray Mfg. Co. v. Sefac USA Inc., No. 17-4639, 2020 WL 13866444, *1 (E.D. Pa. Feb. 6, 2020) (denying motion to compel production of customer identities because "[i]t is unlikely that discovery from [defendant's] customers would alert [plaintiff] to some novel form of infringement" and "[t]he customers' identities are therefore minimally relevant," and, "[b]ecause [the parties] . . . are competitors, [plaintiff] could use the identities of [defendant's] customers to undermine [defendant's] relationship with those customers"); AquaShield, Inc. v. Sonitec Vortisand, Inc., No. 1:13-cv-119-SKL, 2014 WL 12704706, *3 (E.D. Tenn. Mar. 21, 2014) (because "Defendant has carried its burden of showing that Plaintiffs' discovery requests will require the disclosure of trade secrets or confidential information, and that the disclosure of the non-publicized customer information would cause harm to Defendant," and "disclosure of the identity of Defendant's non-publicized customers is not necessary for Plaintiffs to make their case," motion to compel production of customer identities denied).

Best, Chris

---

**From:** Tepas, Meghan <mtepas@sgrlaw.com>
**Sent:** Monday, January 15, 2024 6:30 AM
**To:** Christopher Edgar

**Cc:** Bill Frimel; O'Hara, Matthew; Benjamin Solomon-Schwartz; Smith, Dylan; Tepas, Meghan
**Subject:** RE: Call today

Thanks Chris. Although I am a little confused how you went from expecting to have a response to me by January 12, but now are saying you still need to discuss with your client early this week. We are really getting pressed for time and if we are going to need to file a motion, it is going to have to be soon.

Can you please confirm that we will know your final position on the documents requested by the subpoena by end of day on Wednesday?

I would appreciate it.

Thank you,


**Meghan E. Tepas**  she/her/hers
*Partner*

---

**p** | 312-360-6454
**f** | 312-360-6520
**e** | mtepas@sgrlaw.com
311 South Wacker Drive | Suite 3000 | Chicago, IL 60606
www.sgrlaw.com  |  My Bio



---

**From:** Christopher Edgar <chris@sffwlaw.com>
**Sent:** Friday, January 12, 2024 5:25 PM
**To:** Tepas, Meghan <mtepas@sgrlaw.com>
**Cc:** Bill Frimel <Bill@sffwlaw.com>; O'Hara, Matthew <mohara@sgrlaw.com>
**Subject:** Re: Call today

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Hi Meghan,

Just as an update, my client has not been available but I expect to be able to further discuss with him early next week and will get back to you then.

Chris

---

**From:** Christopher Edgar
**Sent:** Thursday, January 11, 2024 10:22:55 AM
**To:** Tepas, Meghan
**Cc:** Bill Frimel; O'Hara, Matthew
**Subject:** Re: Call today

Hi Meghan,

I plan to send a further response regarding this issue tomorrow.

Best, Chris

---

**From:** Tepas, Meghan <mtepas@sgrlaw.com>
**Sent:** Thursday, January 11, 2024 9:52:35 AM
**To:** Christopher Edgar
**Cc:** Bill Frimel; O'Hara, Matthew; Tepas, Meghan
**Subject:** RE: Call today

Hi Chris,

Following up on this. Have you had a change to further discuss the subpoena response issues with your client? I'd appreciate an update when you have a moment.

Thanks,

Meghan

**Meghan E. Tepas**  she/her/hers
*Partner*

---

**p** | 312-360-6454
**f** | 312-360-6520
**e** | mtepas@sgrlaw.com
311 South Wacker Drive | Suite 3000 | Chicago, IL 60606
www.sgrlaw.com | My Bio



---

**From:** Tepas, Meghan <mtepas@sgrlaw.com>
**Sent:** Friday, January 5, 2024 10:05 AM
**To:** Christopher Edgar <chris@sffwlaw.com>
**Cc:** Bill Frimel <Bill@sffwlaw.com>; Tepas, Meghan <mtepas@sgrlaw.com>
**Subject:** RE: Call today

Yes, that works. What number should I use?

**Meghan E. Tepas**  she/her/hers
*Partner*

---

**p** | 312-360-6454
**f** | 312-360-6520
**e** | mtepas@sgrlaw.com
311 South Wacker Drive | Suite 3000 | Chicago, IL 60606
www.sgrlaw.com | My Bio



---

**From:** Christopher Edgar <chris@sffwlaw.com>
**Sent:** Friday, January 5, 2024 9:56 AM
**To:** Tepas, Meghan <mtepas@sgrlaw.com>
**Cc:** Bill Frimel <Bill@sffwlaw.com>
**Subject:** Re: Call today

> CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Sure, would Monday at 11 am PST / 1 pm CST work for you?

**From:** Tepas, Meghan <mtepas@sgrlaw.com>
**Sent:** Friday, January 5, 2024 7:51:10 AM
**To:** Christopher Edgar
**Cc:** Bill Frimel; Tepas, Meghan
**Subject:** RE: Call today

Hi Chris,

I think there may have been some miscommunication between our clients on this. Do you have time for a call today or Monday? I think I can shed some light and hopefully alleviate any issues.

**Meghan E. Tepas**  she/her/hers
*Partner*

**p** | 312-360-6454
**f** | 312-360-6520
**e** | mtepas@sgrlaw.com
311 South Wacker Drive | Suite 3000 | Chicago, IL 60606
www.sgrlaw.com  | My Bio



**From:** Christopher Edgar <chris@sffwlaw.com>
**Sent:** Thursday, January 4, 2024 12:43 PM
**To:** Tepas, Meghan <mtepas@sgrlaw.com>
**Cc:** Bill Frimel <Bill@sffwlaw.com>
**Subject:** Re: Call today

> CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Hi Meghan,

Further to our call on Tuesday, would it be possible for you to confirm that neither you nor the other attorneys representing SPINS in the Crownalytics litigation are also representing SPINS in connection with its cease and desist communications with Bedrock and Slate Craft Goods?  Thanks.

Regards, Chris

**From:** Christopher Edgar
**Sent:** Tuesday, January 2, 2024 12:39 PM
**To:** Tepas, Meghan; Bill Frimel
**Subject:** Re: Call today

Okay, that's fine -- let's talk at 4:30 CST.

---

**From:** Tepas, Meghan <mtepas@sgrlaw.com>
**Sent:** Tuesday, January 2, 2024 12:28:31 PM
**To:** Christopher Edgar; Bill Frimel
**Cc:** Tepas, Meghan
**Subject:** Call today

Chris,

I'm sorry for the late notice, but can we push this back to 4 or 430 CST? I am trying to wrap up an unexpected fire drill.

**Meghan E. Tepas**  she/her/hers
*Partner*

---

**p** | 312-360-6454
**f** | 312-360-6520
**e** | mtepas@sgrlaw.com
311 South Wacker Drive | Suite 3000 | Chicago, IL 60606
www.sgrlaw.com  |  My Bio



---

# EXHIBIT 6



July 12, 2019

Via FEDEX and email (william@bedrockanalytics.com)

Bedrock Analytics
344 20th Street, Suite 115
Oakland, CA 94612
Attn: Will Salcido

Re: Termination of Third Party Access Agreement and use of SPINS Data

Dear Mr. Salcido:

This letter serves as written notice of termination of the Third Party Access Agreement, dated as of July 14, 2014, among Bedrock Analytics, SPINS LLC and Nutiva, Inc. (the "TPA"). Please destroy all copies of any data that is licensed by Nutiva from SPINS that you have in your possession, and any materials that you have prepared that include such data.

We are not aware of any other currently active third party agreements that we have entered into with Bedrock. However, to the extent there are any currently active third party agreements in effect, this letter serves as written notice of termination of any and all third party agreements among SPINS, Bedrock and any third party. Please destroy all copies of any data licensed from SPINS ("SPINS Data") that you have in your possession, and any materials that you have prepared that include SPINS Data.

We have been made aware that some of our clients have made SPINS Data available to you without first entering into a third party agreement with SPINS and Bedrock, which is a violation of our agreements with our clients. Bedrock does not have permission from SPINS to access any SPINS Data. Please immediately cease accessing any SPINS Data and immediately delete all SPINS Data in your possession, including any of your materials that contain any SPINS Data. Please reply to this letter with a list of companies that have provided to you any SPINS Data so that we can reach out to these clients and ensure they are aware of their obligations.

In the future, if any company contacts Bedrock and offers to provide any SPINS Data to Bedrock, please inform them that you cannot receive SPINS Data and ask the company to first arrange for a third party agreement with SPINS that would permit Bedrock to have access to SPINS Data.

In addition to the list of companies that have provided you access to SPINS Data, please reply to this letter to confirm you have destroyed all copies of any SPINS Data that you have in your possession, and any materials that you have prepared that include SPINS Data.

Thank you for your cooperation in ensuring the proper usage of SPINS Data in compliance with our agreements.

Sincerely,

Evan Makela
General Counsel

SPINS LLC | 222 W. Hubbard St. | Suite 300 | Chicago, IL 60654

# EXHIBIT 7

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 22-cv-01275-NYW-JPO

CROWNALYTICS, LLC, a Colorado Limited Liability Company

      Plaintiff,

v.

SPINS, LLC, a Delaware Limited Liability Company,
DAAP, LLC, a Delaware Limited Liability Company,
INFORMATION RESOURCES, INC, a Delaware Corporation,

      Defendants.

---

## ORDER ENTERING AMENDED
## PROTECTIVE ORDER

---

      For good cause shown, the Protective Order entered June 21, 2023, ECF No. 104, is hereby amended.  Paragraph 5(a) shall now read as follows:

      "outside counsel and a single inside counsel actively working on this case for each defendant to be identified by each party to the other parties.  A defendant may only change the identity of the single inside counsel if the counsel leaves the company or is otherwise, in good faith, unable to serve.  In its notice to the other parties, the defendant shall explain the good faith reason the counsel is unable to serve[.]"

                   **SO ORDERED.**

Dated:  January 31 , 2024

                   Magistrate Judge James P. O'Hara

# EXHIBIT 8



**From:** Christopher Edgar <chris@sfw-law.com>
**Sent:** Wednesday, April 3, 2024 11:02 AM
**To:** Tepas, Meghan <mtepas@sgrlaw.com>
**Cc:** Bill Frimel <Bill@sfw-law.com>
**Subject:** Re: Bedrock--Crownalytics v. SPINS subpoena response

**CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Meghan,

I was able to discuss the issues we talked about in our call with Bedrock.  I'm informed that the parties are still negotiating the terms of Bedrock's global third-party access agreement with SPINS, and that the legal document is not yet being drafted.  I'm also informed that SPINS' commercial team has agreed to accommodate Bedrock's request not to share Bedrock's customer list at this time, and that the terms of any information-sharing that may occur will be governed by the as-yet incomplete global TPA.

Thus, Bedrock's position regarding providing its customer contracts to SPINS that I previously discussed remains the same.

Best, Chris

---

**From:** Tepas, Meghan <mtepas@sgrlaw.com>
**Sent:** Friday, March 29, 2024 4:52 PM
**To:** Christopher Edgar
**Cc:** Bill Frimel; Tepas, Meghan
**Subject:** RE: Bedrock--Crownalytics v. SPINS subpoena response

That works.

You kill me with the no signature block! Can you send me your number?

**Meghan E. Tepas**  she/her/hers
*Partner*

---

p | 312-360-6454
f | 312-360-6520
e | mtepas@sgrlaw.com
311 South Wacker Drive | Suite 3000 | Chicago, IL 60606
www.sgrlaw.com | My Bio



---

**From:** Christopher Edgar <chris@sfw-law.com>
**Sent:** Friday, March 29, 2024 6:01 PM
**To:** Tepas, Meghan <mtepas@sgrlaw.com>
**Cc:** Bill Frimel <Bill@sfw-law.com>
**Subject:** Re: Bedrock--Crownalytics v. SPINS subpoena response

 **IRONSCALES finds this email suspicious! We know Christopher Edgar by name, but the email was sent from an unfamiliar address chris@sfw-law.com | Know this sender?**

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Meghan,


Bill forwarded me your email below.  Why don't we talk at 10 am CST on Monday if that works for you.


Chris

---

**From:** Tepas, Meghan <mtepas@sgrlaw.com>
**Sent:** Friday, March 29, 2024 12:08 PM
**To:** Bill Frimel <Bill@sfw-law.com>
**Cc:** Tepas, Meghan <mtepas@sgrlaw.com>
**Subject:** Bedrock--Crownalytics v. SPINS subpoena response


Bill,


I left you a voicemail. I represent SPINS in connection with the subpoena it issued to your client, Bedrock Analytics. I had previously spoken several times with Chris Edgar, but I do not see him listed on your website so perhaps he has left the firm.


Do you have time for a call either today or Monday?


Thanks,


**Meghan E. Tepas**  she/her/hers
*Partner*

---

**p** | 312-360-6454
**f** | 312-360-6520
**e** | mtepas@sgrlaw.com
311 South Wacker Drive | Suite 3000 | Chicago, IL 60606
www.sgrlaw.com  |  My Bio



# EXHIBIT 9



**From:** Tepas, Meghan <mtepas@sgrlaw.com>
**Sent:** Monday, June 17, 2024 11:50 AM
**To:** Christopher Edgar <chris@sfw-law.com>
**Cc:** Bill Frimel <Bill@sfw-law.com>; Tepas, Meghan <mtepas@sgrlaw.com>
**Subject:** RE: SPINS/Bedrock

That time works on our end. I will send a calendar invite and call-in.

Thanks Chris.

Meghan


**Meghan E. Tepas**  she/her/hers
*Partner*

---

**p** | 312-360-6454
**f** | 312-360-6520
**e** | mtepas@sgrlaw.com
311 South Wacker Drive | Suite 3000 | Chicago, IL 60606
www.sgrlaw.com  |  My Bio

---

**From:** Christopher Edgar <chris@sfw-law.com>
**Sent:** Monday, June 17, 2024 11:21 AM
**To:** Tepas, Meghan <mtepas@sgrlaw.com>

**Cc:** Bill Frimel <Bill@sfw-law.com>
**Subject:** Re: SPINS/Bedrock

> CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Hi Meghan,

Will is on vacation this week but has some availability next week. Would you and the SPINS principals be available to talk at 10 am PST / 12 pm CST on June 26?

Chris

---

**From:** Tepas, Meghan <mtepas@sgrlaw.com>
**Sent:** Monday, June 17, 2024 8:29:40 AM
**To:** Christopher Edgar
**Cc:** Tepas, Meghan
**Subject:** SPINS/Bedrock

Hi Chris,

I know its been awhile, but we are still hoping to reach some agreement on the documents subpoena that we issued to your client Bedrock. As I explained during a few of our calls, it was my understanding that the business people were working together on an agreement, and that there may be a disconnect in communication between business and legal (either on their end or ours). Given that, we think it might be most productive at this point if we could schedule a call with me and you, the SPINS GC, SPINS head of retail, and Will Salcido (Bedrock CEO) (and any Bedrock internal legal if they have).

If your side is amenable to that, could you send over some days/times this week that work on your end and I can work on coordinating schedules on mine.

Thanks,

Meghan

**Meghan E. Tepas**  she/her/hers
*Partner*

**p** | 312-360-6454
**f** | 312-360-6520
**e** | mtepas@sgrlaw.com
311 South Wacker Drive | Suite 3000 | Chicago, IL 60606
www.sgrlaw.com  |  My Bio



# EXHIBIT 10



**From:** Christopher Edgar <chris@sfw-law.com>
**Sent:** Tuesday, July 9, 2024 4:03 PM
**To:** Tepas, Meghan <mtepas@sgrlaw.com>
**Cc:** Bill Frimel <Bill@sfw-law.com>
**Subject:** Re: Bedrock--Crownalytics v. SPINS subpoena response

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Hi Meghan,

I discussed the issue further with Bedrock, and, for the reasons I've previously stated, Bedrock's position regarding the disclosure of its customer contracts remains the same at this time.

Best, Chris

---

**From:** Tepas, Meghan <mtepas@sgrlaw.com>
**Sent:** Tuesday, July 9, 2024 9:03:09 AM
**To:** Christopher Edgar
**Cc:** Bill Frimel; Tepas, Meghan
**Subject:** Bedrock--Crownalytics v. SPINS subpoena response

Hi Chris,

It's almost been two weeks since we all last spoke regarding Bedrock's compliance with our subpoena. Do you have any update on this? I am available for a call tomorrow or Thursday if easier.

Thank you,

**Meghan E. Tepas**  she/her/hers
*Partner*

---

**p** | 312-360-6454
**f** | 312-360-6520
**e** | mtepas@sgrlaw.com
311 South Wacker Drive | Suite 3000 | Chicago, IL 60606
www.sgrlaw.com  |  My Bio



# EXHIBIT 11

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:22-cv-1275-NYW-JPO

CROWNALYTICS, LLC, a Colorado Limited Liability Company,

     *Plaintiff*,

v.

SPINS LLC, a Delaware Limited Liability Company; DAAP LLC, a Delaware Limited Liability Company; and CIRCANA, LLC., a Delaware Corporation,

     *Defendants*.

---

**AMENDED NOTICE OF DEPOSITION OF BEDROCK ANALYTICS CORP.**

---

To:    Counsel of Record

     PLEASE TAKE NOTICE that counsel for Defendants will take the Rule 30(b)(6) deposition of Bedrock Analytics on September 4, 2024 at 9:00 a.m., pursuant to subpoena, a copy of which is attached hereto.  The deposition will take place at Reed Smith LLP, 101 Second Street, Suite 1800, San Francisco, CA 94105. The deposition will be recorded by audiovisual and stenographic means.

Dated**:** July 22, 2024

Respectfully submitted,


SPINS LLC and DAAP LLC


By: _/s/ Meghan E. Tepas_____
           One of Their Attorneys


| | |
|---|---|
| Matthew J. O'Hara | Raymond W. Martin |
| Katheleen A. Ehrhart | WHEELER TRIGG O'DONNELL LLP |
| Meghan E. Tepas | 370 Seventeenth Street |
| Alexander A. Pabon | Suite 4500 |
| SMITH, GAMBRELL & RUSSELL, LLP | Denver, Colorado 80202 |
| 311 South Wacker Drive | martin@wtotrial.com |
| Suite 3000 | |
| Chicago, Illinois 60606 | |
| (312) 360-6000 | |
| mohara@sgrlaw.com | |
| kehrhart@sgrlaw.com | |
| mtepas@sgrlaw.com | |
| apabon@sgrlaw.com | |

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that she caused a true and correct copy of the foregoing

**Amended Notice of Deposition of Bedrock Analytics Corp.** to be served on counsel of record

on July 22, 2024.

Jon F. Cieslak
Kristen Harris
4275 Executive Square
Suite 200
La Jolla, CA 92037
jon.cieslak@bonalawpc.com
kristen.harris@bonalawpc.com
(858) 964-4589

Pat Pascarella
100 Crescent Court, #700-3425
Dallas, TX 75201
pat.pascarella@bonalawpc.com
(469) 296-7716

*Attorneys for Plaintiff Crownalytics, LLC*

LAW OFFICE OF RICK D. BAILEY
Rick D. Bailey, Esq.
1801 Broadway, Ste. 528
Denver, CO 80202
rick@rickbaileylaw.com
(720) 676-6023

James P. Denvir
Michael S. Mitchell
BOIES SCHILLER FLEXNER LLP
1401 New York Ave., NW
Washington, DC 20005
Tel: 202-237-2727
jdenvir@bsfllp.com
mmitchell@bsfllp.com

*Attorneys for CIRCANA, LLC*

Kenneth F. Rossman, IV
LEWIS ROCA ROTHGERBER
CHRISTIE LLP
1601 19th Street
Suite  1000
Denver, CO 80202
Tel: 303-623-9000
krossman@lewisroca.com

/s/  *Meghan E. Tepas*

AO 88A  (Rev. 12/20) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT

for the

District of Colorado ▾

| | |
|---|---|
| CROWNALYTICS, LLC | ) |
| *Plaintiff* | ) |
| v. | ) |
| SPINS LLC; DAAP LLC; CIRCANA, LLC | ) |
| *Defendant* | ) |

Civil Action No.   22-CV-1275-NYW-JPO

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:          Bedrock Analytics Corp., c/o Registered Agent Solutions, Inc.
838 Walker Road, Suite 21-2, Dover, DE 19904

*(Name of person to whom this subpoena is directed)*

☑ Testimony:  YOU ARE COMMANDED to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization, you must promptly confer in good faith with the party serving this subpoena about the following matters, or those set forth in an attachment, and you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about these matters:

| Place: Reed Smith LLP, 101 Second Street, Suite 1800 San Francisco, CA 94105 | Date and Time: September 4, 2024 at 9:00 a.m. |
|---|---|

The deposition will be recorded by this method:   Stenographic, audio, video, and/or real-time transcription

☐ *Production:*  You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:   7/22/2024

|  |  |
|---|---|
| *CLERK OF COURT* | |
| | OR |
| | /s/ Meghan E. Tepas |
| *Signature of Clerk or Deputy Clerk* | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*   SPINS LLC

Meghan E. Tepas

Smith, Gambrell & Russell, LLP, 311 S. Wacker Dr., Ste. 3000, Chicago, IL 60606
mtepas@sgrlaw.com, 312-360-6454

, who issues or requests this subpoena, are:

### Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88A  (Rev.  12/20) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No. 22-CV-1275-NYW-JPO

## PROOF OF SERVICE

### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)*  Bedrock Analytics

on *(date)*    7/22/2024    .

☒ I served the subpoena by delivering a copy to the named individual as follows:  e-mail service on counsel

_____    on *(date)*    7/22/2024    ; or

☐ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$    To be determined    .

My fees are $ _____ for travel and $ _____ for services, for a total of $    0.00    .

I declare under penalty of perjury that this information is true.

Date:    7/22/2024

_____
/s/ Meghan E. Tepas
*Server's signature*

_____
Meghan E. Tepas
*Printed name and title*

Smith, Gambrell & Russell, LLP
311 S. Wacker Dr., Ste. 3000
Chicago, IL 60606

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88A (Rev. 12/20) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

  **(1) For a Trial, Hearing, or Deposition.** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
    **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
    **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
      **(i)** is a party or a party's officer; or
      **(ii)** is commanded to attend a trial and would not incur substantial expense.

  **(2) For Other Discovery.** A subpoena may command:
    **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
    **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

  **(1) Avoiding Undue Burden or Expense; Sanctions.** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

  **(2) Command to Produce Materials or Permit Inspection.**
    **(A) Appearance Not Required.** A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
    **(B) Objections.** A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
      **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
      **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

  **(3) Quashing or Modifying a Subpoena.**

    **(A) When Required.** On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

      **(i)** fails to allow a reasonable time to comply;
      **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
      **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
      **(iv)** subjects a person to undue burden.
    **(B) When Permitted.** To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

      **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
      **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
    **(C) Specifying Conditions as an Alternative.** In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
      **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
      **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

  **(1) Producing Documents or Electronically Stored Information.** These procedures apply to producing documents or electronically stored information:
    **(A) Documents.** A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
    **(B) Form for Producing Electronically Stored Information Not Specified.** If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
    **(C) Electronically Stored Information Produced in Only One Form.** The person responding need not produce the same electronically stored information in more than one form.
    **(D) Inaccessible Electronically Stored Information.** The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

  **(2) Claiming Privilege or Protection.**
    **(A) Information Withheld.** A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
      **(i)** expressly make the claim; and
      **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
    **(B) Information Produced.** If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

**TOPICS OF EXAMINATION**

1.      Description and summary of the Data Analytics services offered by You.

2.      Bedrock's creation and entry into business in the Data Analytics market, including initial and subsequent associated costs and investments.

3.      Your market share(s) in the Data Analytics market from 2019 to the present.

4.      Your annual gross revenues from2019 to present.

5.      The identity of and the type of customers to whom you provide or seek to provide Data Analytics services, including the particular type of Data Analytics, the brand or brands for which such Data Analytics were obtained, the price paid or payments received for such Data Analytics, the sources of data analyzed for Your customers, and the duration of any contract governing such customer's purchase of such Data Analytics.

6.      The identity of Your competitors in the Data Analytics' market and the services you understand they provide and any understanding you have concerning the pricing of their products and services.

7.       How You compare to and differentiate from other providers of Data Analytics, including Crownalytics, TABS Analytics (Telus), Red Fox Analytics, Crisp, Byzzer, Data Impact, SPINS, Circana, NielsenIQ, and Big Chalk Analytics.

8.      How You price Your products and services.

9.      Your participation or potential participation in the NielsenIQ Partner Network.

10.     Identification of sources of Data that You use in your provision of Data Analytics services, how You access such Data, and any restrictions relating to such access.

11.     Any third-party agreement or other contract, agreement, or understanding authorizing You to access Data from NielsenIQ, SPINS, IRI, Circana, The NPD Group ("NPD"), or any other Data source.

12.     All communications You have had with Crownalytics, including without limitation, Crownalytics, Kristopher Crown, or any attorney or other person acting on Crownalytics's or Crown's behalf regarding the provision of data analytics services, this litigation, SPINS, IRI, Circana, or DAAP.

13.     The documents You produced in response to any document subpoena issued to you in this Litigation.

## DECLARATION OF JOHN PAVLENKOV

I, John Pavlenkov, declare as follows pursuant to 28 U.S.C. § 1746:

1.    I am the Vice President of Sales Operations at SPINS LLC, a position I have held since approximately February 2018. I have been employed by SPINS in various capacities since approximately July 2007, including as Senior Director-Manufacturer Client Sales and Director of Analytics and Insight. I submit this Declaration in support of the motion of Defendants-Petitioners SPINS LLC and DAAP LLC ("Petitioners") to compel compliance with a document subpoena issued to Bedrock Analytics LLC ("Bedrock").  I am fully familiar with the business records of SPINS and the facts and circumstances set forth below.

2.    Bedrock entered into six separate Third-Party Agreements ("TPAs") with SPINS and third-party clients of SPINS in 2020 and 2021. These TPAs allowed Bedrock to access SPINS-licensed information for six consumer packaged goods manufacturers who are SPINS clients.

3.    A true and correct copy of the American Popcorn TPA, dated August 17, 2020, is attached hereto as **Exhibit 1.**

4.    A true and correct copy of the Lillie's Q Sauces & Rubs TPA, dated November 10, 2020, is attached hereto as **Exhibit 2.**

5.    A true and correct copy of the Levain Bakery Cookie Company LLC TPA, dated February 1, 2021, is attached hereto as **Exhibit 3.**

6.    A true and correct copy of the Beecher's Homemade Cheese TPA, dated April 9, 2021, is attached hereto as **Exhibit 4.**

7.    A true and correct copy of the Chef Bobo Brand Inc. TPA, dated May 25, 2021, is attached hereto as **Exhibit 5.**

8.    A true and correct copy of the Just Greens LLC TPA, dated July 9, 2021, is attached hereto as **Exhibit 6.**

SMITH, GAMBRELL & RUSSELL, LLP
444 SOUTH FLOWER STREET, SUITE 1700
LOS ANGELES, CALIFORNIA 90071, UNITED STATES OF AMERICA
TELEPHONE: 213-358-7200

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 22nd day of July, 2024.

/s/ _John Pavlenkov_
John Pavlenkov

SMITH, GAMBRELL & RUSSELL, LLP
444 SOUTH FLOWER STREET, SUITE 1700
LOS ANGELES, CALIFORNIA 90071, UNITED STATES OF AMERICA
TELEPHONE: 213-358-7200

---

2

**DECLARATION OF JOHN PAVLENKOV RE MOTION TO COMPEL**

# EXHIBIT 1

DocuSign Envelope ID: FCE7E8AC-AB62-4E6B-B993-46D4B980F4BE

 **Third Party Access Agreement**

| Client: American Popcorn | Client Agreement Number: 00003368 |
|---|---|
| | Effective Date: 08/17/2020 |

This Third Party Access Agreement (this "Agreement") is made as of the Effective Date above among SPINS LLC, a Delaware limited liability company, with its corporate office located at 222 W. Hubbard St., Suite 300, Chicago, IL 60654 ("SPINS"), the Client identified above, and Bedrock Analytics Corporation, with its corporate office located at 344 20th St. Suite 115, Oakland, CA 94612 ("Bedrock").

Client desires to disclose to Bedrock certain SPINS information provided by SPINS to Client under the Information and Services Agreement between Client and SPINS identified above ("Client Agreement"). Bedrock desires to use the SPINS information to provide services to Client. SPINS agrees to permit Bedrock to use SPINS information on the terms and conditions set forth in this Agreement.

1. **License and Permissible Use.** SPINS consents to Client disclosing to Bedrock the SPINS information that is licensed to Client under the Client Agreement, other than such information that a Third Party Licensor has prohibited SPINS from disclosing to Bedrock and that is identified by SPINS to Client and Bedrock in writing ("SPINS Information"). SPINS waives any claim against Bedrock with respect to Bedrock's prior receipt and use of SPINS information received from Client prior to the Effective Date hereof. Subject to the terms and conditions of this Agreement and (with respect to Client) the Client Agreement, SPINS grants to Bedrock a non-exclusive, limited, royalty-free and fully paid up license to use the SPINS Information during the term of this Agreement solely to provide services to Client, including without limitation the preparation of Improvements (which Improvements will be owned by Bedrock). Bedrock will allow access to and use of SPINS Information only to employees and contractors who need such access and use to provide services to Client. The SPINS Information includes the SPINS Product Library. Bedrock may not use the SPL Hierarchy, or any SPL Attributes or any other data derived from the SPINS Product Library in connection with any data from any source other than SPINS, such as, for example, arranging such data according to the SPL Hierarchy or applying SPL Attributes to any such data (for clarity the foregoing shall not limit Bedrock's right to use Improvements).

2. **Term and Termination.** This Agreement is effective as of the Effective Date and will remain in effect until the earlier of (i) the date upon which the Client Agreement terminates; or (ii) the date on which SPINS gives written notice of termination to Bedrock.

**This Agreement includes and incorporates the attached Terms and Conditions, which contain, among other things, warranty disclaimers, liability limitations, and use limitations. Bedrock hereby agrees to the Terms and Conditions and in the event of any conflict between this document and the Terms and Conditions, the Terms and Conditions will govern.**

This Agreement may be executed in two or more counterparts, each of which, when taken together, will constitute one in the same agreement. Signatures of the Parties transmitted by PDF or similar file type transmitted via electronic mail, cloud based server, e-signature technology or other similar electronic means are deemed to be original signatures for all purposes.

In witness whereof, the Parties hereto have entered into this Agreement as of the Effective Date.

**Client**
Signature: _____

Print Name: _Steve Huisenga_

Title: _Vice President of Sales + Market_

**Bedrock**
Signature: _____

Print Name: Will Salcido
Title: CEO

**SPINS LLC**
Signature: _Vlad Deronja_

Print Name: _____Vlad Deronja_____

Title: _____VP Finance_____

_EM_

## Terms and Conditions

These Terms and Conditions are included and incorporated in the Third Party Access Agreement (which is referred to, collectively with these Terms and Conditions, as the "Agreement") between SPINS, Client and Bedrock. SPINS, Client and Bedrock are each a "Party" to this Agreement and, collectively, the "Parties". Capitalized terms not otherwise defined in this Agreement have the meanings provided in Appendix 1 to this Agreement.

1. <u>Delivery of SPINS Information</u>. SPINS will deliver SPINS Information to Bedrock via a data extract file in the standard Bedrock format made available to SPINS, which format will indicate which SPINS Information Bedrock is requesting that SPINS deliver to Bedrock. SPINS will effect such delivery promptly after the Effective Date and on an ongoing basis during the term hereof. Client will not separately provide any SPINS Information to Bedrock. Bedrock is not permitted to access SPINS online data delivery platform, including, without limitation, by using access credentials provided to Client. Client acknowledges and agrees that providing access credentials to the SPINS online data delivery platform to Bedrock is a material breach of the Client Agreement.

2. <u>Ownership</u>. SPINS or its Third Party Licensors own all right, title and interest in and to SPINS Information. Except for the limited license granted to Bedrock under this Agreement, no right, title or interest to SPINS Information is transferred to Bedrock or any third party. Bedrock agrees not to assert any proprietary rights to SPINS Information or Improvements against SPINS, any Third Party Licensor, or SPINS' licensees, affiliates, successors or assigns. To the extent any SPINS Information (other than Improvements) is contained within a Bedrock Work, such SPINS Information shall remain the property of SPINS or its Third Party Licensor and the use of such Bedrock Work is subject to this Agreement.

3. <u>Termination</u>.
   a. Upon termination or expiration of this Agreement, (i) Bedrock will cease to have access to SPINS Information and will cease to use SPINS Information, and (ii) Bedrock shall promptly return to SPINS or destroy all SPINS Information in its possession or control, without retaining any copies thereof, and Bedrock will promptly destroy all copies of any analyses, compilations, studies or other documents, records or data prepared by Bedrock to the extent that they contain any SPINS Information (other than Improvements), and upon SPINS' request, Bedrock will certify in writing that Bedrock has complied with this subsection.
   b. The "<u>License and Permissible Use</u>", "<u>Ownership</u>", "<u>Confidential Information</u>", "<u>Indemnification</u>", "<u>Enforcement</u>", "<u>Disclaimer of Warranties</u>", "<u>Limitation on Liability</u>" and "<u>General</u>" sections of this Agreement shall survive any termination or expiration of this Agreement.

4. <u>Confidential Information</u>. Bedrock shall treat as confidential all Confidential Information received from SPINS, shall not use such Confidential Information except as expressly permitted under this Agreement, and shall not cause or permit its employees, officers and affiliates to reveal, disclose or otherwise make available such Confidential Information to any third party, except as expressly permitted under this Agreement. Bedrock shall use at least the same degree of care which it uses to prevent the disclosure of its own confidential information, but in no event with less than reasonable care, to prevent the disclosure of Confidential Information.

5. <u>Indemnification</u>. SPINS will indemnify, defend and hold harmless Bedrock and its officers, directors, employees and agents from and against any and all loss, liability, cost, damages and expense, including attorneys' fees, which arise out of or are related to third party claims that SPINS Information or Services infringe upon the intellectual property rights of any third party. Bedrock agrees that if SPINS Information or Services infringe or are alleged to infringe upon any third party intellectual property rights, SPINS at its sole option may (i) obtain at SPINS's expense the right for Bedrock to continue such use of SPINS Information or Services, (ii) modify the SPINS Information or Services in such a way that the SPINS Information or Services are substantially similar but Bedrock's use of the modified SPINS Information or Services does not infringe upon any third party intellectual property rights, or (iii) require Bedrock to stop using the SPINS Information or

Services that may be infringing. Bedrock will promptly notify SPINS of any such claim in writing and SPINS will control the defense of such claim.

6. <u>Enforcement</u>. The Parties acknowledge and agree that SPINS would lack an adequate remedy at law and would suffer irreparable injury if the "<u>License and Permissible Use</u>" or "<u>Confidential Information</u>" sections of this Agreement are violated. In the event of any violation or imminent violation of this Agreement by Bedrock or any of its employees, contractors or agents, SPINS or a Third Party Licensor shall be entitled to seek injunctive relief as an appropriate remedy, without having to prove irreparable injury, lack of an adequate remedy at law, posting bond or waiving any other rights or remedies. If Bedrock is shown to have breached the "<u>License and Permissible Use</u>" or "<u>Confidential Information</u>" sections of this Agreement, Bedrock will reimburse SPINS for all expenses (including without limitation attorneys' fees and expenses of investigation) incurred by SPINS in enforcing its rights under this Agreement.

7. <u>Disclaimer of Warranties</u>. SPINS DISCLAIMS, ON ITS OWN BEHALF AND ON BEHALF OF THIRD PARTY LICENSORS, AND CLIENT AND BEDROCK WAIVE, ANY AND ALL WARRANTIES OF ANY KIND, WHETHER EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION ANY IMPLIED WARRANTIES OF MERCHANTABILITY, NON-INFRINGEMENT, FITNESS FOR A PARTICULAR PURPOSE, RELIABILITY, OR TIMELINESS OF DELIVERY. ALL SPINS INFORMATION IS PROVIDED BY SPINS ON AN "AS IS" AND "AS AVAILABLE" BASIS. SPINS, ON ITS OWN BEHALF AND ON BEHALF OF THIRD PARTY LICENSORS, DOES NOT WARRANT THAT SPINS INFORMATION WILL BE UNINTERRUPTED OR ERROR FREE.

8. <u>Limitation on Liability</u>. NEITHER SPINS NOR ANY OF ITS THIRD PARTY LICENSORS, SERVICE PROVIDERS OR SUPPLIERS SHALL BE LIABLE FOR ANY INCIDENTAL, SPECIAL, CONSEQUENTIAL OR INDIRECT DAMAGES OF ANY KIND (INCLUDING WITHOUT LIMITATION DAMAGES FOR INTERRUPTION OF BUSINESS, PROCUREMENT OF SUBSTITUTE GOODS, LOSS OF PROFITS, OR THE LIKE) REGARDLESS OF THE FORM OF ACTION, WHETHER IN CONTRACT, TORT (INCLUDING NEGLIGENCE), STRICT PRODUCT LIABILITY OR ANY OTHER LEGAL OR EQUITABLE THEORY, EVEN IF SPINS HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. IN NO EVENT WILL SPINS' AGGREGATE CUMULATIVE LIABILITY FOR ANY CLAIMS ARISING OUT OF OR RELATED TO THIS AGREEMENT (INCLUDING WITHOUT LIMITATION, A FAILURE TO PROVIDE INFORMATION) EXCEED THE GREATER OF (A) $10,000 OR (B) THE AMOUNTS PAID TO SPINS BY BEDROCK PURSUANT TO THIS AGREEMENT IN THE 12 MONTH PERIOD PRECEDING SUCH CLAIM.

9. <u>General</u>.
    a. <u>Authority</u>. Each Party represents and warrants that it has full power and authority to enter into this Agreement and to carry out its obligations hereunder.
    b. <u>Governing Law</u>. This Agreement and the Parties' respective rights and duties shall be interpreted and governed in accordance with the laws of the State of Illinois, regardless of its choice of law principles. Any and all claims arising from this Agreement shall be brought either in the state or federal courts located in Cook County, Illinois, and each Party consents to the jurisdiction of such courts.
    c. <u>Assignment</u>.  Neither Bedrock nor Client may assign this Agreement without the prior written consent of SPINS. Any change of control, merger, sale or lease of all or substantially all of Bedrock's or Client's assets shall be deemed an assignment for purposes of this Agreement. Any attempted assignment in violation of this provision shall be null and void. All terms and conditions of this Agreement shall be binding on and inure to the benefit of the permitted successors and assigns of the Parties.
    d. <u>Entire Agreement</u>. This Agreement constitutes the entire understanding among the Parties regarding the subject matter of this Agreement and supersedes any previous communications, representations or agreements, whether written or oral.  No changes or modifications of any of the terms or conditions of this Agreement shall be valid or binding on either Party unless in writing and signed by an authorized representative of each Party.
    e. <u>Force Majeure</u>. SPINS shall not be liable for any loss, damage or delay resulting from any cause beyond its reasonable control, including, without limitation: fire; flood; action or decree of civil or military authority; insurrection; act of war; threatened or actual terrorism or bioterrorism; or embargo.

f.  <u>Notices</u>. Notices hereunder must be in writing and given to the other Party by in-hand delivery, by first class mail, postage prepaid, or by air courier to the mailing address set forth above or to such other address as either Party may designate, by facsimile, or by e-mail. Notices shall be effective when received.

g.  <u>Status of Parties</u>. This Agreement shall not be construed as creating a joint venture, partnership, agency or any other similar relationship between any two Parties, and no Party shall have any authority to bind or make commitments on behalf of another Party.

## Appendix 1

## Definitions

"<u>Confidential Information</u>" means (i) the terms and conditions of this Agreement and the Client Agreement, (ii) all SPINS Information, including without limitation data and other information provided by Third Party Licensors and included in the SPINS Information, and (iii) any other information disclosed by SPINS to Client or Bedrock, either directly or through a third party, in any form, which is designated as "Confidential," "Proprietary" or some similar designation or which should reasonably be considered to be confidential given the nature of the information or the circumstances of its disclosure. Confidential Information does not, however, include any information which (i) was publicly known and made generally available in the public domain prior to the time of disclosure by SPINS; (ii) becomes publicly known and made generally available through no breach of this Agreement; (iii) is already in the possession of Bedrock at the time of disclosure by SPINS; or (iv) is obtained by Bedrock from a third party without a breach of such third party's obligations of confidentiality; (v) is independently developed by Bedrock without use of or reference to SPINS' Confidential Information; or (vi) is compelled by law to be disclosed by Bedrock, provided that Bedrock gives SPINS prompt written notice of such requirement prior to such disclosure and assistance at SPINS' sole expense in obtaining an order protecting the information from public disclosure.

"<u>Bedrock Work</u>" means information owned by Client and derivatives thereof.

"<u>Improvements</u>" means (a) any modifications, improvements, derivatives, models, updates, enhancements or revisions made to the SPINS Information whether solely by a party, jointly, or jointly with a third party as a result of a party's obligations under or exercise of licenses granted under this Agreement.

"<u>SPINS Information</u>" means, collectively, (i) the SPL, SPL Hierarchy and SPL Attributes, and (ii) the information, data, reports, report templates, tools, products, services and other deliverables provided by SPINS to Client under the Client Agreement.

"<u>SPINS Product Library</u>" or "<u>SPL</u>" means all UPC-level product information owned, licensed, or sublicensed by SPINS, and which will include without limitation: (i) hierarchical classifications of department, category, subcategory, and product type ("<u>SPL Hierarchy</u>"); and (ii) product attributes, including without limitation manufacturer and brand name, product description, and other elements as defined, coded and maintained by SPINS ("<u>SPL Attributes</u>").

"<u>Third Party Licensor</u>" means any third party who has entered into a separate agreement with SPINS pursuant to which the third party's data and other confidential information belonging to the third party has been made available to SPINS and is included in SPINS Information.

# EXHIBIT 2



# Third Party Access Agreement

| **Client:** Lillie's Q Sauces & Rubs | **Client Agreement Number:** S-005230 |
|---|---|
| | **Effective Date:** 11/10/2020 |

This Third Party Access Agreement (this "Agreement") is made as of the Effective Date above among SPINS LLC, a Delaware limited liability company, with its corporate office located at 222 W. Hubbard St., Suite 300, Chicago, IL 60654 ("SPINS"), the Client identified above, and Bedrock Analytics Corporation, with its corporate office located at 344 20th St. Suite 115, Oakland, CA 94612 ("Bedrock").

Client desires to disclose to Bedrock certain SPINS information provided by SPINS to Client under the Information and Services Agreement between Client and SPINS identified above ("Client Agreement"). Bedrock desires to use the SPINS information to provide services to Client. SPINS agrees to permit Bedrock to use SPINS information on the terms and conditions set forth in this Agreement.

1. <u>License and Permissible Use</u>. SPINS consents to Client disclosing to Bedrock the SPINS information that is licensed to Client under the Client Agreement, other than such information that a Third Party Licensor has prohibited SPINS from disclosing to Bedrock and that is identified by SPINS to Client and Bedrock in writing ("SPINS Information"). SPINS waives any claim against Bedrock with respect to Bedrock's prior receipt and use of SPINS information received from Client prior to the Effective Date hereof. Subject to the terms and conditions of this Agreement and (with respect to Client) the Client Agreement, SPINS grants to Bedrock a non-exclusive, limited, royalty-free and fully paid up license to use the SPINS Information during the term of this Agreement solely to provide services to Client, including without limitation the preparation of Improvements (which Improvements will be owned by Bedrock). Bedrock will allow access to and use of SPINS Information only to employees and contractors who need such access and use to provide services to Client. The SPINS Information includes the SPINS Product Library. Bedrock may not use the SPL Hierarchy, or any SPL Attributes or any other data derived from the SPINS Product Library in connection with any data from any source other than SPINS, such as, for example, arranging such data according to the SPL Hierarchy or applying SPL Attributes to any such data (for clarity the foregoing shall not limit Bedrock's right to use Improvements).
2. <u>Term and Termination</u>. This Agreement is effective as of the Effective Date and will remain in effect until the earlier of (i) the date upon which the Client Agreement terminates; or (ii) the date on which SPINS gives written notice of termination to Bedrock.

**This Agreement includes and incorporates the attached Terms and Conditions, which contain, among other things, warranty disclaimers, liability limitations, and use limitations. Bedrock hereby agrees to the Terms and Conditions and in the event of any conflict between this document and the Terms and Conditions, the Terms and Conditions will govern.**

This Agreement may be executed in two or more counterparts, each of which, when taken together, will constitute one in the same agreement. Signatures of the Parties transmitted by PDF or similar file type transmitted via electronic mail, cloud based server, e-signature technology or other similar electronic means are deemed to be original signatures for all purposes.

In witness whereof, the Parties hereto have entered into this Agreement as of the Effective Date.

**Client**
Signature: *Brian Golinvaux*

Print Name: Brian Golinvaux

Title: President

**SPINS LLC**
Signature: *Vlad Deronja*

Print Name: Vlad Deronja

Title: VP Finance

**Bedrock**
Signature: *Will Salcido*

Print Name: Will Salcido

*EM*

**Terms and Conditions**

These Terms and Conditions are included and incorporated in the Third Party Access Agreement (which is referred to, collectively with these Terms and Conditions, as the "Agreement") between SPINS, Client and Bedrock. SPINS, Client and Bedrock are each a "Party" to this Agreement and, collectively, the "Parties". Capitalized terms not otherwise defined in this Agreement have the meanings provided in Appendix 1 to this Agreement.

1. Delivery of SPINS Information. SPINS will deliver SPINS Information to Bedrock via a data extract file in the standard Bedrock format made available to SPINS, which format will indicate which SPINS Information Bedrock is requesting that SPINS deliver to Bedrock. SPINS will effect such delivery promptly after the Effective Date and on an ongoing basis during the term hereof. Client will not separately provide any SPINS Information to Bedrock. Bedrock is not permitted to access SPINS online data delivery platform, including, without limitation, by using access credentials provided to Client. Client acknowledges and agrees that providing access credentials to the SPINS online data delivery platform to Bedrock is a material breach of the Client Agreement.

2. Ownership. SPINS or its Third Party Licensors own all right, title and interest in and to SPINS Information. Except for the limited license granted to Bedrock under this Agreement, no right, title or interest to SPINS Information is transferred to Bedrock or any third party. Bedrock agrees not to assert any proprietary rights to SPINS Information or Improvements against SPINS, any Third Party Licensor, or SPINS' licensees, affiliates, successors or assigns. To the extent any SPINS Information (other than Improvements) is contained within a Bedrock Work, such SPINS Information shall remain the property of SPINS or its Third Party Licensor and the use of such Bedrock Work is subject to this Agreement.

3. Termination.
   a. Upon termination or expiration of this Agreement, (i) Bedrock will cease to have access to SPINS Information and will cease to use SPINS Information, and (ii) Bedrock shall promptly return to SPINS or destroy all SPINS Information in its possession or control, without retaining any copies thereof, and Bedrock will promptly destroy all copies of any analyses, compilations, studies or other documents, records or data prepared by Bedrock to the extent that they contain any SPINS Information (other than Improvements), and upon SPINS' request, Bedrock will certify in writing that Bedrock has complied with this subsection.
   b. The "License and Permissible Use", "Ownership", "Confidential Information", "Indemnification", "Enforcement", "Disclaimer of Warranties", "Limitation on Liability" and "General" sections of this Agreement shall survive any termination or expiration of this Agreement.

4. Confidential Information. Bedrock shall treat as confidential all Confidential Information received from SPINS, shall not use such Confidential Information except as expressly permitted under this Agreement, and shall not cause or permit its employees, officers and affiliates to reveal, disclose or otherwise make available such Confidential Information to any third party, except as expressly permitted under this Agreement. Bedrock shall use at least the same degree of care which it uses to prevent the disclosure of its own confidential information, but in no event with less than reasonable care, to prevent the disclosure of Confidential Information.

5. Indemnification. SPINS will indemnify, defend and hold harmless Bedrock and its officers, directors, employees and agents from and against any and all loss, liability, cost, damages and expense, including attorneys' fees, which arise out of or are related to third party claims that SPINS Information or Services infringe upon the intellectual property rights of any third party. Bedrock agrees that if SPINS Information or Services infringe or are alleged to infringe upon any third party intellectual property rights, SPINS at its sole option may (i) obtain at SPINS's expense the right for Bedrock to continue such use of SPINS Information or Services, (ii) modify the SPINS Information or Services in such a way that the SPINS Information or Services are substantially similar but Bedrock's use of the modified SPINS Information or Services does not infringe upon any third party intellectual property rights, or (iii) require Bedrock to stop using the SPINS Information or Services that may be infringing. Bedrock will promptly notify SPINS of any such claim in writing and SPINS will control the defense of such claim.

6. <u>Enforcement</u>. The Parties acknowledge and agree that SPINS would lack an adequate remedy at law and would suffer irreparable injury if the "<u>License and Permissible Use</u>" or "<u>Confidential Information</u>" sections of this Agreement are violated.  In the event of any violation or imminent violation of this Agreement by Bedrock or any of its employees, contractors or agents, SPINS or a Third Party Licensor shall be entitled to seek injunctive relief as an appropriate remedy, without having to prove irreparable injury, lack of an adequate remedy at law, posting bond or waiving any other rights or remedies. If Bedrock is shown to have breached the "<u>License and Permissible Use</u>" or "<u>Confidential Information</u>" sections of this Agreement, Bedrock will reimburse SPINS for all expenses (including without limitation attorneys' fees and expenses of investigation) incurred by SPINS in enforcing its rights under this Agreement.

7. <u>Disclaimer of Warranties</u>. SPINS DISCLAIMS, ON ITS OWN BEHALF AND ON BEHALF OF THIRD PARTY LICENSORS, AND CLIENT AND BEDROCK WAIVE, ANY AND ALL WARRANTIES OF ANY KIND, WHETHER EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION ANY IMPLIED WARRANTIES OF MERCHANTABILITY, NON-INFRINGEMENT, FITNESS FOR A PARTICULAR PURPOSE, RELIABILITY, OR TIMELINESS OF DELIVERY. ALL SPINS INFORMATION IS PROVIDED BY SPINS ON AN "AS IS" AND "AS AVAILABLE" BASIS. SPINS, ON ITS OWN BEHALF AND ON BEHALF OF THIRD PARTY LICENSORS, DOES NOT WARRANT THAT SPINS INFORMATION WILL BE UNINTERRUPTED OR ERROR FREE.

8. <u>Limitation on Liability</u>. NEITHER SPINS NOR ANY OF ITS THIRD PARTY LICENSORS, SERVICE PROVIDERS OR SUPPLIERS SHALL BE LIABLE FOR ANY INCIDENTAL, SPECIAL, CONSEQUENTIAL OR INDIRECT DAMAGES OF ANY KIND (INCLUDING WITHOUT LIMITATION DAMAGES FOR INTERRUPTION OF BUSINESS, PROCUREMENT OF SUBSTITUTE GOODS, LOSS OF PROFITS, OR THE LIKE) REGARDLESS OF THE FORM OF ACTION, WHETHER IN CONTRACT, TORT (INCLUDING NEGLIGENCE), STRICT PRODUCT LIABILITY OR ANY OTHER LEGAL OR EQUITABLE THEORY, EVEN IF SPINS HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. IN NO EVENT WILL SPINS' AGGREGATE CUMULATIVE LIABILITY FOR ANY CLAIMS ARISING OUT OF OR RELATED TO THIS AGREEMENT (INCLUDING WITHOUT LIMITATION, A FAILURE TO PROVIDE INFORMATION) EXCEED THE GREATER OF (A) $10,000 OR (B) THE AMOUNTS PAID TO SPINS BY BEDROCK PURSUANT TO THIS AGREEMENT IN THE 12 MONTH PERIOD PRECEDING SUCH CLAIM.

9. <u>General</u>.
   a. <u>Authority</u>. Each Party represents and warrants that it has full power and authority to enter into this Agreement and to carry out its obligations hereunder.
   b. <u>Governing Law</u>. This Agreement and the Parties' respective rights and duties shall be interpreted and governed in accordance with the laws of the State of Illinois, regardless of its choice of law principles. Any and all claims arising from this Agreement shall be brought either in the state or federal courts located in Cook County, Illinois, and each Party consents to the jurisdiction of such courts.
   c. <u>Assignment</u>.  Neither Bedrock nor Client may assign this Agreement without the prior written consent of SPINS. Any change of control, merger, sale or lease of all or substantially all of Bedrock's or Client's assets shall be deemed an assignment for purposes of this Agreement. Any attempted assignment in violation of this provision shall be null and void. All terms and conditions of this Agreement shall be binding on and inure to the benefit of the permitted successors and assigns of the Parties.
   d. <u>Entire Agreement</u>. This Agreement constitutes the entire understanding among the Parties regarding the subject matter of this Agreement and supersedes any previous communications, representations or agreements, whether written or oral.  No changes or modifications of any of the terms or conditions of this Agreement shall be valid or binding on either Party unless in writing and signed by an authorized representative of each Party.
   e. <u>Force Majeure</u>. SPINS shall not be liable for any loss, damage or delay resulting from any cause beyond its reasonable control, including, without limitation: fire; flood; action or decree of civil or military authority; insurrection; act of war; threatened or actual terrorism or bioterrorism; or embargo.
   f. <u>Notices</u>. Notices hereunder must be in writing and given to the other Party by in-hand delivery, by first class mail, postage prepaid, or by air courier to the mailing address set forth above or to such other address as either Party may designate, by facsimile, or by e-mail. Notices shall be effective when received.

DocuSign Envelope ID: A08EEA4E-50A7-4D1E-AC8B-EE94E1508E8E

g.  <u>Status of Parties</u>. This Agreement shall not be construed as creating a joint venture, partnership, agency or any other similar relationship between any two Parties, and no Party shall have any authority to bind or make commitments on behalf of another Party.

**Appendix 1**

Definitions

"<u>Confidential Information</u>" means (i) the terms and conditions of this Agreement and the Client Agreement, (ii) all SPINS Information, including without limitation data and other information provided by Third Party Licensors and included in the SPINS Information, and (iii) any other information disclosed by SPINS to Client or Bedrock, either directly or through a third party, in any form, which is designated as "Confidential," "Proprietary" or some similar designation or which should reasonably be considered to be confidential given the nature of the information or the circumstances of its disclosure. Confidential Information does not, however, include any information which (i) was publicly known and made generally available in the public domain prior to the time of disclosure by SPINS; (ii) becomes publicly known and made generally available through no breach of this Agreement; (iii) is already in the possession of Bedrock at the time of disclosure by SPINS; or (iv) is obtained by Bedrock from a third party without a breach of such third party's obligations of confidentiality; (v) is independently developed by Bedrock without use of or reference to SPINS' Confidential Information; or (vi) is compelled by law to be disclosed by Bedrock, provided that Bedrock gives SPINS prompt written notice of such requirement prior to such disclosure and assistance at SPINS' sole expense in obtaining an order protecting the information from public disclosure.

"<u>Bedrock Work</u>" means information owned by Client and derivatives thereof.

"<u>Improvements</u>" means (a) any modifications, improvements, derivatives, models, updates, enhancements or revisions made to the SPINS Information whether solely by a party, jointly, or jointly with a third party as a result of a party's obligations under or exercise of licenses granted under this Agreement.

"<u>SPINS Information</u>" means, collectively, (i) the SPL, SPL Hierarchy and SPL Attributes, and (ii) the information, data, reports, report templates, tools, products, services and other deliverables provided by SPINS to Client under the Client Agreement.

"<u>SPINS Product Library</u>" or "<u>SPL</u>" means all UPC-level product information owned, licensed, or sublicensed by SPINS, and which will include without limitation: (i) hierarchical classifications of department, category, subcategory, and product type ("<u>SPL Hierarchy</u>"); and (ii) product attributes, including without limitation manufacturer and brand name, product description, and other elements as defined, coded and maintained by SPINS ("<u>SPL Attributes</u>").

"<u>Third Party Licensor</u>" means any third party who has entered into a separate agreement with SPINS pursuant to which the third party's data and other confidential information belonging to the third party has been made available to SPINS and is included in SPINS Information.

# EXHIBIT 3



**Third Party Access Agreement**

| **Client:** Levain Bakery Cookie Company LLC | **Client Agreement Number:** S-015138 |
|---|---|
| | **Effective Date:** 2/1/2021 |

This Third Party Access Agreement (this "Agreement") is made as of the Effective Date above among SPINS LLC, a Delaware limited liability company, with its corporate office located at 222 W. Hubbard St., Suite 300, Chicago, IL 60654 ("SPINS"), the Client identified above, and Bedrock Analytics Corporation, with its corporate office located at 344 20th St. Suite 115, Oakland, CA 94612 ("Bedrock").

Client desires to disclose to Bedrock certain SPINS information provided by SPINS to Client under the Information and Services Agreement between Client and SPINS identified above ("Client Agreement"). Bedrock desires to use the SPINS information to provide services to Client. SPINS agrees to permit Bedrock to use SPINS information on the terms and conditions set forth in this Agreement.

1. <u>License and Permissible Use</u>. SPINS consents to Client disclosing to Bedrock the SPINS information that is licensed to Client under the Client Agreement, other than such information that a Third Party Licensor has prohibited SPINS from disclosing to Bedrock and that is identified by SPINS to Client and Bedrock in writing ("SPINS Information"). SPINS waives any claim against Bedrock with respect to Bedrock's prior receipt and use of SPINS information received from Client prior to the Effective Date hereof. Subject to the terms and conditions of this Agreement and (with respect to Client) the Client Agreement, SPINS grants to Bedrock a non-exclusive, limited, royalty-free and fully paid up license to use the SPINS Information during the term of this Agreement solely to provide services to Client, including without limitation the preparation of Improvements (which Improvements will be owned by Bedrock). Bedrock will allow access to and use of SPINS Information only to employees and contractors who need such access and use to provide services to Client. The SPINS Information includes the SPINS Product Library. Bedrock may not use the SPL Hierarchy, or any SPL Attributes or any other data derived from the SPINS Product Library in connection with any data from any source other than SPINS, such as, for example, arranging such data according to the SPL Hierarchy or applying SPL Attributes to any such data (for clarity the foregoing shall not limit Bedrock's right to use Improvements).

2. <u>Term and Termination</u>. This Agreement is effective as of the Effective Date and will remain in effect until the earlier of (i) the date upon which the Client Agreement terminates; or (ii) the date on which SPINS gives written notice of termination to Bedrock.

**This Agreement includes and incorporates the attached Terms and Conditions, which contain, among other things, warranty disclaimers, liability limitations, and use limitations. Bedrock hereby agrees to the Terms and Conditions and in the event of any conflict between this document and the Terms and Conditions, the Terms and Conditions will govern.**

This Agreement may be executed in two or more counterparts, each of which, when taken together, will constitute one in the same agreement. Signatures of the Parties transmitted by PDF or similar file type transmitted via electronic mail, cloud based server, e-signature technology or other similar electronic means are deemed to be original signatures for all purposes.

In witness whereof, the Parties hereto have entered into this Agreement as of the Effective Date.

**Client**
Signature: _Jennifer Dong_

Print Name: Jennifer Dong

Title: CFO

**SPINS LLC**
Signature: _Vlad Deronja_

Print Name: Vlad Deronja

Title: VP Finance

**Bedrock**
Signature: _William Salcido_

Print Name: William Salcido

Title: CEO

_EM_

**Terms and Conditions**

These Terms and Conditions are included and incorporated in the Third Party Access Agreement (which is referred to, collectively with these Terms and Conditions, as the "Agreement") between SPINS, Client and Bedrock. SPINS, Client and Bedrock are each a "Party" to this Agreement and, collectively, the "Parties". Capitalized terms not otherwise defined in this Agreement have the meanings provided in Appendix 1 to this Agreement.

1.  Delivery of SPINS Information. SPINS will deliver SPINS Information to Bedrock via a data extract file in the standard Bedrock format made available to SPINS, which format will indicate which SPINS Information Bedrock is requesting that SPINS deliver to Bedrock. SPINS will effect such delivery promptly after the Effective Date and on an ongoing basis during the term hereof. Client will not separately provide any SPINS Information to Bedrock. Bedrock is not permitted to access SPINS online data delivery platform, including, without limitation, by using access credentials provided to Client. Client acknowledges and agrees that providing access credentials to the SPINS online data delivery platform to Bedrock is a material breach of the Client Agreement.

2.  Ownership. SPINS or its Third Party Licensors own all right, title and interest in and to SPINS Information. Except for the limited license granted to Bedrock under this Agreement, no right, title or interest to SPINS Information is transferred to Bedrock or any third party. Bedrock agrees not to assert any proprietary rights to SPINS Information or Improvements against SPINS, any Third Party Licensor, or SPINS' licensees, affiliates, successors or assigns. To the extent any SPINS Information (other than Improvements) is contained within a Bedrock Work, such SPINS Information shall remain the property of SPINS or its Third Party Licensor and the use of such Bedrock Work is subject to this Agreement.

3.  Termination.
    a.  Upon termination or expiration of this Agreement, (i) Bedrock will cease to have access to SPINS Information and will cease to use SPINS Information, and (ii) Bedrock shall promptly return to SPINS or destroy all SPINS Information in its possession or control, without retaining any copies thereof, and Bedrock will promptly destroy all copies of any analyses, compilations, studies or other documents, records or data prepared by Bedrock to the extent that they contain any SPINS Information (other than Improvements), and upon SPINS' request, Bedrock will certify in writing that Bedrock has complied with this subsection.
    b.  The "License and Permissible Use", "Ownership", "Confidential Information", "Indemnification", "Enforcement", "Disclaimer of Warranties", "Limitation on Liability" and "General" sections of this Agreement shall survive any termination or expiration of this Agreement.

4.  Confidential Information. Bedrock shall treat as confidential all Confidential Information received from SPINS, shall not use such Confidential Information except as expressly permitted under this Agreement, and shall not cause or permit its employees, officers and affiliates to reveal, disclose or otherwise make available such Confidential Information to any third party, except as expressly permitted under this Agreement. Bedrock shall use at least the same degree of care which it uses to prevent the disclosure of its own confidential information, but in no event with less than reasonable care, to prevent the disclosure of Confidential Information.

5.  Indemnification. SPINS will indemnify, defend and hold harmless Bedrock and its officers, directors, employees and agents from and against any and all loss, liability, cost, damages and expense, including attorneys' fees, which arise out of or are related to third party claims that SPINS Information or Services infringe upon the intellectual property rights of any third party. Bedrock agrees that if SPINS Information or Services infringe or are alleged to infringe upon any third party intellectual property rights, SPINS at its sole option may (i) obtain at SPINS's expense the right for Bedrock to continue such use of SPINS Information or Services, (ii) modify the SPINS Information or Services in such a way that the SPINS Information or Services are substantially similar but Bedrock's use of the modified SPINS Information or Services does not infringe upon any third party intellectual property rights, or (iii) require Bedrock to stop using the SPINS Information or Services that may be infringing. Bedrock will promptly notify SPINS of any such claim in writing and SPINS will control the defense of such claim.

DocuSign Envelope ID: 49DC3691-282A-40A5-A993-52EF499D1B30

6.  <u>Enforcement</u>. The Parties acknowledge and agree that SPINS would lack an adequate remedy at law and would suffer irreparable injury if the "<u>License and Permissible Use</u>" or "<u>Confidential Information</u>" sections of this Agreement are violated.  In the event of any violation or imminent violation of this Agreement by Bedrock or any of its employees, contractors or agents, SPINS or a Third Party Licensor shall be entitled to seek injunctive relief as an appropriate remedy, without having to prove irreparable injury, lack of an adequate remedy at law, posting bond or waiving any other rights or remedies. If Bedrock is shown to have breached the "<u>License and Permissible Use</u>" or "<u>Confidential Information</u>" sections of this Agreement, Bedrock will reimburse SPINS for all expenses (including without limitation attorneys' fees and expenses of investigation) incurred by SPINS in enforcing its rights under this Agreement.

7.  <u>Disclaimer of Warranties</u>. SPINS DISCLAIMS, ON ITS OWN BEHALF AND ON BEHALF OF THIRD PARTY LICENSORS, AND CLIENT AND BEDROCK WAIVE, ANY AND ALL WARRANTIES OF ANY KIND, WHETHER EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION ANY IMPLIED WARRANTIES OF MERCHANTABILITY, NON-INFRINGEMENT, FITNESS FOR A PARTICULAR PURPOSE, RELIABILITY, OR TIMELINESS OF DELIVERY. ALL SPINS INFORMATION IS PROVIDED BY SPINS ON AN "AS IS" AND "AS AVAILABLE" BASIS. SPINS, ON ITS OWN BEHALF AND ON BEHALF OF THIRD PARTY LICENSORS, DOES NOT WARRANT THAT SPINS INFORMATION WILL BE UNINTERRUPTED OR ERROR FREE.

8.  <u>Limitation on Liability</u>. NEITHER SPINS NOR ANY OF ITS THIRD PARTY LICENSORS, SERVICE PROVIDERS OR SUPPLIERS SHALL BE LIABLE FOR ANY INCIDENTAL, SPECIAL, CONSEQUENTIAL OR INDIRECT DAMAGES OF ANY KIND (INCLUDING WITHOUT LIMITATION DAMAGES FOR INTERRUPTION OF BUSINESS, PROCUREMENT OF SUBSTITUTE GOODS, LOSS OF PROFITS, OR THE LIKE) REGARDLESS OF THE FORM OF ACTION, WHETHER IN CONTRACT, TORT (INCLUDING NEGLIGENCE), STRICT PRODUCT LIABILITY OR ANY OTHER LEGAL OR EQUITABLE THEORY, EVEN IF SPINS HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. IN NO EVENT WILL SPINS' AGGREGATE CUMULATIVE LIABILITY FOR ANY CLAIMS ARISING OUT OF OR RELATED TO THIS AGREEMENT (INCLUDING WITHOUT LIMITATION, A FAILURE TO PROVIDE INFORMATION) EXCEED THE GREATER OF (A) $10,000 OR (B) THE AMOUNTS PAID TO SPINS BY BEDROCK PURSUANT TO THIS AGREEMENT IN THE 12 MONTH PERIOD PRECEDING SUCH CLAIM.

9.  <u>General</u>.
    a.  <u>Authority</u>. Each Party represents and warrants that it has full power and authority to enter into this Agreement and to carry out its obligations hereunder.
    b.  <u>Governing Law</u>. This Agreement and the Parties' respective rights and duties shall be interpreted and governed in accordance with the laws of the State of Illinois, regardless of its choice of law principles. Any and all claims arising from this Agreement shall be brought either in the state or federal courts located in Cook County, Illinois, and each Party consents to the jurisdiction of such courts.
    c.  <u>Assignment</u>.  Neither Bedrock nor Client may assign this Agreement without the prior written consent of SPINS. Any change of control, merger, sale or lease of all or substantially all of Bedrock's or Client's assets shall be deemed an assignment for purposes of this Agreement. Any attempted assignment in violation of this provision shall be null and void. All terms and conditions of this Agreement shall be binding on and inure to the benefit of the permitted successors and assigns of the Parties.
    d.  <u>Entire Agreement</u>. This Agreement constitutes the entire understanding among the Parties regarding the subject matter of this Agreement and supersedes any previous communications, representations or agreements, whether written or oral.  No changes or modifications of any of the terms or conditions of this Agreement shall be valid or binding on either Party unless in writing and signed by an authorized representative of each Party.
    e.  <u>Force Majeure</u>. SPINS shall not be liable for any loss, damage or delay resulting from any cause beyond its reasonable control, including, without limitation: fire; flood; action or decree of civil or military authority; insurrection; act of war; threatened or actual terrorism or bioterrorism; or embargo.
    f.  <u>Notices</u>. Notices hereunder must be in writing and given to the other Party by in-hand delivery, by first class mail, postage prepaid, or by air courier to the mailing address set forth above or to such other address as either Party may designate, by facsimile, or by e-mail. Notices shall be effective when received.

g.  <u>Status of Parties</u>. This Agreement shall not be construed as creating a joint venture, partnership, agency or any other similar relationship between any two Parties, and no Party shall have any authority to bind or make commitments on behalf of another Party.

**Appendix 1**

Definitions

"Confidential Information" means (i) the terms and conditions of this Agreement and the Client Agreement, (ii) all SPINS Information, including without limitation data and other information provided by Third Party Licensors and included in the SPINS Information, and (iii) any other information disclosed by SPINS to Client or Bedrock, either directly or through a third party, in any form, which is designated as "Confidential," "Proprietary" or some similar designation or which should reasonably be considered to be confidential given the nature of the information or the circumstances of its disclosure. Confidential Information does not, however, include any information which (i) was publicly known and made generally available in the public domain prior to the time of disclosure by SPINS; (ii) becomes publicly known and made generally available through no breach of this Agreement; (iii) is already in the possession of Bedrock at the time of disclosure by SPINS; or (iv) is obtained by Bedrock from a third party without a breach of such third party's obligations of confidentiality; (v) is independently developed by Bedrock without use of or reference to SPINS' Confidential Information; or (vi) is compelled by law to be disclosed by Bedrock, provided that Bedrock gives SPINS prompt written notice of such requirement prior to such disclosure and assistance at SPINS' sole expense in obtaining an order protecting the information from public disclosure.

"Bedrock Work" means information owned by Client and derivatives thereof.

" Improvements" means (a) any modifications, improvements, derivatives, models, updates, enhancements or revisions made to the SPINS Information whether solely by a party, jointly, or jointly with a third party as a result of a party's obligations under or exercise of licenses granted under this Agreement.

"SPINS Information" means, collectively, (i) the SPL, SPL Hierarchy and SPL Attributes, and (ii) the information, data, reports, report templates, tools, products, services and other deliverables provided by SPINS to Client under the Client Agreement.

"SPINS Product Library" or "SPL" means all UPC-level product information owned, licensed, or sublicensed by SPINS, and which will include without limitation: (i) hierarchical classifications of department, category, subcategory, and product type ("SPL Hierarchy"); and (ii) product attributes, including without limitation manufacturer and brand name, product description, and other elements as defined, coded and maintained by SPINS ("SPL Attributes").

"Third Party Licensor" means any third party who has entered into a separate agreement with SPINS pursuant to which the third party's data and other confidential information belonging to the third party has been made available to SPINS and is included in SPINS Information.

# EXHIBIT 4



**Third Party Access Agreement**

| **Client:** ~~Beecher's Homeade Cheese~~ | **Client Agreement Number:** S-015787 |
|---|---|
| Beecher's Handmade Cheese | **Effective Date:** 4/9/2021 |

This Third Party Access Agreement (this "Agreement") is made as of the Effective Date above among SPINS LLC, a Delaware limited liability company, with its corporate office located at 222 W. Hubbard St., Suite 300, Chicago, IL 60654 ("SPINS"), the Client identified above, and Bedrock Analytics Corporation, with its corporate office located at 344 20th St. Suite 115, Oakland, CA 94612 ("Bedrock").

Client desires to disclose to Bedrock certain SPINS information provided by SPINS to Client under the Information and Services Agreement between Client and SPINS identified above ("Client Agreement"). Bedrock desires to use the SPINS information to provide services to Client.  SPINS agrees to permit Bedrock to use SPINS information on the terms and conditions set forth in this Agreement.

1. License and Permissible Use. SPINS consents to Client disclosing to Bedrock the SPINS information that is licensed to Client under the Client Agreement, other than such information that a Third Party Licensor  has prohibited SPINS from disclosing to Bedrock and that is identified by SPINS to Client and Bedrock in writing ("SPINS Information").  SPINS waives any claim against Bedrock with respect to Bedrock's prior receipt and use of SPINS information received from Client prior to the Effective Date hereof. Subject to the terms and conditions of this Agreement and (with respect to Client) the Client Agreement, SPINS grants to Bedrock a non-exclusive, limited, royalty-free and fully paid up license to use the SPINS Information during the term of this Agreement solely to provide services to Client, including without limitation the preparation of Improvements (which Improvements will be owned by Bedrock). Bedrock will allow access to and use of SPINS Information only to employees and contractors who need such access and use to provide services to Client. The SPINS Information includes the SPINS Product Library. Bedrock may not use the SPL Hierarchy, or any SPL Attributes or any other data derived from the SPINS Product Library in connection with any data from any source other than SPINS, such as, for example, arranging such data according to the SPL Hierarchy or applying SPL Attributes to any such data (for clarity the foregoing shall not limit Bedrock's right to use Improvements).
2. Term and Termination. This Agreement is effective as of the Effective Date and will remain in effect until the earlier of (i) the date upon which the Client Agreement terminates; or (ii) the date on which SPINS gives written notice of termination to Bedrock.

**This Agreement includes and incorporates the attached Terms and Conditions, which contain, among other things, warranty disclaimers, liability limitations, and use limitations. Bedrock hereby agrees to the Terms and Conditions and in the event of any conflict between this document and the Terms and Conditions, the Terms and Conditions will govern.**

This Agreement may be executed in two or more counterparts, each of which, when taken together, will constitute one in the same agreement. Signatures of the Parties transmitted by PDF or similar file type transmitted via electronic mail, cloud based server, e-signature technology or other similar electronic means are deemed to be original signatures for all purposes.

In witness whereof, the Parties hereto have entered into this Agreement as of the Effective Date.

**Client**
Signature: _Nathaniel W. Polky_____

Print Name: _____

Title: _____

**SPINS LLC**
Signature: _Vlad Deronya_____

Print Name: _____

Title: _____

**Bedrock**
Signature: _William Salcido_____

Print Name: Will Salcido

**Terms and Conditions**

These Terms and Conditions are included and incorporated in the Third Party Access Agreement (which is referred to, collectively with these Terms and Conditions, as the "Agreement") between SPINS, Client and Bedrock. SPINS, Client and Bedrock are each a "Party" to this Agreement and, collectively, the "Parties". Capitalized terms not otherwise defined in this Agreement have the meanings provided in Appendix 1 to this Agreement.

1. Delivery of SPINS Information.  SPINS will deliver SPINS Information to Bedrock via a data extract file in the standard Bedrock format made available to SPINS, which format will indicate which SPINS Information Bedrock is requesting that SPINS deliver to Bedrock. SPINS will effect such delivery promptly after the Effective Date and on an ongoing basis during the term hereof.  Client will not separately provide any SPINS Information to Bedrock. Bedrock is not permitted to access SPINS online data delivery platform, including, without limitation, by using access credentials provided to Client. Client acknowledges and agrees that providing access credentials to the SPINS online data delivery platform to Bedrock is a material breach of the Client Agreement.

2. Ownership. SPINS or its Third Party Licensors own all right, title and interest in and to SPINS Information. Except for the limited license granted to Bedrock under this Agreement, no right, title or interest to SPINS Information is transferred to Bedrock or any third party. Bedrock agrees not to assert any proprietary rights to SPINS Information or Improvements against SPINS, any Third Party Licensor, or SPINS' licensees, affiliates, successors or assigns. To the extent any SPINS Information (other than Improvements) is contained within a Bedrock Work, such SPINS Information shall remain the property of SPINS or its Third Party Licensor and the use of such Bedrock Work is subject to this Agreement.

3. Termination.
   a. Upon termination or expiration of this Agreement, (i) Bedrock will cease to have access to SPINS Information and will cease to use SPINS Information, and (ii) Bedrock shall promptly return to SPINS or destroy all SPINS Information in its possession or control, without retaining any copies thereof, and Bedrock will promptly destroy all copies of any analyses, compilations, studies or other documents, records or data prepared by Bedrock to the extent that they contain any SPINS Information (other than Improvements), and upon SPINS' request, Bedrock will certify in writing that Bedrock has complied with this subsection.
   b. The "License and Permissible Use", "Ownership", "Confidential Information", "Indemnification", "Enforcement", "Disclaimer of Warranties", "Limitation on Liability" and "General" sections of this Agreement shall survive any termination or expiration of this Agreement.

4. Confidential Information. Bedrock shall treat as confidential all Confidential Information received from SPINS, shall not use such Confidential Information except as expressly permitted under this Agreement, and shall not cause or permit its employees, officers and affiliates to reveal, disclose or otherwise make available such Confidential Information to any third party, except as expressly permitted under this Agreement. Bedrock shall use at least the same degree of care which it uses to prevent the disclosure of its own confidential information, but in no event with less than reasonable care, to prevent the disclosure of Confidential Information.

5. Indemnification. SPINS will indemnify, defend and hold harmless Bedrock and its officers, directors, employees and agents from and against any and all loss, liability, cost, damages and expense, including attorneys' fees, which arise out of or are related to third party claims that SPINS Information or Services infringe upon the intellectual property rights of any third party. Bedrock agrees that if SPINS Information or Services infringe or are alleged to infringe upon any third party intellectual property rights, SPINS at its sole option may (i) obtain at SPINS's expense the right for Bedrock to continue such use of SPINS Information or Services, (ii) modify the SPINS Information or Services in such a way that the SPINS Information or Services are substantially similar but Bedrock's use of the modified SPINS Information or Services does not infringe upon any third party intellectual property rights, or (iii) require Bedrock to stop using the SPINS Information or Services that may be infringing. Bedrock will promptly notify SPINS of any such claim in writing and SPINS will control the defense of such claim.

6. <u>Enforcement</u>. The Parties acknowledge and agree that SPINS would lack an adequate remedy at law and would suffer irreparable injury if the "<u>License and Permissible Use</u>" or "<u>Confidential Information</u>" sections of this Agreement are violated. In the event of any violation or imminent violation of this Agreement by Bedrock or any of its employees, contractors or agents, SPINS or a Third Party Licensor shall be entitled to seek injunctive relief as an appropriate remedy, without having to prove irreparable injury, lack of an adequate remedy at law, posting bond or waiving any other rights or remedies. If Bedrock is shown to have breached the "<u>License and Permissible Use</u>" or "<u>Confidential Information</u>" sections of this Agreement, Bedrock will reimburse SPINS for all expenses (including without limitation attorneys' fees and expenses of investigation) incurred by SPINS in enforcing its rights under this Agreement.

7. <u>Disclaimer of Warranties</u>. SPINS DISCLAIMS, ON ITS OWN BEHALF AND ON BEHALF OF THIRD PARTY LICENSORS, AND CLIENT AND BEDROCK WAIVE, ANY AND ALL WARRANTIES OF ANY KIND, WHETHER EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION ANY IMPLIED WARRANTIES OF MERCHANTABILITY, NON-INFRINGEMENT, FITNESS FOR A PARTICULAR PURPOSE, RELIABILITY, OR TIMELINESS OF DELIVERY. ALL SPINS INFORMATION IS PROVIDED BY SPINS ON AN "AS IS" AND "AS AVAILABLE" BASIS. SPINS, ON ITS OWN BEHALF AND ON BEHALF OF THIRD PARTY LICENSORS, DOES NOT WARRANT THAT SPINS INFORMATION WILL BE UNINTERRUPTED OR ERROR FREE.

8. <u>Limitation on Liability</u>. NEITHER SPINS NOR ANY OF ITS THIRD PARTY LICENSORS, SERVICE PROVIDERS OR SUPPLIERS SHALL BE LIABLE FOR ANY INCIDENTAL, SPECIAL, CONSEQUENTIAL OR INDIRECT DAMAGES OF ANY KIND (INCLUDING WITHOUT LIMITATION DAMAGES FOR INTERRUPTION OF BUSINESS, PROCUREMENT OF SUBSTITUTE GOODS, LOSS OF PROFITS, OR THE LIKE) REGARDLESS OF THE FORM OF ACTION, WHETHER IN CONTRACT, TORT (INCLUDING NEGLIGENCE), STRICT PRODUCT LIABILITY OR ANY OTHER LEGAL OR EQUITABLE THEORY, EVEN IF SPINS HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. IN NO EVENT WILL SPINS' AGGREGATE CUMULATIVE LIABILITY FOR ANY CLAIMS ARISING OUT OF OR RELATED TO THIS AGREEMENT (INCLUDING WITHOUT LIMITATION, A FAILURE TO PROVIDE INFORMATION) EXCEED THE GREATER OF (A) $10,000 OR (B) THE AMOUNTS PAID TO SPINS BY BEDROCK PURSUANT TO THIS AGREEMENT IN THE 12 MONTH PERIOD PRECEDING SUCH CLAIM.

9. <u>General</u>.
   a. <u>Authority</u>. Each Party represents and warrants that it has full power and authority to enter into this Agreement and to carry out its obligations hereunder.
   b. <u>Governing Law</u>. This Agreement and the Parties' respective rights and duties shall be interpreted and governed in accordance with the laws of the State of Illinois, regardless of its choice of law principles. Any and all claims arising from this Agreement shall be brought either in the state or federal courts located in Cook County, Illinois, and each Party consents to the jurisdiction of such courts.
   c. <u>Assignment</u>. Neither Bedrock nor Client may assign this Agreement without the prior written consent of SPINS. Any change of control, merger, sale or lease of all or substantially all of Bedrock's or Client's assets shall be deemed an assignment for purposes of this Agreement. Any attempted assignment in violation of this provision shall be null and void. All terms and conditions of this Agreement shall be binding on and inure to the benefit of the permitted successors and assigns of the Parties.
   d. <u>Entire Agreement</u>. This Agreement constitutes the entire understanding among the Parties regarding the subject matter of this Agreement and supersedes any previous communications, representations or agreements, whether written or oral. No changes or modifications of any of the terms or conditions of this Agreement shall be valid or binding on either Party unless in writing and signed by an authorized representative of each Party.
   e. <u>Force Majeure</u>. SPINS shall not be liable for any loss, damage or delay resulting from any cause beyond its reasonable control, including, without limitation: fire; flood; action or decree of civil or military authority; insurrection; act of war; threatened or actual terrorism or bioterrorism; or embargo.
   f. <u>Notices</u>. Notices hereunder must be in writing and given to the other Party by in-hand delivery, by first class mail, postage prepaid, or by air courier to the mailing address set forth above or to such other address as either Party may designate, by facsimile, or by e-mail. Notices shall be effective when received.

g.   <u>Status of Parties</u>. This Agreement shall not be construed as creating a joint venture, partnership, agency or any other similar relationship between any two Parties, and no Party shall have any authority to bind or make commitments on behalf of another Party.

DocuSign Envelope ID: A4274D4A-7D2B-443D-891B-B339ACFF121B

**Appendix 1**

Definitions

"<u>Confidential Information</u>" means (i) the terms and conditions of this Agreement and the Client Agreement, (ii) all SPINS Information, including without limitation data and other information provided by Third Party Licensors and included in the SPINS Information, and (iii) any other information disclosed by SPINS to Client or Bedrock, either directly or through a third party, in any form, which is designated as "Confidential," "Proprietary" or some similar designation or which should reasonably be considered to be confidential given the nature of the information or the circumstances of its disclosure. Confidential Information does not, however, include any information which (i) was publicly known and made generally available in the public domain prior to the time of disclosure by SPINS; (ii) becomes publicly known and made generally available through no breach of this Agreement; (iii) is already in the possession of Bedrock at the time of disclosure by SPINS; or (iv) is obtained by Bedrock from a third party without a breach of such third party's obligations of confidentiality; (v) is independently developed by Bedrock without use of or reference to SPINS' Confidential Information; or (vi) is compelled by law to be disclosed by Bedrock, provided that Bedrock gives SPINS prompt written notice of such requirement prior to such disclosure and assistance at SPINS' sole expense in obtaining an order protecting the information from public disclosure.

"<u>Bedrock Work</u>" means information owned by Client and derivatives thereof.

"<u>Improvements</u>" means (a) any modifications, improvements, derivatives, models, updates, enhancements or revisions made to the SPINS Information whether solely by a party, jointly, or jointly with a third party as a result of a party's obligations under or exercise of licenses granted under this Agreement.

"<u>SPINS Information</u>" means, collectively, (i) the SPL, SPL Hierarchy and SPL Attributes, and (ii) the information, data, reports, report templates, tools, products, services and other deliverables provided by SPINS to Client under the Client Agreement.

"<u>SPINS Product Library</u>" or "<u>SPL</u>" means all UPC-level product information owned, licensed, or sublicensed by SPINS, and which will include without limitation: (i) hierarchical classifications of department, category, subcategory, and product type ("<u>SPL Hierarchy</u>"); and (ii) product attributes, including without limitation manufacturer and brand name, product description, and other elements as defined, coded and maintained by SPINS ("<u>SPL Attributes</u>").

"<u>Third Party Licensor</u>" means any third party who has entered into a separate agreement with SPINS pursuant to which the third party's data and other confidential information belonging to the third party has been made available to SPINS and is included in SPINS Information.

# EXHIBIT 5



**Third Party Access Agreement**

| Client: CHEF BOBO BRAND INC | Client Agreement Number: S-007039 |
|---|---|
| | Effective Date: 5/25/2021 |

This Third Party Access Agreement (this "Agreement") is made as of the Effective Date above among SPINS LLC, a Delaware limited liability company, with its corporate office located at 222 W. Hubbard St., Suite 300, Chicago, IL 60654 ("SPINS"), the Client identified above, and Bedrock Analytics Corporation, with its corporate office located at 344 20th St. Suite 115, Oakland, CA 94612 ("Bedrock").

Client desires to disclose to Bedrock certain SPINS information provided by SPINS to Client under the Information and Services Agreement between Client and SPINS identified above ("Client Agreement"). Bedrock desires to use the SPINS information to provide services to Client.  SPINS agrees to permit Bedrock to use SPINS information on the terms and conditions set forth in this Agreement.

1. License and Permissible Use. SPINS consents to Client disclosing to Bedrock the SPINS information that is licensed to Client under the Client Agreement, other than such information that a Third Party Licensor  has prohibited SPINS from disclosing to Bedrock and that is identified by SPINS to Client and Bedrock in writing ("SPINS Information").  SPINS waives any claim against Bedrock with respect to Bedrock's prior receipt and use of SPINS information received from Client prior to the Effective Date hereof. Subject to the terms and conditions of this Agreement and (with respect to Client) the Client Agreement, SPINS grants to Bedrock a non-exclusive, limited, royalty-free and fully paid up license to use the SPINS Information during the term of this Agreement solely to provide services to Client, including without limitation the preparation of Improvements (which Improvements will be owned by Bedrock). Bedrock will allow access to and use of SPINS Information only to employees and contractors who need such access and use to provide services to Client. The SPINS Information includes the SPINS Product Library. Bedrock may not use the SPL Hierarchy, or any SPL Attributes or any other data derived from the SPINS Product Library in connection with any data from any source other than SPINS, such as, for example, arranging such data according to the SPL Hierarchy or applying SPL Attributes to any such data (for clarity the foregoing shall not limit Bedrock's right to use Improvements).
2. Term and Termination. This Agreement is effective as of the Effective Date and will remain in effect until the earlier of (i) the date upon which the Client Agreement terminates; or (ii) the date on which SPINS gives written notice of termination to Bedrock.

**This Agreement includes and incorporates the attached Terms and Conditions, which contain, among other things, warranty disclaimers, liability limitations, and use limitations. Bedrock hereby agrees to the Terms and Conditions and in the event of any conflict between this document and the Terms and Conditions, the Terms and Conditions will govern.**

This Agreement may be executed in two or more counterparts, each of which, when taken together, will constitute one in the same agreement. Signatures of the Parties transmitted by PDF or similar file type transmitted via electronic mail, cloud based server, e-signature technology or other similar electronic means are deemed to be original signatures for all purposes.

In witness whereof, the Parties hereto have entered into this Agreement as of the Effective Date.

**Client**
Signature: _Stephanie Thrasher_____

**SPINS LLC**
Signature: _Vlad Deronya_____

Print Name: _____

Print Name: _____

Title: _____

Title: _____

**Bedrock**
Signature: _William Salcido_____

Print Name: Will Salcido

**Terms and Conditions**

These Terms and Conditions are included and incorporated in the Third Party Access Agreement (which is referred to, collectively with these Terms and Conditions, as the "Agreement") between SPINS, Client and Bedrock. SPINS, Client and Bedrock are a each a "Party" to this Agreement and, collectively, the "Parties". Capitalized terms not otherwise defined in this Agreement have the meanings provided in Appendix 1 to this Agreement.

1.  Delivery of SPINS Information.  SPINS will deliver SPINS Information to Bedrock via a data extract file in the standard Bedrock format made available to SPINS, which format will indicate which SPINS Information Bedrock is requesting that SPINS deliver to Bedrock. SPINS will effect such delivery promptly after the Effective Date and on an ongoing basis during the term hereof.  Client will not separately provide any SPINS Information to Bedrock. Bedrock is not permitted to access SPINS online data delivery platform, including, without limitation, by using access credentials provided to Client. Client acknowledges and agrees that providing access credentials to the SPINS online data delivery platform to Bedrock is a material breach of the Client Agreement.

2.  Ownership. SPINS or its Third Party Licensors own all right, title and interest in and to SPINS Information. Except for the limited license granted to Bedrock under this Agreement, no right, title or interest to SPINS Information is transferred to Bedrock or any third party. Bedrock agrees not to assert any proprietary rights to SPINS Information or Improvements against SPINS, any Third Party Licensor, or SPINS' licensees, affiliates, successors or assigns. To the extent any SPINS Information (other than Improvements) is contained within a Bedrock Work, such SPINS Information shall remain the property of SPINS or its Third Party Licensor and the use of such Bedrock Work is subject to this Agreement.

3.  Termination.
    a.  Upon termination or expiration of this Agreement, (i) Bedrock will cease to have access to SPINS Information and will cease to use SPINS Information, and (ii) Bedrock shall promptly return to SPINS or destroy all SPINS Information in its possession or control, without retaining any copies thereof, and Bedrock will promptly destroy all copies of any analyses, compilations, studies or other documents, records or data prepared by Bedrock to the extent that they contain any SPINS Information (other than Improvements), and upon SPINS' request, Bedrock will certify in writing that Bedrock has complied with this subsection.
    b.  The "License and Permissible Use", "Ownership", "Confidential Information", "Indemnification", "Enforcement", "Disclaimer of Warranties", "Limitation on Liability" and "General" sections of this Agreement shall survive any termination or expiration of this Agreement.

4.  Confidential Information. Bedrock shall treat as confidential all Confidential Information received from SPINS, shall not use such Confidential Information except as expressly permitted under this Agreement, and shall not cause or permit its employees, officers and affiliates to reveal, disclose or otherwise make available such Confidential Information to any third party, except as expressly permitted under this Agreement. Bedrock shall use at least the same degree of care which it uses to prevent the disclosure of its own confidential information, but in no event with less than reasonable care, to prevent the disclosure of Confidential Information.

5.  Indemnification. SPINS will indemnify, defend and hold harmless Bedrock and its officers, directors, employees and agents from and against any and all loss, liability, cost, damages and expense, including attorneys' fees, which arise out of or are related to third party claims that SPINS Information or Services infringe upon the intellectual property rights of any third party. Bedrock agrees that if SPINS Information or Services infringe or are alleged to infringe upon any third party intellectual property rights, SPINS at its sole option may (i) obtain at SPINS's expense the right for Bedrock to continue such use of SPINS Information or Services, (ii) modify the SPINS Information or Services in such a way that the SPINS Information or Services are substantially similar but Bedrock's use of the modified SPINS Information or Services does not infringe upon any third party intellectual property rights, or (iii) require Bedrock to stop using the SPINS Information or Services that may be infringing. Bedrock will promptly notify SPINS of any such claim in writing and SPINS will control the defense of such claim.

6. <u>Enforcement</u>. The Parties acknowledge and agree that SPINS would lack an adequate remedy at law and would suffer irreparable injury if the "<u>License and Permissible Use</u>" or "<u>Confidential Information</u>" sections of this Agreement are violated.  In the event of any violation or imminent violation of this Agreement by Bedrock or any of its employees, contractors or agents, SPINS or a Third Party Licensor shall be entitled to seek injunctive relief as an appropriate remedy, without having to prove irreparable injury, lack of an adequate remedy at law, posting bond or waiving any other rights or remedies. If Bedrock is shown to have breached the "<u>License and Permissible Use</u>" or "<u>Confidential Information</u>" sections of this Agreement, Bedrock will reimburse SPINS for all expenses (including without limitation attorneys' fees and expenses of investigation) incurred by SPINS in enforcing its rights under this Agreement.

7. <u>Disclaimer of Warranties</u>. SPINS DISCLAIMS, ON ITS OWN BEHALF AND ON BEHALF OF THIRD PARTY LICENSORS, AND CLIENT AND BEDROCK WAIVE, ANY AND ALL WARRANTIES OF ANY KIND, WHETHER EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION ANY IMPLIED WARRANTIES OF MERCHANTABILITY, NON-INFRINGEMENT, FITNESS FOR A PARTICULAR PURPOSE, RELIABILITY, OR TIMELINESS OF DELIVERY. ALL SPINS INFORMATION IS PROVIDED BY SPINS ON AN "AS IS" AND "AS AVAILABLE" BASIS. SPINS, ON ITS OWN BEHALF AND ON BEHALF OF THIRD PARTY LICENSORS, DOES NOT WARRANT THAT SPINS INFORMATION WILL BE UNINTERRUPTED OR ERROR FREE.

8. <u>Limitation on Liability</u>. NEITHER SPINS NOR ANY OF ITS THIRD PARTY LICENSORS, SERVICE PROVIDERS OR SUPPLIERS SHALL BE LIABLE FOR ANY INCIDENTAL, SPECIAL, CONSEQUENTIAL OR INDIRECT DAMAGES OF ANY KIND (INCLUDING WITHOUT LIMITATION DAMAGES FOR INTERRUPTION OF BUSINESS, PROCUREMENT OF SUBSTITUTE GOODS, LOSS OF PROFITS, OR THE LIKE) REGARDLESS OF THE FORM OF ACTION, WHETHER IN CONTRACT, TORT (INCLUDING NEGLIGENCE), STRICT PRODUCT LIABILITY OR ANY OTHER LEGAL OR EQUITABLE THEORY, EVEN IF SPINS HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. IN NO EVENT WILL SPINS' AGGREGATE CUMULATIVE LIABILITY FOR ANY CLAIMS ARISING OUT OF OR RELATED TO THIS AGREEMENT (INCLUDING WITHOUT LIMITATION, A FAILURE TO PROVIDE INFORMATION) EXCEED THE GREATER OF (A) $10,000 OR (B) THE AMOUNTS PAID TO SPINS BY BEDROCK PURSUANT TO THIS AGREEMENT IN THE 12 MONTH PERIOD PRECEDING SUCH CLAIM.

9. <u>General</u>.
   a. <u>Authority</u>. Each Party represents and warrants that it has full power and authority to enter into this Agreement and to carry out its obligations hereunder.
   b. <u>Governing Law</u>. This Agreement and the Parties' respective rights and duties shall be interpreted and governed in accordance with the laws of the State of Illinois, regardless of its choice of law principles. Any and all claims arising from this Agreement shall be brought either in the state or federal courts located in Cook County, Illinois, and each Party consents to the jurisdiction of such courts.
   c. <u>Assignment</u>.  Neither Bedrock nor Client may assign this Agreement without the prior written consent of SPINS. Any change of control, merger, sale or lease of all or substantially all of Bedrock's or Client's assets shall be deemed an assignment for purposes of this Agreement. Any attempted assignment in violation of this provision shall be null and void. All terms and conditions of this Agreement shall be binding on and inure to the benefit of the permitted successors and assigns of the Parties.
   d. <u>Entire Agreement</u>. This Agreement constitutes the entire understanding among the Parties regarding the subject matter of this Agreement and supersedes any previous communications, representations or agreements, whether written or oral.  No changes or modifications of any of the terms or conditions of this Agreement shall be valid or binding on either Party unless in writing and signed by an authorized representative of each Party.
   e. <u>Force Majeure</u>. SPINS shall not be liable for any loss, damage or delay resulting from any cause beyond its reasonable control, including, without limitation: fire; flood; action or decree of civil or military authority; insurrection; act of war; threatened or actual terrorism or bioterrorism; or embargo.
   f. <u>Notices</u>. Notices hereunder must be in writing and given to the other Party by in-hand delivery, by first class mail, postage prepaid, or by air courier to the mailing address set forth above or to such other address as either Party may designate, by facsimile, or by e-mail. Notices shall be effective when received.

g. <u>Status of Parties</u>. This Agreement shall not be construed as creating a joint venture, partnership, agency or any other similar relationship between any two Parties, and no Party shall have any authority to bind or make commitments on behalf of another Party.

**Appendix 1**

Definitions

"<u>Confidential Information</u>" means (i) the terms and conditions of this Agreement and the Client Agreement, (ii) all SPINS Information, including without limitation data and other information provided by Third Party Licensors and included in the SPINS Information, and (iii) any other information disclosed by SPINS to Client or Bedrock, either directly or through a third party, in any form, which is designated as "Confidential," "Proprietary" or some similar designation or which should reasonably be considered to be confidential given the nature of the information or the circumstances of its disclosure. Confidential Information does not, however, include any information which (i) was publicly known and made generally available in the public domain prior to the time of disclosure by SPINS; (ii) becomes publicly known and made generally available through no breach of this Agreement; (iii) is already in the possession of Bedrock at the time of disclosure by SPINS; or (iv) is obtained by Bedrock from a third party without a breach of such third party's obligations of confidentiality; (v) is independently developed by Bedrock without use of or reference to SPINS' Confidential Information; or (vi) is compelled by law to be disclosed by Bedrock, provided that Bedrock gives SPINS prompt written notice of such requirement prior to such disclosure and assistance at SPINS' sole expense in obtaining an order protecting the information from public disclosure.

"<u>Bedrock Work</u>" means information owned by Client and derivatives thereof.

"<u>Improvements</u>" means (a) any modifications, improvements, derivatives, models, updates, enhancements or revisions made to the SPINS Information whether solely by a party, jointly, or jointly with a third party as a result of a party's obligations under or exercise of licenses granted under this Agreement.

"<u>SPINS Information</u>" means, collectively, (i) the SPL, SPL Hierarchy and SPL Attributes, and (ii) the information, data, reports, report templates, tools, products, services and other deliverables provided by SPINS to Client under the Client Agreement.

"<u>SPINS Product Library</u>" or "<u>SPL</u>" means all UPC-level product information owned, licensed, or sublicensed by SPINS, and which will include without limitation: (i) hierarchical classifications of department, category, subcategory, and product type ("<u>SPL Hierarchy</u>"); and (ii) product attributes, including without limitation manufacturer and brand name, product description, and other elements as defined, coded and maintained by SPINS ("<u>SPL Attributes</u>").

"<u>Third Party Licensor</u>" means any third party who has entered into a separate agreement with SPINS pursuant to which the third party's data and other confidential information belonging to the third party has been made available to SPINS and is included in SPINS Information.

# EXHIBIT 6



**Third Party Access Agreement**

| **Client:** Just Greens LLC | **Client Agreement Number:** S-017353 |
|---|---|
| | **Effective Date:** 7/9/2021 |

This Third Party Access Agreement (this "Agreement") is made as of the Effective Date above among SPINS LLC, a Delaware limited liability company, with its corporate office located at 222 W. Hubbard St., Suite 300, Chicago, IL 60654 ("SPINS"), the Client identified above, and Bedrock Analytics Corporation, with its corporate office located at 344 20th St. Suite 115, Oakland, CA 94612 ("Bedrock").

Client desires to disclose to Bedrock certain SPINS information provided by SPINS to Client under the Information and Services Agreement between Client and SPINS identified above ("Client Agreement"). Bedrock desires to use the SPINS information to provide services to Client.  SPINS agrees to permit Bedrock to use SPINS information on the terms and conditions set forth in this Agreement.

1. License and Permissible Use. SPINS consents to Client disclosing to Bedrock the SPINS information that is licensed to Client under the Client Agreement, other than such information that a Third Party Licensor  has prohibited SPINS from disclosing to Bedrock and that is identified by SPINS to Client and Bedrock in writing ("SPINS Information").  SPINS waives any claim against Bedrock with respect to Bedrock's prior receipt and use of SPINS information received from Client prior to the Effective Date hereof. Subject to the terms and conditions of this Agreement and (with respect to Client) the Client Agreement, SPINS grants to Bedrock a non-exclusive, limited, royalty-free and fully paid up license to use the SPINS Information during the term of this Agreement solely to provide services to Client, including without limitation the preparation of Improvements (which Improvements will be owned by Bedrock). Bedrock will allow access to and use of SPINS Information only to employees and contractors who need such access and use to provide services to Client. The SPINS Information includes the SPINS Product Library. Bedrock may not use the SPL Hierarchy, or any SPL Attributes or any other data derived from the SPINS Product Library in connection with any data from any source other than SPINS, such as, for example, arranging such data according to the SPL Hierarchy or applying SPL Attributes to any such data (for clarity the foregoing shall not limit Bedrock's right to use Improvements).

2. Term and Termination. This Agreement is effective as of the Effective Date and will remain in effect until the earlier of (i) the date upon which the Client Agreement terminates; or (ii) the date on which SPINS gives written notice of termination to Bedrock.

**This Agreement includes and incorporates the attached Terms and Conditions, which contain, among other things, warranty disclaimers, liability limitations, and use limitations. Bedrock hereby agrees to the Terms and Conditions and in the event of any conflict between this document and the Terms and Conditions, the Terms and Conditions will govern.**

This Agreement may be executed in two or more counterparts, each of which, when taken together, will constitute one in the same agreement. Signatures of the Parties transmitted by PDF or similar file type transmitted via electronic mail, cloud based server, e-signature technology or other similar electronic means are deemed to be original signatures for all purposes.

In witness whereof, the Parties hereto have entered into this Agreement as of the Effective Date.

**Client**
Signature: _____

Print Name: _____

Title: _____

**SPINS LLC**
Signature: _____

Print Name: _____

Title: _____

**Bedrock**
Signature: _____

Print Name: Will Salcido

**Terms and Conditions**

These Terms and Conditions are included and incorporated in the Third Party Access Agreement (which is referred to, collectively with these Terms and Conditions, as the "Agreement") between SPINS, Client and Bedrock. SPINS, Client and Bedrock are each a "Party" to this Agreement and, collectively, the "Parties". Capitalized terms not otherwise defined in this Agreement have the meanings provided in Appendix 1 to this Agreement.

1. Delivery of SPINS Information. SPINS will deliver SPINS Information to Bedrock via a data extract file in the standard Bedrock format made available to SPINS, which format will indicate which SPINS Information Bedrock is requesting that SPINS deliver to Bedrock. SPINS will effect such delivery promptly after the Effective Date and on an ongoing basis during the term hereof. Client will not separately provide any SPINS Information to Bedrock. Bedrock is not permitted to access SPINS online data delivery platform, including, without limitation, by using access credentials provided to Client. Client acknowledges and agrees that providing access credentials to the SPINS online data delivery platform to Bedrock is a material breach of the Client Agreement.

2. Ownership. SPINS or its Third Party Licensors own all right, title and interest in and to SPINS Information. Except for the limited license granted to Bedrock under this Agreement, no right, title or interest to SPINS Information is transferred to Bedrock or any third party. Bedrock agrees not to assert any proprietary rights to SPINS Information or Improvements against SPINS, any Third Party Licensor, or SPINS' licensees, affiliates, successors or assigns. To the extent any SPINS Information (other than Improvements) is contained within a Bedrock Work, such SPINS Information shall remain the property of SPINS or its Third Party Licensor and the use of such Bedrock Work is subject to this Agreement.

3. Termination.
   a. Upon termination or expiration of this Agreement, (i) Bedrock will cease to have access to SPINS Information and will cease to use SPINS Information, and (ii) Bedrock shall promptly return to SPINS or destroy all SPINS Information in its possession or control, without retaining any copies thereof, and Bedrock will promptly destroy all copies of any analyses, compilations, studies or other documents, records or data prepared by Bedrock to the extent that they contain any SPINS Information (other than Improvements), and upon SPINS' request, Bedrock will certify in writing that Bedrock has complied with this subsection.
   b. The "License and Permissible Use", "Ownership", "Confidential Information", "Indemnification", "Enforcement", "Disclaimer of Warranties", "Limitation on Liability" and "General" sections of this Agreement shall survive any termination or expiration of this Agreement.

4. Confidential Information. Bedrock shall treat as confidential all Confidential Information received from SPINS, shall not use such Confidential Information except as expressly permitted under this Agreement, and shall not cause or permit its employees, officers and affiliates to reveal, disclose or otherwise make available such Confidential Information to any third party, except as expressly permitted under this Agreement. Bedrock shall use at least the same degree of care which it uses to prevent the disclosure of its own confidential information, but in no event with less than reasonable care, to prevent the disclosure of Confidential Information.

5. Indemnification. SPINS will indemnify, defend and hold harmless Bedrock and its officers, directors, employees and agents from and against any and all loss, liability, cost, damages and expense, including attorneys' fees, which arise out of or are related to third party claims that SPINS Information or Services infringe upon the intellectual property rights of any third party. Bedrock agrees that if SPINS Information or Services infringe or are alleged to infringe upon any third party intellectual property rights, SPINS at its sole option may (i) obtain at SPINS's expense the right for Bedrock to continue such use of SPINS Information or Services, (ii) modify the SPINS Information or Services in such a way that the SPINS Information or Services are substantially similar but Bedrock's use of the modified SPINS Information or Services does not infringe upon any third party intellectual property rights, or (iii) require Bedrock to stop using the SPINS Information or Services that may be infringing. Bedrock will promptly notify SPINS of any such claim in writing and SPINS will control the defense of such claim.

6. <u>Enforcement</u>. The Parties acknowledge and agree that SPINS would lack an adequate remedy at law and would suffer irreparable injury if the "<u>License and Permissible Use</u>" or "<u>Confidential Information</u>" sections of this Agreement are violated.  In the event of any violation or imminent violation of this Agreement by Bedrock or any of its employees, contractors or agents, SPINS or such a Third Party Licensor shall be entitled to seek injunctive relief as an appropriate remedy, without having to prove irreparable injury, lack of an adequate remedy at law, posting bond or waiving any other rights or remedies. If Bedrock is shown to have breached the "<u>License and Permissible Use</u>" or "<u>Confidential Information</u>" sections of this Agreement, Bedrock will reimburse SPINS for all expenses (including without limitation attorneys' fees and expenses of investigation) incurred by SPINS in enforcing its rights under this Agreement.

7. <u>Disclaimer of Warranties</u>. SPINS DISCLAIMS, ON ITS OWN BEHALF AND ON BEHALF OF THIRD PARTY LICENSORS, AND CLIENT AND BEDROCK WAIVE, ANY AND ALL WARRANTIES OF ANY KIND, WHETHER EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION ANY IMPLIED WARRANTIES OF MERCHANTABILITY, NON-INFRINGEMENT, FITNESS FOR A PARTICULAR PURPOSE, RELIABILITY, OR TIMELINESS OF DELIVERY. ALL SPINS INFORMATION IS PROVIDED BY SPINS ON AN "AS IS" AND "AS AVAILABLE" BASIS. SPINS, ON ITS OWN BEHALF AND ON BEHALF OF THIRD PARTY LICENSORS, DOES NOT WARRANT THAT SPINS INFORMATION WILL BE UNINTERRUPTED OR ERROR FREE.

8. <u>Limitation on Liability</u>. NEITHER SPINS NOR ANY OF ITS THIRD PARTY LICENSORS, SERVICE PROVIDERS OR SUPPLIERS SHALL BE LIABLE FOR ANY INCIDENTAL, SPECIAL, CONSEQUENTIAL OR INDIRECT DAMAGES OF ANY KIND (INCLUDING WITHOUT LIMITATION DAMAGES FOR INTERRUPTION OF BUSINESS, PROCUREMENT OF SUBSTITUTE GOODS, LOSS OF PROFITS, OR THE LIKE) REGARDLESS OF THE FORM OF ACTION, WHETHER IN CONTRACT, TORT (INCLUDING NEGLIGENCE), STRICT PRODUCT LIABILITY OR ANY OTHER LEGAL OR EQUITABLE THEORY, EVEN IF SPINS HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. IN NO EVENT WILL SPINS' AGGREGATE CUMULATIVE LIABILITY FOR ANY CLAIMS ARISING OUT OF OR RELATED TO THIS AGREEMENT (INCLUDING WITHOUT LIMITATION, A FAILURE TO PROVIDE INFORMATION) EXCEED THE GREATER OF (A) $10,000 OR (B) THE AMOUNTS PAID TO SPINS BY BEDROCK PURSUANT TO THIS AGREEMENT IN THE 12 MONTH PERIOD PRECEDING SUCH CLAIM.

9. <u>General</u>.
   a. <u>Authority</u>. Each Party represents and warrants that it has full power and authority to enter into this Agreement and to carry out its obligations hereunder.
   b. <u>Governing Law</u>. This Agreement and the Parties' respective rights and duties shall be interpreted and governed in accordance with the laws of the State of Illinois, regardless of its choice of law principles. Any and all claims arising from this Agreement shall be brought either in the state or federal courts located in Cook County, Illinois, and each Party consents to the jurisdiction of such courts.
   c. <u>Assignment</u>.  Neither Bedrock nor Client may assign this Agreement without the prior written consent of SPINS. Any change of control, merger, sale or lease of all or substantially all of Bedrock's or Client's assets shall be deemed an assignment for purposes of this Agreement. Any attempted assignment in violation of this provision shall be null and void. All terms and conditions of this Agreement shall be binding on and inure to the benefit of the permitted successors and assigns of the Parties.
   d. <u>Entire Agreement</u>. This Agreement constitutes the entire understanding among the Parties regarding the subject matter of this Agreement and supersedes any previous communications, representations or agreements, whether written or oral.  No changes or modifications of any of the terms or conditions of this Agreement shall be valid or binding on either Party unless in writing and signed by an authorized representative of each Party.
   e. <u>Force Majeure</u>. SPINS shall not be liable for any loss, damage or delay resulting from any cause beyond its reasonable control, including, without limitation: fire; flood; action or decree of civil or military authority; insurrection; act of war; threatened or actual terrorism or bioterrorism; or embargo.
   f. <u>Notices</u>. Notices hereunder must be in writing and given to the other Party by in-hand delivery, by first class mail, postage prepaid, or by air courier to the mailing address set forth above or to such other address as either Party may designate, by facsimile, or by e-mail. Notices shall be effective when received.

g.  <u>Status of Parties</u>. This Agreement shall not be construed as creating a joint venture, partnership, agency or any other similar relationship between any two Parties, and no Party shall have any authority to bind or make commitments on behalf of another Party.

**Appendix 1**

Definitions

"<u>Confidential Information</u>" means (i) the terms and conditions of this Agreement and the Client Agreement, (ii) all SPINS Information, including without limitation data and other information provided by Third Party Licensors and included in the SPINS Information, and (iii) any other information disclosed by SPINS to Client or Bedrock, either directly or through a third party, in any form, which is designated as "Confidential," "Proprietary" or some similar designation or which should reasonably be considered to be confidential given the nature of the information or the circumstances of its disclosure. Confidential Information does not, however, include any information which (i) was publicly known and made generally available in the public domain prior to the time of disclosure by SPINS; (ii) becomes publicly known and made generally available through no breach of this Agreement; (iii) is already in the possession of Bedrock at the time of disclosure by SPINS; or (iv) is obtained by Bedrock from a third party without a breach of such third party's obligations of confidentiality; (v) is independently developed by Bedrock without use of or reference to SPINS' Confidential Information; or (vi) is compelled by law to be disclosed by Bedrock, provided that Bedrock gives SPINS prompt written notice of such requirement prior to such disclosure and assistance at SPINS' sole expense in obtaining an order protecting the information from public disclosure.

"<u>Bedrock Work</u>" means information owned by Client and derivatives thereof.

"<u>Improvements</u>" means (a) any modifications, improvements, derivatives, models, updates, enhancements or revisions made to the SPINS Information whether solely by a party, jointly, or jointly with a third party as a result of a party's obligations under or exercise of licenses granted under this Agreement.

"<u>SPINS Information</u>" means, collectively, (i) the SPL, SPL Hierarchy and SPL Attributes, and (ii) the information, data, reports, report templates, tools, products, services and other deliverables provided by SPINS to Client under the Client Agreement.

"<u>SPINS Product Library</u>" or "<u>SPL</u>" means all UPC-level product information owned, licensed, or sublicensed by SPINS, and which will include without limitation: (i) hierarchical classifications of department, category, subcategory, and product type ("<u>SPL Hierarchy</u>"); and (ii) product attributes, including without limitation manufacturer and brand name, product description, and other elements as defined, coded and maintained by SPINS ("<u>SPL Attributes</u>").

"<u>Third Party Licensor</u>" means any third party who has entered into a separate agreement with SPINS pursuant to which the third party's data and other confidential information belonging to the third party has been made available to SPINS and is included in SPINS Information.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**PROOF OF SERVICE**

***Crownalytics, LLC v. SPINS LLC, DAAP***
**U.S.D.C. Case Number __:__-cv--------**

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

      At the time of service, I was over 18 years of age and not a party to this action.  I am employed in the County of Los Angeles, State of California.  My business address is 444 South Flower Street, Suite 1700, Los Angeles, CA 90071-2901.

      On July 22, 2024, I served true copies of the following document(s) described as

- **NOTICE OF MOTION AND MOTION TO COMPEL COMPLIANCE OF SUBPOENA ISSUED TO BEDROCK ANALYTICS LLC; MEMORANDUM OF POINTS AND AUTHORITIES – SUPPORTING DECLARATIONS OF MEGHAN E. TAPAS AND JOHN PAVLENKOF**

- **DEFENDANTS SPINS LLC AND DAAP LLC CERTIFICATION OF INTERESTED ENTITIES OR PERSONS**

on the interested parties in this action as follows:

William J. Frimel              *Attorneys for Respondent*
Christopher R. Edgar         *BEDROCK ANALYTICS CORPORATION*
SEUBERT FRENCH FRIMEL & WARNER LLP
1075 Curtis Street
Menlo Park, CA  94025
Email:  bill@sffwlaw.com
Email:  chris@sffwlaw.com

- **BY MAIL.:**  I enclosed the document(s) in a sealed envelope or package addressed to the persons at the addresses listed in the Service List and placed the envelope for collection and mailing, following our ordinary business practices.  I am readily familiar with the practice of Smith, Gambrell & Russell, LLP for collecting and processing correspondence for mailing.  On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid.  I am a resident or employed in the county where the mailing occurred.  The envelope was placed in the mail at Los Angeles, California.

- **BY E-MAIL OR ELECTRONIC TRANSMISSION**:  I caused a copy of the document(s) to be sent from e-mail address vmills@sgrlaw.com to the persons at the e-mail addresses listed in the Service List.  I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

      I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court

1

**PROOF OF SERVICE**

at whose direction the service was made.

Executed on July 22, 2024, at Los Angeles, California.

*/s/ Verastine Mills*
Verastine Mills

2
**PROOF OF SERVICE**